UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| JOHN CARR | ) | |
|     Plaintiff | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO: 05-10445MLW |
| | ) | |
| SIEMENS DEMATIC CORP. | ) | |
| AND AMEC CONSTRUCTION | ) | |
| MANAGEMENT, INC. | ) | |
|     Defendants | ) | |

**MEMORANDUM IN SUPPORT OF THE PLAINTIFF'S MOTION TO COMPEL THE
PRODUCTION OF DOCUMENTS AND FURTHER 30(B)(6) TESTIMONY BY THE
DEFENDANT, SIEMENS DEMATIC CORP.**

**Introduction**

Pursuant to Rule 37 of the Federal Rules of Civil Procedure, the Plaintiff, John Carr,
moves to compel the Defendants, Siemens Dematic Corp. ("Siemens") and AMEC Construction
Management, Inc. ("AMEC") to produce certain documents as well as certain 30(b)(6) testimony.
The instant Motion is the result of the Defendants continued refusal to comply with their
discovery obligations.

The present action stems from an industrial accident that took place at Logan Airport,
Terminal E, on or about February 19, 2003, in which the Plaintiff, a union millwright, sustained
severe personal injuries in the course of installing and testing a conveyor belt system at the
terminal.  The 30(b)(6) deposition of the Defendant, Siemens, was originally noticed for Friday,
February 24, 2006 and then re-noticed for July 28, 2006.  (Exhibit 1, Plaintiff's Re-Notice of
Taking 30(b)(6) Deposition of Defendant, Siemens Dematic Corp.)

**Production of Contracts**

In the notice, the Plaintiff made unambiguous requests that Siemens' 30(b)(6) designee be
knowledgeable with respect to "[t]he contract between [Siemens] and any other entity relative to
the Logan Airport Terminal E project."  (Exhibit 1 at No. 4)  Moreover, the Schedule A served

1

requested that Siemens' (30(b)(6) designee bring with him the following documentation relative to contractual obligations on the Terminal E project:

"[a]ny and all contracts, other documents, or memoranda relative to any work performed at the Logan Airport Terminal E job site, including, but not limited to, (a) the contract between [Siemens] and the Plaintiff's employer, if any; (2) the contracts between [Siemens] and any and all sub-contractors peforming installation of machines on the project; (3) the contract between [Siemens] and the owner; (4) any other contracts to which [Siemens] was a party." (Exhibit 1 at No. 20.)

Despite the indisputable relevance and the reasonable anticipation of admissibility of the very contracts controlling the performances and obligations of the parties involved in the project in which the Plaintiff was injured, counsel for Siemens objected to these requests, as they did nearly every request, on grounds that they were overly broad and burdensome and not narrowly tailored to lead to the discovery of admissible evidence. (Exhibit 2, April 24, 2006 correspondence.)

Additionally, pursuant to Fed. R. Civ. P. 26(a)(1) and Local Rule 26.2(A), Siemens was obligated to provide a copy or description of all documents, data compilations, and tangible things in the possession, custody and control of the party that are relevant to the disputed facts alleged with particularity in the pleadings. In its disclosure, Siemens failed to delineate any contract of any type, despite the fact that all contracts related to Siemens' work at the site would have clear relevance to the allegations in the Plaintiff's complaint as the allegations were rooted in Siemens' obligations with respect to the conveyor system at the Logan Airport Terminal E project. (Exhibit 3, Siemens' Automatic Disclosures.)

In spite of numerous requests, as well as obligations pursuant to the Federal Rules of Civil Procedure, Siemens failed to produce contracts responsive to the Plaintiff's requests in this case. As of approximately September of 2006, Siemens did produce about 4 boxes of documents, its first document production of any type, which contained the following contracts:

1.    April 19, 1999 Subcontract Agreement between Siemens and Modern Continental Construction Co., Inc. ("Modern"), the original general contractor at the project

2

site.  (Exhibit 4, Subcontract between Modern and Siemens (face sheet only).) The Siemens 30(b)(6) designee later testified that, prior to the Plaintiff's accident, Modern ceded all control over the conveyor installation, i.e., the portion of the project in which the Plaintiff was injured.  (Exhibit 5, Depo. Tr. at 163.) Therefore this contract is immaterial to this case.

2. December 6, 1999 and December 6, 2001 Subcontract Agreements between Mannesmann Dematic Rapistan Corp., a/k/a, Siemens and Lone Star Installation/Maintenance, Inc. ("Lone Star").  (Exhibit 6, Subcontracts between Siemens and Lone Star (face sheets only).)  According to Siemens' 30(b)(6) designee, Lone Star went bankrupt in roughly June of 2001, about a year and half before the Plaintiff's accident. (Exhibit 7, Depo. Tr. at 32.)  Therefore these contracts are both immaterial to this case.

3. April 23, 2002 Subcontract Agreement between Siemens and Edward G. Sawyer Co., Inc. ("E.G. Sawyer").  (Exhibit 8, Subcontract Agreement between Siemens and E.G. Sawyer (face sheet only).)  This contract, while relevant, concerns only electric subcontractor work, and therefore represents only a small portion of Siemens' overall responsibilities and obligations on site.

Furthermore, despite the Plaintiff's request that Siemens produce a 30(b)(6) designee knowledgeable about the contractual obligations of Siemens as pertaining to the subject job site, the 30(b)(6) designee testified that he knew nothing about Siemens' contracts.  (Exhibit 9, Depo. Tr. at 55.)

As such, the Plaintiff still remains without the contracts that dictated Siemens rights, obligations, and responsibilities with respect to its work on the conveyor system in Terminal E of Logan Airport on or about February 19, 2003.  This lack of production represents a contravention of Siemens obligations pursuant to the Federal Rules of Civil Procedure and the Plaintiff respectfully requests that this Honorable Court compel said production.

**<u>Production of Documents Related to Safety</u>**

The Plaintiff also requested that the Siemens' 30(b)(6) designee bring with him to his deposition copies of documents related to safety at the job site. (Exhibit 1.) While Siemens' 30(b)(6) designee did not comply with this request, Siemens did produce the semblance of a safety manual prior to said deposition. To that effect, Siemens produced the face sheet of its Automation Division Safety Policy and Manual. However, the production contained only the face sheet and a few scattered pages from the manual, none of which covered substantive safety issues, concerns, instructions, etc. (Exhibit 10, Siemens Safety Policy Manual.) Siemens 30(b)(6) designee testified that he recalled having seen the manual in its entirety while he worked on the subject job site, and that the scattering of pages that Siemens produced to the Plaintiff "[d]oesn't seem like the one I saw." (Ex. 11, Depo. Tr. at 225-233.)

Therefore, again in violation of the Federal Rules of Civil Procedure, its 30(b)(6) responsibilities, and its Automatic Disclosure obligations, Siemens has not produced its safety manual that was given to its employees and that was in effect at the time of the Plaintiff's accident. Accordingly, the Plaintiff respectfully moves the Court to compel the production of the Siemens Safety Policy Manual in its entirety as was in effect as of February 19, 2003, as well as any and all other documents that pertained to job site safety in the same time frame.

**<u>Further 30(b)(6) Testimony</u>**

This case involves allegations that certain segments of the conveyor belt being installed at Logan Airport Terminal E were turned on unexpectedly and that occurrence was the proximate cause of the Plaintiff's injuries. At the time of the accident, Siemens employees were running tests on the functionality of the conveyor system. Accordingly, the Plaintiff's 30(b)(6) notice requested that Siemens 30(b)(6) designee have knowledge of the work being done on the computer logic and/or in the control room at the time of the Plaintiff's accident. (Exhibit 1 at Nos. 5, 21, 22.)

The Siemens employees were testing the conveyor system using a computer logic system

4

located in a control room that was situated on site.  At the time, the audio and visual delayed alarms were not operational allegedly due to either lack of electrical supply or a computer logic/control room override.  (Exhibit 12, Depo. Tr. at 218-25, 306-12.)   In the course of Siemens' 30(b)(6) deposition, Mr. Richard Reinecke testified that, again in contravention of the Plaintiff's 30(b)(6) notice, he, as the 30(b)(6) designee of Siemens did not possess any knowledge as to whether the alarms were operational as of February 19, 2003.  Mr. Reinecke testified that the Siemens individual who possessed the most knowledge as to the electrical and/or computer logic and the control room operations would be Gary Clinkscales, who was the Siemens electrical superintendent on site at the time of the Plaintiff's accident.   (Exhibit 13, Depo. Tr. at 105, 297, 312-13.)

Subsequently, counsel for Siemens has agreed to produce Mr. Clinkscales for deposition, to take place at Siemens' headquarters in Texas.   It is the Plaintiff's understanding the **Mr. Clinkscales is the individual at Siemens with the most knowledge relative to the electrical and computer logic operations in and around the control room at the Terminal E Logan Airport project as of February 19, 2003**.  Further, it is the Plaintiff's understanding that, pursuant to the Federal Rules of Civil Procedure, Siemens is obligated to produce for its further 30(b)(6) deposition in Texas the person with the most knowledge as to the electrical and computer logic operations in and around the control room at said project **whether that individual be Gary Clinkscales or another person**.

Additionally, also pursuant to its aforementioned discovery obligations, the Defendant is obligated to produce at said deposition any and all documents related to the electrical and/or computer logic operations in the control room as of the time of the accident, including, but not limited to any blueprints, diagrams, work orders, meeting minutes, and/or any other documents so related.

Therefore, the Plaintiff respectfully requests that the Court order Siemens to produce the Siemens employee, agent, or representative with the most knowledge regarding the policies,

procedures, and happenings relative to the electrical, computer logic, and/or the control room operations being tested by Siemens as of February 19, 2003.

## **Conclusion**

WHEREFORE, the Plaintiff prays that this Honorable Court grant his Motion to Compel the production of documents by entering an Order mandating that Siemens produce any and all contracts in existence between itself and any other entity that were in effect as of February 19, 2003, as well as any and all documents related to safety generally and in connection with Siemens employees specifically, including, but not limited to, the Safety Policy Manual as noted above. Further, the Plaintiff respectfully requests that the Court Order the Defendant, Siemens, to produce in Texas the individual with the most knowledge relative to electrical, computer logic, and/or control room operations as of February 19, 2003 for further 30(b)(6) testimony.

Respectfully Submitted,
The Plaintiff, John Carr,
By his Attorney,

/s/ Brian C. Dever
Brian C. Dever
BBO# 544203
KECHES & MALLEN, P.C.
122 Dean Street
Taunton, MA   02780

6

# UNITED STATES DISTRICT COURT
## FOR THE
## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| **JOHN CARR** | ) | **CIVIL ACTION NO: 05-10445-MLW** |
|     Plaintiff | ) | |
| **v.** | ) | |
| | ) | |
| **SIEMENS DEMATIC CORP.** | ) | |
| **AND AMEC CONSTRUCTION** | ) | |
| **MANAGEMENT, INC.** | ) | |
|     Defendants | ) | |

## PLAINTIFFS' RE-NOTICE OF TAKING 30(b)(6) DEPOSITION OF DEFENDANT, SIEMENS DEMATIC CORP.

Notice is hereby given that on **Friday, July 28, 2006 at 10:00 a.m.** at the office of Keches & Mallen, P.C., 122 Dean Street, Taunton, Massachusetts, the plaintiff will take the deposition upon oral examination of **Rick Reineke, designee for Siemens Dematic Corp.,** of the following matters pursuant to Fed. R. Civ. P. 30(b)(6):

DEFINITION:

      "Computer Logic" - The computer program and/or code which effects the way in which a luggage conveyor operates and/or interacts with other pieces of equipment.

1. The facts and circumstances surrounding the Plaintiff's accident of February 19, 2003
2. The policies and procedures employed by the defendant with respect to posting warning signs regarding hazardous conditions or the jobsite.
3. The policies and procedures employed by the defendant with respect to the supervision of the installation of the conveyer machine on the jobsite located in Logan Airport, Boston, Massachusetts.
4. The contract between the defendant and any other entity relative to the Logan Airport Terminal E project.
5. The identity of employees/agents of the defendant with supervisory responsibilities for the installation of the conveyer machines on the Logan Airport Terminal E project including work done on the computer logic of said machine.
6. The identity of employees/agents of the defendant with supervisory responsibilities for the installation of the conveyer machines on the Logan Airport Terminal E project including the implementation of lock out/tag out procedures on the conveyor machines on the Logan Airport Terminal E project.

7. The preparation of any reports of injury filed by or on behalf of Siemens Dematic Corp. and the information contained therein, which have John Carr's accident of February 19, 2003 as their subject matter.

8. The preparation and/or generation of any and all investigative reports by any person or entity which has John Carr's accident as the subject matter.

9. The taking of any statement, written or oral, from any witnesses to John Carr's accident.

10. The schedule of work performed by on the project including but not limited to daily progress of the work.

11. The names of any employees of Siemens Dematic Corp. including, but not limited to, the name of the employees with responsibilities for supervising any work being done on the subject conveyer belt or computer logic program on the date of the Plaintiff's accident.

12. Any and all guidelines, instructions, warnings, or policies issued to the defendant relative to job safety on the on the Logan Airport Terminal E project.

13. Any and all incidents involving the subject conveyer machine at the Logan Airport Terminal E project.

14. The identities of any and all entities and/or persons for the defendant with responsibilities for inspecting the job site for safety concerns.

15. The identities of any and all independent contractors responsible for supervising the installation of the conveyer machines on the Logan Airport Terminal E project.

16. The identity of any and all persons who were servants, agents, or employees of the defendant who conversed with the Plaintiff on the subject job site from February 1, 2003 to February 19, 2003.

17. The issuance of any citations, warnings, or instructions to the defendant or any subcontractor relative to the supervision of the installation of the conveyer machine on the Logan Airport Terminal E project.

18. Any and all complaints of injury made to the defendant involving lock out/tag out procedures and/or implementation and/or requests for locks on the Logan Airport Terminal E project.

19. The scheduling of the work at Logan Airport Terminal E project.

20. The substance of all discussions held regarding the supervision of the installation of the conveyer machines during safety meetings, including any discussions regarding the lock out/tag out procedures, locks and/or the effect of working being conducted on the computer logic of the luggage conveyors.

21. The way in which the computer logic controls, relates to, effects or otherwise communicates with the luggage conveyors on Terminal E of Logan Airport.

22. The scope of any work being performed on the computer logic in the five days prior to the

## SCHEDULE A

1. Copies of any and all written statements, signed or unsigned, and/or copies of any and all verbatim written transcriptions of any and all statements of the Defendant taken on a recording device, which are in the possession, custody or control of the Defendant or the Defendant's attorney(s).

2. Copies of any and all written statements, signed or unsigned, and/or copies of any and all verbatim written transcriptions of any and all statements of any and all witnesses to the accident taken on a recording device, which are in the possession, custody or control of the Defendant or the Defendant's attorney(s).

3. Copies of any and all written statements, signed or unsigned, and/or copies of any and all verbatim written transcriptions of any and all statements of the Plaintiff taken on a recording device, which are in the possession, custody or control of the Defendant or the Defendant's attorney(s).

4. Any and all photographs which depict the location of the accident which forms the basis of this action and any and all photographs of the water accumulation on the floor from the beginning of the project to the present.

5. Copies of any and all charts, maps, diagrams, blueprints, or drawings which depict the area where the Plaintiff alleges he was injured.

6. All letters and statements of any kind whatsoever in the possession, custody or control of the Defendant, its agents, servants and/or employees which notified said Defendant of the accident alleged in the Plaintiff's Complaint.

7. All reports of injury filed with or by the Defendant which have John Carr's industrial accident of February 19, 2003 as their subject matter.

8. The minutes of all safety meetings conducted at the job site for one year before the Plaintiff's accident to the present.

9. Any and all correspondence between the Defendant and O.S.H.A. which has John Carr's industrial accident as its subject matter.

10. All correspondence between the Defendant and O.S.H.A. which has job safety as its subject matter.

11. All correspondence between the Defendant and any person or entity which has John Carr's industrial accident as its subject matter.

12. All accident reports generated by any person or entity which have John Carr's industrial accident as their subject matter.

13. All investigative reports generated by any person or entity which have John Carr's industrial accident as their subject matter.

14. All correspondence between the Defendant and any federal, state, municipal, or administrative agency which has John Carr's industrial accident as its subject matter.

15. All directives, memoranda, postings, and other documents which have the supervision of

- 4 -

installation of conveyer machines on the Logan Airport Terminal E project as their subject matter.

16.  All directives, memoranda, postings, and other documents which have the supervision of work on the Logan Airport Terminal E project as their subject matter.

17.  Any work schedules, directives, memoranda, postings or employee lists which indicate the name of the employee(s), agent(s) or servant(s) of the Defendant responsible for safety at the job site.

18.  Any and all surveillance and/or investigative videotapes and/or photographs depicting the Plaintiff.

19.  Any and all documents which the Defendant intends to introduce as evidence in a trial of this action.

20.  Any and all contracts, other documents, or memoranda relative to any work performed at the Logan Airport Terminal E job site, including by not limited to:

   a)  The contract between the Defendant and the Plaintiff's employer, if any;
   b)  The contracts between the Defendant and any and all sub contractors performing installation of machines on the project;
   c)  The contract between the Defendant and the owner;
   d)  Any other contracts to which the Defendant was a party.

21.  Any and all policies of insurance, including but not limited to coverage selection pages or declaration sheets, or any other agreements under which the Defendant or any other entity may be liable to satisfy, in whole or in part, any judgment which may be entered in the instant litigation or to indemnify any other party as a result of the act alleged in the Plaintiff's Complaint.

22.  All documents reflecting any work being performed in the area where the Plaintiff alleges his accident occurred from 2 months prior to his alleged accident date of February 19, 2003 through the present.

23.  All documents reflecting the scheduling of any work relative to contracts at Logan Airport Terminal E project.

24.  Copies of any and all charts, maps, schematics, diagrams, blueprints, and/or drawings of any kind which depict, refer to and/or in any manner relate to the premises upon which the Plaintiff claims to have been injured.

You are invited to attend and cross-examine.

Respectfully Submitted,
The Plaintiff,
By His Attorney,

Daniel M.  Surprenant
BBO# 634616
KECHES & MALLEN, P.C.
122 Dean Street
Taunton, MA  02780
(508) 822-2000

- 5 -



ROPES & GRAY LLP

ONE INTERNATIONAL PLACE     BOSTON, MA 02110-2624     617-951-7000     F 617-951-7050

BOSTON     NEW YORK     PALO ALTO     SAN FRANCISCO     WASHINGTON, DC     www.ropesgray.com

April 24, 2006

Gabriel D. O'Malley
(617) 951-7656
gabriel.o'malley@ropesgray.com

**BY MAIL AND FACSIMILE**

Daniel M. Surprenant, Esq.
Keches & Mallen, P.C.
122 Dean Street
Taunton, MA 02780

Re:     Carr v. Siemens Dematic Corp., et al
        USDC C.A. No. 05-10445MLW
        <u>Our File No.: 00965.00220</u>

Dear Dan:

I write with respect to Plaintiff, John Carr's, Fed. R. Civ. P. 30(b)(6) Deposition Notice for a corporate representative for Siemans Dematic Corp ("Siemans"). As you know, we represent Siemans in the above-captioned matter.

Certain of the topics on which testimony is sought are objectionable. I will address our specific objections to each topic in the Notice in the order in which they appear. Siemans reserves the right to assert further objections at the time of, or prior to, the deposition.

**Topic 2:**

Siemans objects to this topic on the grounds that it is vague, ambiguous, and overbroad. Siemans objects to the term "jobsite" as vague and ambiguous, and interprets it to encompass that area of Logan Airport Terminal E where Plaintiff's accident occurred. Siemans further objects to this topic to the extent that it calls for information that does not specifically relate to the conveyors at Logan Airport Terminal E on the grounds that such information is irrelevant and/or immaterial and not reasonably calculated to lead to the discovery of admissible evidence.

**Topic 3:**

Siemans objects to this topic on the grounds that it is overly broad and burdensome. Siemans objects to this topic on the grounds that any inquiries that are not limited in time to the date of Plaintiff's accident and a reasonable time period preceding Plaintiff's accident are irrelevant and/or immaterial and not reasonably calculated to lead to the discovery of admissible evidence.

Daniel M. Suprenant, Esq.　　　　　　　　- 2 -　　　　　　　　　　April 24, 2006

**Topic 4:**

Siemans objects to this topic on the grounds that it is overly broad and burdensome. Siemans objects to this topic to the extent that it calls for information that does not specifically relate to the conveyors at Logan Airport Terminal E on the grounds that such information is irrelevant and/or immaterial and not reasonably calculated to lead to the discovery of admissible evidence.

**Topic 5:**

Siemans objects to this topic on the grounds that it is vague, overly broad, and burdensome. Siemans objects to this topic on the grounds that the term "supervisory responsibilities" is vague and on the grounds that the topic calls for a legal conclusion. Siemans further objects to this topic on the grounds that any inquiries that are not limited in time to the date of Plaintiff's accident and a reasonable time period preceding Plaintiff's accident are irrelevant and/or immaterial and not reasonably calculated to lead to the discovery of admissible evidence.

**Topic 6:**

Siemans objects to this topic on the grounds that it is vague, overly broad, and burdensome. Siemans objects to this topic on the grounds that the term "supervisory responsibilities" is vague and on the grounds that the topic calls for a legal conclusion. Siemans further objects to this topic on the grounds that any inquiries that are not limited in time to the date of Plaintiff's accident and a reasonable time period preceding Plaintiff's accident are irrelevant and/or immaterial and not reasonably calculated to lead to the discovery of admissible evidence.

**Topic 10:**

Siemans objects to this topic on the grounds that it is overly broad and burdensome. Siemans objects to this topic on the grounds that any inquiries that are not limited in time to the date of Plaintiff's accident and a reasonable time period preceding Plaintiff's accident are irrelevant and/or immaterial and not reasonably calculated to lead to the discovery of admissible evidence. Siemans further objects to this topic to the extent that it calls for information that does not relate specifically to the conveyors at Logan Airport Terminal E on the grounds that such information is irrelevant and/or immaterial and not reasonably calculated to lead to the discovery of admissible evidence.

**Topic 11:**

Siemans objects to the term "subject conveyor belt" as vague and ambiguous.

Daniel M. Suprenant, Esq.             - 3 -                         April 24, 2006

**Topic 12:**

Siemans objects to this topic on the grounds that it is overly broad and burdensome. Siemans objects to this topic on the grounds that any inquiries that are not limited in time to the date of Plaintiff's accident and a reasonable time period preceding Plaintiff's accident are irrelevant and/or immaterial and not reasonably calculated to lead to the discovery of admissible evidence. Siemans further objects to this topic to the extent that it calls for information that does not specifically relate to the conveyors at Logan Airport Terminal E on the grounds that such information is irrelevant and/or immaterial and not reasonably calculated to lead to the discovery of admissible evidence.

**Topic 13:**

Siemans objects to the terms "incidents" and "subject conveyor machine" as vague and ambiguous. Siemans objects to this topic on the grounds that any inquiries that are not limited in time to the date of Plaintiff's accident and a reasonable time period preceding Plaintiff's accident are irrelevant and/or immaterial and not reasonably calculated to lead to the discovery of admissible evidence.

**Topic 14:**

Siemans objects to this topic on the grounds that it is overly broad and burdensome. Siemans further objects to this topic to the extent that it calls for information that does not relate to the conveyors at Logan Airport Terminal E on the grounds that such information is irrelevant and/or immaterial and not reasonably calculated to lead to the discovery of admissible evidence.

**Topic 15:**

Siemans objects to this topic on the grounds that any inquiries that are not limited in time to the date of Plaintiff's accident and a reasonable time period preceding Plaintiff's accident are irrelevant and/or immaterial and not reasonably calculated to lead to the discovery of admissible evidence.

**Topic 17:**

Siemans objects to this topic on the grounds that any inquiries that are not limited in time to the date of Plaintiff's accident and a reasonable time period preceding Plaintiff's accident are irrelevant and/or immaterial and not reasonably calculated to lead to the discovery of admissible evidence.

**Topic 18:**

Daniel M. Suprenant, Esq.                    - 4 -                    April 24, 2006

Siemans objects to this topic on the grounds that any inquiries that are not limited in time to the
date of Plaintiff's accident and a reasonable time period preceding Plaintiff's accident are
irrelevant and/or immaterial and not reasonably calculated to lead to the discovery of admissible
evidence.

**Topic 19:**

Siemans objects to this topic on the grounds that any inquiries that are not limited in time to the
date of Plaintiff's accident and a reasonable time period preceding Plaintiff's accident are
irrelevant and/or immaterial and not reasonably calculated to lead to the discovery of admissible
evidence. Siemans further objects to this topic to the extent that it calls for information that does
not specifically relate to the conveyors at Logan Airport Terminal E on the grounds that such
information is irrelevant and/or immaterial and not reasonably calculated to lead to the discovery
of admissible evidence.

**Topic 20:**

Siemans objects to this topic on the grounds that any inquiries that are not limited in time to the
date of Plaintiff's accident and a reasonable time period preceding Plaintiff's accident are
irrelevant and/or immaterial and not reasonably calculated to lead to the discovery of admissible
evidence.

**Topic 21:**

Siemans objects to this topic on the grounds that any inquiries that are not limited in time to the
date of Plaintiff's accident and a reasonable time period preceding Plaintiff's accident are
irrelevant and/or immaterial and not reasonably calculated to lead to the discovery of admissible
evidence.

**Topic 23:**

Siemans objects to this topic on the grounds that any inquiries that are not limited in time to the
date of Plaintiff's accident and a reasonable time period preceding Plaintiff's accident are
irrelevant and/or immaterial and not reasonably calculated to lead to the discovery of admissible
evidence.

*********************************

With respect to Schedule A, attached to the Notice, certain of the requests for documents are
objectionable. I will address our specific objections to each request in the Notice in the order in
which they appear. Siemans reserves the right to assert further objections at the time of, or prior
to, the deposition.

9878308_11.DOC

Daniel M. Suprenant, Esq.                  - 5 -                  April 24, 2006

**Request 1:**

Siemans objects to this request to the extent that it calls for information that does not specifically relate to Plaintiff's accident on the grounds that such information is irrelevant and/or immaterial and not reasonably calculated to lead to the discovery of admissible evidence.

**Request 3:**

Siemans objects to this request to the extent that it calls for information that does not specifically relate to Plaintiff's accident on the grounds that such information is irrelevant and/or immaterial and not reasonably calculated to lead to the discovery of admissible evidence.

**Request 4:**

Siemans objects to this request on the grounds that any inquiries that are not limited in time to the date of Plaintiff's accident and a reasonable time period preceding Plaintiff's accident are irrelevant and/or immaterial and not reasonably calculated to lead to the discovery of admissible evidence.

**Request 5:**

Siemans objects to this request on the grounds that any inquiries that are not limited in time to the date of Plaintiff's accident and a reasonable time period preceding Plaintiff's accident are irrelevant and/or immaterial and not reasonably calculated to lead to the discovery of admissible evidence.

**Request 8:**

Siemans objects to this request on the grounds that any inquiries that are not limited in time to the date of Plaintiff's accident and a reasonable time period preceding Plaintiff's accident are irrelevant and/or immaterial and not reasonably calculated to lead to the discovery of admissible evidence.

**Request 10:**

Siemans objects to this request on the grounds that any inquiries that are not limited in time to the date of Plaintiff's accident and a reasonable time period preceding Plaintiff's accident are irrelevant and/or immaterial and not reasonably calculated to lead to the discovery of admissible evidence. Siemans further objects to this request to the extent that it calls for information that does not specifically relate to the conveyors at Logan Airport Terminal E on the grounds that

Daniel M. Suprenant, Esq.                    - 6 -                    April 24, 2006

such information is irrelevant and/or immaterial and not reasonably calculated to lead to the discovery of admissible evidence.

**Request 15:**

Siemans objects to this request on the grounds that any inquiries that are not limited in time to the date of Plaintiff's accident and a reasonable time period preceding Plaintiff's accident are irrelevant and/or immaterial and not reasonably calculated to lead to the discovery of admissible evidence.

**Request 16:**

Siemans objects to this request on the grounds that any inquiries that are not limited in time to the date of Plaintiff's accident and a reasonable time period preceding Plaintiff's accident are irrelevant and/or immaterial and not reasonably calculated to lead to the discovery of admissible evidence. Siemans further objects to this request to the extent that it calls for information that does not specifically relate to the conveyors at Logan Airport Terminal E on the grounds that such information is irrelevant and/or immaterial and not reasonably calculated to lead to the discovery of admissible evidence.

**Request 17:**

Siemans objects to this request on the grounds that any inquiries that are not limited in time to the date of Plaintiff's accident and a reasonable time period preceding Plaintiff's accident are irrelevant and/or immaterial and not reasonably calculated to lead to the discovery of admissible evidence. Siemans further objects to this request to the extent that it calls for information that does not specifically relate to the conveyors at Logan Airport Terminal E on the grounds that such information is irrelevant and/or immaterial and not reasonably calculated to lead to the discovery of admissible evidence.

**Request 19:**

Siemans objects to this request on the grounds that it is premature.

**Request 20:**

Siemans objects to each subpart of the request on the grounds that any inquiries that are not limited in time to the date of Plaintiff's accident and a reasonable time period preceding Plaintiff's accident are irrelevant and/or immaterial and not reasonably calculated to lead to the discovery of admissible evidence. Siemans further objects to the request to the extent that it calls for information that does not specifically relate to the conveyors at Logan Airport Terminal E on the grounds that such information is irrelevant and/or immaterial and not reasonably calculated to lead to the discovery of admissible evidence.

9878308_11.DOC

Daniel M. Suprenant, Esq.          - 7 -          April 24, 2006

**Request 23:**

Siemans objects to this request on the grounds that any inquiries that are not limited in time to the date of Plaintiff's accident and a reasonable time period preceding Plaintiff's accident are irrelevant and/or immaterial and not reasonably calculated to lead to the discovery of admissible evidence. Siemans further objects to this request to the extent that it calls for information that does not specifically relate to the conveyors at Logan Airport Terminal E on the grounds that such information is irrelevant and/or immaterial and not reasonably calculated to lead to the discovery of admissible evidence.

**Request 24:**

Siemans objects to this request on the grounds that any inquiries that are not limited in time to the date of Plaintiff's accident and a reasonable time period preceding Plaintiff's accident are irrelevant and/or immaterial and not reasonably calculated to lead to the discovery of admissible evidence. Siemans further objects to this request to the extent that it calls for information that does not specifically relate to the conveyors at Logan Airport Terminal E on the grounds that such information is irrelevant and/or immaterial and not reasonably calculated to lead to the discovery of admissible evidence.

Subject to, and without waiving, the objections set forth above, Richard Reinecke will be the Siemans designee for the topics set forth in the Notice. I am available to discuss the objections set forth above at your convenience.

Sincerely,

Gabriel O'Malley

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JOHN CARR, <br><br> Plaintiff <br><br> v. <br><br> SIEMENS DEMATIC CORP. and <br><br> AMEC CONSTRUCTION MANAGEMENT, INC., <br><br> Defendants | CIVIL ACTION NO. 05-10445MLW |

### DEFENDANT'S, SIEMENS DEMATIC CORPORATION AUTOMATIC REQUIRED DISCLOSURES PURSUANT TO FED. R. CIV. P. RULE 26(a)(1) and LOCAL RULE 26.2(A)

Defendant, Siemens Dematic Corp., hereby complies with its initial disclosure requirements pursuant to Fed. R. Civ. P. 26 and L.R. 26.2:

**(A) The name and, if known, the address and telephone number of each individual likely to have discoverable information relevant to the disputed facts and alleged with particularity in the pleadings, identifying the subjects of the information:**

Discovery has just begun and the defendant has not yet determined all the identities, addresses and telephone numbers of individuals likely to have discoverable information relevant to disputed facts alleged with particularity in the pleadings. At this time, the defendants identify the following individuals:

a. John Carr, Plaintiff;
b. William T. Carr, Shaughnessy Millwrights, 341 D St., South Boston;
c. Francis Ryan, Shaughnessy Millwrights, 341 D St., South Boston;
d. Robert Garrity, Shaughnessy Millwrights, 341 D St., South Boston;
e. Eric Cameron, Shaughnessy Millwrights, 341 D St., South Boston;
f. Jeffrey McLaughlin, Siemens Dematic Corp., Dallas, Texas;
g. Johnny Daly, Siemens Dematic Corp., Dallas, Texas.

The defendant contends these witnesses may have relevant information to the claims made in the plaintiff's complaint. Some of the witnesses listed were present when the incident occurred. In addition, some of the witnesses listed were involved with the construction project and were notified of the incident after it occurred.

**(B) A copy of, or a description by category and location of, all documents, data compilations, and tangible things in the possession, custody and control of the**

43079.1

party that are relevant to disputed facts alleged with particularity in the pleadings:

Discovery has just begun and the defendant has not determined all of the documents, data compilations, and tangible things that are relevant to disputed facts alleged with particularity in the pleadings. At this time, the defendant identifies the following categories of documents may be used to support its defenses.

    a.    Employer's First Report of Injury;
    b.    Insurer's Notification of Payment;
    c.    Shaughnessy Employee Accident Report;
    d.    Shaughnessy Accident Report-Eye Witness Accounts;
    e.    Shaughnessy Supervisors Accident Investigation Report;
    f.    AMEC Injury Report;
    g.    All lock out tag out procedures in place at the time of the incident.

The defendants reserve the right to supplement the above items during or at the close of discovery in this action. Furthermore, the defendant states that any and all non-objectionable, responsive documents will be produced to the plaintiff in accordance with requests pursuant to F.R.C.P. 34.

**(C) A computation of any category of damages claimed by the disclosing party, making available for inspection and copying under Rule 34 the documents or other evidentiary material, not privileged or protected from disclosure, on which such computation is based, including materials bearing on the nature and extent of injuries suffered:**

Not applicable.

**(D) For inspection and copying under Rule 34 any insurance agreement under which any person carrying on an insurance business may be liable to satisfy part or all of a judgment which may be entered in the action or to indemnify or reimburse for payments made to satisfy the judgment:**

The defendant will make available for inspection and copying relevant information concerning applicable insurance coverage.

Respectfully submitted,
SIEMENS DEMATIC CORP.
By Its Attorneys,

Maynard M. Kirpalani, BBO#273940
Carey Bertrand, BBO#650496
Wilson, Elser, Moskowitz,
    Edelman & Dicker, LLP

43079.1

155 Federal Street
Boston, MA 02110
(617) 422-5300

Date: October 3, 2005

## CERTIFICATE OF SERVICE

I, Carey L. Bertrand, hereby certify that a true copy of the foregoing *document* was served upon all counsel of record by forwarding a copy of the same, first class mail, postage prepaid on this 3rd day of October 2005 to:

Matthew M. Burke
Ropes & Gray
1 International Place
Boston, MA

Brian C. Dever
Daniel M. Surprenant
Keches & Mallen, P.C.
122 Dean Street
Taunton, MA 02780

Carey L. Bertrand

43079.1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JOHN CARR, )<br><br>Plaintiff, )<br><br>v. )<br><br>SIEMENS DEMATIC CORP., et al., )<br><br>Defendants. ) | Civil Action No. 05-10445-RBC |

### DEFENDANT SIEMANS DEMATIC CORP.'S
### UPDATED RULE 26(A)(1) AUTOMATIC DISCLOSURES

Pursuant to Rule 26(a)(1) of the Federal Rules of Civil Procedure and the Scheduling

Order dated September 12, 2005 in the above-referenced action, Defendant Siemans Dematic

Corp. ("Siemans"), by its undersigned attorneys, makes the following updated initial disclosures

pursuant to Rule 26(a)(1) of the Federal Rules of Civil Procedure and the Joint Rule 26(f) Report

filed by the parties with the Court on September 2, 2005. The following information reflects the

current knowledge of AMEC and its attorneys at this stage of the litigation. Siemans reserves

the right to amend or supplement these disclosures as appropriate, but does not undertake to do

so except as required by Rule 26(e) of the Federal Rules of Civil Procedure.

    A.     The name and, if known, the address and telephone number of each individual
likely to have discoverable information that the disclosing party may use to support its claims or
defenses, unless solely for impeachment, identifying the subjects of the information:

Siemans hereby discloses the following names of individuals likely to have discoverable information that may be used by AMEC to support its defenses and, if applicable, claims in the above-captioned matter:

1.    Richard Reneicke.  Phone Number:  203-948-8441.

SIEMANS DEMATIC CORP.

By its attorney,

Matthew M. Burke (BBO # 557281)
Gabriel D. O'Malley (BBO# 651432)
ROPES & GRAY LLP
One International Place
Boston, Massachusetts 02110
(617) 951-7000

Dated:  September 12, 2006

-2-

# MODERN CONTINENTAL

_____ 0 Memorial Drive, Cambridge, Massachusetts 02139    ■    Telephone: (617) 864-6300   Fax: (617)864-8766

*MCC Job No. 9903*
*Logan Modernization, International Gateway – Terminal Package*
*Rapistan Systems*
*April 21, 1999*
*- Revised -*

## SUBCONTRACT AGREEMENT

*AGREEMENT* made at CAMBRIDGE, Massachusetts, this _TWENTY FIRST_ day of _APRIL_ , 19 _99_ ,
*BY AND BETWEEN* MODERN CONTINENTAL CONSTRUCTION COMPANY, INC. a duly organized Massachusetts
corporation with a usual place of business at SIX HUNDRED MEMORIAL DRIVE, CAMBRIDGE, MA  02139, hereinafter called
the "General Contractor" or "Contractor," and _MANNESMAN DEMATIC RAPISTAN CORPORATION,  8600 WEST ROYAL_
_LANE, SUITE 100B, IRVING, TX 75063_, hereinafter called the "Subcontractor."

*WHEREAS*, General Contractor has entered into a General Contract numbered  _1.652-3_  and dated _MAY 1999_ with  the
_MASSACHUSETTS PORT AUTHORITY_, hereinafter called the "Owner," for work described herein to be performed in accordance with
all the terms and conditions of the General Contract Documents which term, as herein used, shall include, without limitation, said General Contract
and general provisions, special provisions, specifications, plans, addenda, notices, instructions, bids, forms, and all other provisions or documents
therein contained or incorporated by reference including, without limitation, the documents listed in *Schedule A.*

*WHEREAS* the Subcontractor having examined the said General Contract Documents and the site or sites of operations to be conducted
thereunder, is desirous of entering into a Subcontract with the General Contractor on the basis of the terms and conditions hereinafter set forth.

*WITNESSETH* that the General Contractor and Subcontractor for the consideration hereinafter named agree as follows:

### ARTICLE I - WORK TO BE PERFORMED

1.1   The Subcontractor shall furnish and pay for all work, labor, materials, equipment, tools, light, power, details, computations, drawings,
schedules, and all other facilities and shall assume, perform, and furnish everything necessary for the prompt execution and proper
completion of the work described herein, all in complete accordance with the General Contract Documents as hereinabove defined which,
together with the following additional documents, are specifically incorporated herein and made a part hereof by reference, a list of which
is attached hereto as *Schedule A.*

1.2   Subcontractor shall at all times, without extra charge, clear the premises of debris and excess material caused by its operations as the
work progresses.

1.3   Subcontractor does further agree to be bound to the General Contractor by the aforementioned General Contract Documents and all other
instruments herein referred to and further to assume toward the General Contractor all the obligations and responsibilities pertaining to
the work that the General Contractor by the aforesaid General Contract Documents has assumed to the owner including the furnishing
of such warranties and guarantees as are required in the General Contract Documents.  The Subcontractor shall comply with all rulings,
orders, instructions, and operating procedures issued or promulgated by the General Contractor with respect to said work described below.
The Subcontractor further agrees that the General Contractor shall in connection with the work called for by this Subcontract have all
rights, privileges, and immunities which the owner has in connection with its contract with the General Contractor.

1.4   ¿ Said work to be performed and prices thereto are set out on the schedule attached hereto as *Schedule B.*

### ARTICLE 2 - TIME OF PERFORMANCE

**CONFIDENTIAL**
**CARR 002565**

2.1   Time is of the essence of this Agreement. Accordingly, the Subcontractor shall commence work upon notice from the General Contractor
and shall promptly and expeditiously perform said work in accordance with the instructions of the General Contractor utilizing union labor,
which can work in harmony with General Contractor, approved materials, equipment, and tools in such quantities and of such types as
the General Contractor may from time to time deem necessary and shall work overtime or extra shifts as may be required without
additional cost to General Contractor.

2.2   The Subcontractor shall complete its work in sufficient time to allow the General Contractor to complete the entire project within the
General Contractor's planned schedule.  If requested by the General Contractor, Subcontractor shall furnish a progress schedule to the
General Contractor in such detail as the General Contractor requires.

Initialed for Modern Continental _____ dated _10/28/__    Initialed for Subcontractor _____ dated _10/25/__

*An Equal Opportunity Employer*

Page 162

1    AFTERNOON SESSION
2    2:15 O'CLOCK P.M.
3
4        MR. O'MALLEY:  Actually, one point
5    of clarification that Mr. Reinecke would
6    like to make
7        THE WITNESS:  Prior to John Carr's
8    accident, it was -- it was prior to
9    that -- it was AMEC. AMEC. Siemen's. not
10   Modern Continental. You know, I am
11   trying to figure out how to say this.
12       Modern Continental was not involved
13   at the time of the accident. Let's put
14   it that way. They were out of the
15   picture.
16       MR. O'MALLEY:  I just wanted -- I
17   wanted to get it out
18       MR. DEVER:  Thanks, Gabe. I
19   appreciate that. All right
20
21       FURTHER DIRECT EXAMINATION
22
23   BY MR. DEVER:
24       Q  See if we can clarify that. In your
25   earlier testimony you had mentioned that the

Page 163

1    chain of command after you became employed by
2    Siemen's was Massport was the owner?
3        A  Right.
4        Q  They hired Modern Continental as general
5    contractor?
6        A  Right.
7        Q  Modern Continental had a contract with
8    Siemen's?
9        A  Yes.
10       Q  And Siemen's had the contract with
11   Shaughnessy and EG Sawyer?
12       A  Right.
13       Q  You also indicated Massport had a
14   contract, you believe, with AMEC to be the
15   general construction manager?
16       A  Managers.
17       Q  All right. Now, at a point in time
18   before Mr. Carr's accident in February of '03, do
19   you have an understanding that Modern Continental
20   left the job site?
21       A  They didn't leave the job site. They
22   left any control of the conveyor installation.
23       Q  All right. Who did they leave the
24   control of the conveyor installation to?
25       A  AMEC.

Page 164

1        Q  Okay. Is it your understanding that in
2    the time frame of Mr. Carr's accident, AMEC was
3    working as the general contractor in charge of
4    the conveyor belt installation?
5        A  Yes. Overseer or whatever, construction
6    managers.
7        Q  Was there an individual from AMEC who
8    would -- you would interface with on a
9    safety-related issue at a point in time after
10   Modern had ceded control to AMEC but before
11   Mr. Carr's accident?
12       A  Yes. For AMEC I interfaced with a man
13   called Brad, but I can't remember his last name,
14   for AMEC. for safety.
15       Q  If I were to suggest the name of a
16   fellow by the name Bradley Harbour, would that
17   sound about right?
18       A  Harbour?
19       Q  H-a-r-b-o-u-r. You just called him
20   Brad.
21       A  I called him Brad, the safety man for
22   AMEC.
23       Q  What would he do on a day-to-day basis?
24       A  Day-to-day basis. walk the thing and
25   basically see what he considered violations. I

Page 165

1    guess he was a trained safety inspector, whatever
2    his title. Same thing. come to me and say. "I
3    don't like this. I saw millwrights without
4    safety glasses again." et cetera.
5        And then again. once it did come to me.
6    I have to go to Shaughnessy millwrights' foremen
7    and general foreman and notify them I have a
8    complaint from AMEC safety about your men.
9        Q  Would you expect someone like Mr. Ryan.
10   the foreman for Shaughnessy, to direct that
11   complaint to his men and correct it?
12       A  Right.
13       Q  You would come back and walk through the
14   area and make sure whatever the complaint was had
15   been addressed?
16       A  Yes. Any kind of complaint. We did
17   stuff like. made posters. If I knew about
18   something just out of the ordinary, out of
19   caution I would make eight and a half by eleven.
20   AMEC complained, you know. these guys,
21   do they know all of this stuff is live. I said.
22   of course they do.
23       We'd make an eight and a half by eleven
24   piece that says "Caution." and give it to the
25   foremen. and they put a lot of these on the

42 (Pages 162 to 165)

Contractors License No._____Mannesmann Dematic Rapistan Corp.

STATE OF TEXAS

Contract No. 99014-M/E-1

Project No. 99014

MANNESMANN DEMATIC RAPISTAN CORP.
**Rapistan Systems Airport Baggage Operations**
8600 W. Royal Lane, Suite 100B
Irving, Texas 75063

```
┌─────────────────────────────┐
│        FILE COPY             │
│ Date Rec'd _____  │
│ Project # __99014__          │
│ Ref # ____108____            │
│ NOTE: Original copy if RED   │
└─────────────────────────────┘
```

## SUBCONTRACT AGREEMENT

THIS SUBCONTRACT, made this date, 6th day of **December, 1999**, by and between MANNESMANN DEMATIC RAPISTAN CORP. (hereinafter referred to as MDRC) and **Lone Star Installation / Maintenance, Inc.**, located at **251 S.W. Wilshire Blvd., Suite 124 – Box 406, Burleson, Texas 76028** (hereinafter referred to as "Subcontractor").

### WITNESSETH:

WHEREAS, MDRC and **Modern Continental Construction Company, Inc.** located at **600 Memorial Drive, Cambridge, Massachusetts 02139** (hereinafter referred to "Customer", which term shall cover all Customer's representatives including, as appropriate, the Architect, Construction Manager, owner, or other representatives as appropriate), have entered into contract for the complete performance of the work as specified in Section **14520 Baggage Handling System** for the project **Logan Modernization, International Gateway – Terminal Package** (hereinafter referred to as "Project"), according to the Contract Documents listed in **Article "A"** attached hereto (hereinafter referred to as "Contract Documents") and available for Subcontractor's review; and

WHEREAS, MDRC desires to subcontract certain work specified in the Contract Documents, and Subcontractor desires to perform said work at the prices and upon the terms and conditions hereinafter expressed;

NOW, THEREFORE, in consideration of the mutual agreements herein expressed, the parties do contract as follows:

1.    Subcontractor's Work

   a.  Subcontractor shall perform all work and shall furnish all supervision, labor, materials, plant, scaffolding tools, equipment, supplies and all other things necessary for the construction and completion of the work described in **Articles "B" and "C"** attached hereto and work incidental thereto in strict accordance and full compliance with the terms of this Subcontract, and to the satisfaction of MDRC and Customer.

   b.  In respect of work covered by this Subcontract, Subcontractor shall have all right which has under the Contract Documents, and Subcontractor shall assume all obligations, risks and responsibilities which MDRC has assumed towards Customer in the rights and remedies and to defend against claims against it by the Customer as provided in Article 11.

2.    Complete Agreement

The Subcontract contains the entire agreement between the parties hereto with respect to the matters covered herein.  No other agreements, representations, warranties, or other matters, oral or written, shall be deemed to bind the parties hereto.

3.    Payment

CONFIDENTIAL
CARR 004030

PAGE NUMBER 1 OF 21
SUBCONTRACT OF: Lone Star Installation / Maintenance, Inc.
MDRC PROJECT: 99014, Modern Continental, Boston Logan Int'l

INITIAL

Contractors License No._____Siemens Dematic Corp.

STATE OF TEXAS

Contract No. 99014-M/E-2

Project No. 99014

### SIEMENS DEMATIC CORP.
### Rapistan Material Handling Automation Division
2700 East 11th Street, Suite 200B
DFW Airport, Texas 75261

**FILE COPY**
Date Rec'd _12/6/01_
Project # _99014_
Ref # _108_
NOTE: Original copy if RED

## SUBCONTRACT AGREEMENT

THIS SUBCONTRACT, made this date, 6th day of **December, 2001,** by and between SIEMENS DEMATIC CORP. (hereinafter referred to as SDC) and **Lone Star Installation / Maintenance, Inc.,** located at **228 N.E. Wilshire, Suite H, Burleson, Texas 76028** (hereinafter referred to as "Subcontractor").

### WITNESSETH:

WHEREAS, SDC and **Modern Continental Construction Company, Inc.** located at **600 Memorial Drive, Cambridge, Massachusetts 02139** (hereinafter referred to "Customer", which term shall cover all Customer's representatives including, as appropriate, the Architect, Construction Manager, owner, or other representatives as appropriate), have entered into contract for the complete performance of the work as specified in Section **14520 Baggage Handling System** for the project **Logan Modernization, International Gateway – Terminal Package** (hereinafter referred to as "Project"), according to the Contract Documents listed in Article "A" attached hereto (hereinafter referred to as "Contract Documents") and available for Subcontractor's review; and

WHEREAS, SDC desires to subcontract certain work specified in the Contract Documents, and Subcontractor desires to perform said work at the prices and upon the terms and conditions hereinafter expressed;

NOW, THEREFORE, in consideration of the mutual agreements herein expressed, the parties do contract as follows:

1.    Subcontractor's Work

a.  Subcontractor shall perform all work and shall furnish all supervision, labor, materials, plant, scaffolding tools, equipment, supplies and all other things necessary for the construction and completion of the work described in **Articles "B" and "C"** attached hereto and work incidental thereto in strict accordance and full compliance with the terms of this Subcontract, and to the satisfaction of SDC and Customer.

b.  In respect of work covered by this Subcontract, Subcontractor shall have all right which has under the Contract Documents, and Subcontractor shall assume all obligations, risks and responsibilities which SDC has assumed towards Customer in the rights and remedies and to defend against claims against it by the Customer as provided in Article 11.

2.    Complete Agreement

The Subcontract contains the entire agreement between the parties hereto with respect to the matters covered herein.  No other agreements, representations, warranties, or other matters, oral or written, shall be deemed to bind the parties hereto.

3.    Payment

PAGE NUMBER 1 OF 21
SUBCONTRACT OF: Lone Star Installation / Maintenance, Inc.
MDRC PROJECT: 99014, Modern Continental, Boston Logan Int'l

INITIAL _____

CONFIDENTIAL
CARR 004084

Page 30

1  designing?
2      A  Designing, probably, maybe two.
3      Q  Which two were you involved in
4  designing?
5      A  Probably Newark and Philadelphia.
6      Q  You didn't design the whole --
7      A  No.
8      Q  You would design the layout?
9      A  Part.
10     Q  Which is sort of routing pipe, as far as
11 you were concerned.  Right?
12     A  Right.
13     Q  And the other would be, in part, to put
14 some of the components into the system?
15     A  Yes.  I would lay out some of the
16 components, yes.
17     Q  Anything else for those two projects?
18     A  No.
19     Q  You actually went there to make sure
20 that the specifications were met?
21     A  Yes.
22     Q  I think you said a moment ago that you
23 worked for B&P until, roughly 2000?
24     A  Right.
25     Q  Then what, sir?

Page 31

1      A  I went to work for Lonestar out of
2  Texas.
3      Q  That would be Lonestar Installations,
4  slash, Maintenance?
5      A  Yes.
6      Q  Inc?
7      A  Yes.
8      Q  Of Burleson, Texas?
9      A  Yes.
10     Q  How did you hook on with them?
11     A  Through Pat Marino in Philadelphia.
12     Q  While you were working at the
13 Philadelphia airport?
14     A  Yes.
15     Q  How did that come about?
16     A  The owner of Lonestar Installation and
17 Maintenance, Jerry Massingill, was in
18 Philadelphia doing work and was friendly with Pat
19 Marino who, at the time, was working for B&P in
20 Philadelphia.
21     Q  Yes.
22     A  That was my first introduction to
23 Lonestar.
24     Q  Did Mr. Massingill indicate he was
25 looking to hire some people?

Page 32

1      A  He hired Pat Marino first, and then Pat
2  offered me a job with Lonestar.
3      Q  When did you join Lonestar?
4      A  2000.
5      Q  When?
6      A  January of 2000.
7      Q  Were you -- when you were hired there
8  what was your position?
9      A  I was project manager.
10     Q  For what project?
11     A  Boston Logan, Terminal E.
12     Q  How long did you work on that project as
13 the project manager for Lonestar?
14     A  I might have the dates -- about a year
15 and a half, I'd say, somewhere in there.
16     Q  Roughly June '01?
17     A  I'd say, yes.
18     Q  Then what?
19     A  Lonestar went bankrupt.
20     Q  Then what?
21     A  I was hired directly, contracted
22 employee for Siemens.  At that time I think it
23 was called Rapistan, R-a-p-i-s-t-a-n.  I am not
24 sure.
25     Q  All right.  In this January 2000 to June

Page 33

1  2001 time frame, big picture --
2      A  Right.
3      Q  -- tell me what was going on at Boston
4  Logan, Terminal E.
5      A  Prior to the time at Lonestar, between
6  2000 and 2001. I was project manager.  I had --
7  Shaughnessy was Lonestar's subcontractor.
8  Shaughnessy Millwright Service. I believe was the
9  official name of it.  That was my subcontractor
10 for mechanical. and I was directly responsible
11 for them.
12     Q  What was the -- big picture, not going
13 down; big picture, looking up?
14     A  They were building a building, and I was
15 receiving equipment most of the time. and storing
16 it in the yard.
17     Q  Who was building the building?
18     A  Modern Continental.
19     Q  Modern Continental was building a new
20 terminal?
21     A  Yes.
22     Q  You understood they were the general
23 contractor on that project?
24     A  Yes.
25     Q  Do you know who the owner of the project

SUBCONTRACT AGREEMENT   99014 - E

# SIEMENS *DEMATIC*

SUBCONTRACT AGREEMENT NO. 99014 - E

Made this 23th day of April , 2002 .

BETWEEN:

> **Siemens Dematic Corp.**
> **507 Plymouth Avenue, NE**
> **Grand Rapids, Michigan 49505-6098**

hereinafter called "Siemens Dematic", and

Edward G. Sawyer Co., Inc.
260 Libby Parkway
Weymouth, MA. 02189
hereinafter called "Subcontractor".

Siemens Dematic and Subcontractor agree as follows:

## ARTICLE 1 - WORK

Subcontractor shall furnish all the necessary labor, materials, equipment, freight, tools, and services necessary to perform and complete in a workmanlike manner all work in strict accordance with the Contract Documents (as defined in Article 4), hereinafter called "Work".

## ARTICLE 2 - LOCATION OF WORK - IDENTITY OF OWNER

Subcontractor shall perform the Work for Siemens Dematic at:

Terminal E - Logan International Airport
Boston, MA.

Any reference to Owner under this Subcontract Agreement means:

> Modern Continental Construction
> 600 Memorial Drive
> Cambridge, MA. 02139

CONFIDENTIAL
CARR 004205

## Page 54

1  there. It was a crazy period.

2      Q   Certainly within a month or two

3  everything had played out, and you understood

4  that you worked for Siemen's by the summer of

5  2001?

6      A   Yes.

7      Q   And you understood that Siemen's had

8  taken over Mannesmann Dematic Rapistan

9  Corporation's contract with Modern Continental?

10     A   Yes.

11     Q   And that in addition to Siemen's working

12  directly for Modern, Siemen's also effectively

13  took back what it had subcontracted out to

14  Lonestar and brought that in-house. Correct?

15     A   Correct.

16     Q   All right. The in-house part I am

17  talking about is Siemen's then brought in-house

18  the supervision of -- strike that.

19         What Siemen's brought in-house was the

20  oversight of the installation work being done by

21  Shaughnessy, so that Siemen's was assured that

22  Shaughnessy was fulfilling the terms and

23  specifications of the contract?

24         She can read that back, if you would

25  like.

## Page 55

1      A   Shaughnessy was, yes, was under contract

2  now with Siemen's, with me representing Siemen's.

3  If that clarifies.

4      Q   Okay. To your knowledge, when Siemen's

5  took over Siemen's, and Lonestar left, was there

6  a new contract executed between Siemen's and

7  Shaughnessy for the work at the site, if you

8  know?

9      A   I believe there was, but I can't

10  guarantee it. I believe there was.

11     Q   You weren't the contract guy?

12     A   I had nothing to do with the contract.

13     Q   Who was the contract guy for Siemen's on

14  that project?

15     A   I think it was still David Gutherie.

16     Q   What was his title?

17     A   Project manager.

18     Q   Is he still working for Siemen's?

19     A   No.

20     Q   Where is he?

21     A   I heard he was down south. That's all.

22  I don't keep track.

23     Q   What does "down south" mean?

24     A   I heard he is working down south.

25  probably for another conveyor.

## Page 56

1      Q   Who is down south for conveyor

2  companies?

3      A   Vandalier. I might be saying that

4  wrong.

5      Q   Where are they?

6      A   I think they are out of Georgia.

7      Q   Okay.

8      A   FKI is another one.

9      Q   What does that stand for?

10     A   I don't know.

11     Q   Where are they?

12     A   Out of North Carolina, I think.

13     Q   What is the big outfit out of -- what is

14  it -- Ohio or Michigan, conveyor systems?

15     A   Siemen's.

16     Q   Siemen's?

17     A   That's another brand of Siemen's.

18     Q   What is the name of that outfit?

19     A   They are product handling. I have no

20  idea. They are a Wal-Mart.

21     Q   Is there a car that Siemen's owns?

22     A   I don't know.

23     Q   Before you left Lonestar, when you would

24  oversee the work that was being done, you told us

25  that the way you would oversee it is you would be

## Page 57

1  checking the terms and specifications of the

2  contract to make sure the work was being done

3  properly. Correct?

4      A   Correct. For installation per spec.

5      Q   That way, if you had a problem with

6  that, you would interface with the foreman for

7  Shaughnessy. Correct?

8      A   Yes.

9      Q   That's a fancy way of going up and

10  saying to the foreman, "Hey, Bob, I don't think

11  that line is done correctly"?

12     A   Right.

13     Q   All right. Or you would look at a

14  conveyor belt and say, Hey, Bob, I don't think

15  that is tracking properly. You want to get your

16  guys to get that thing tracking properly"?

17     A   Correct.

18     Q   That's the sort of interface we are

19  talking about?

20     A   More or less, yes.

21     Q   Were you ever -- I use the word

22  "allowed," would you ever work hands-on on the

23  system yourself?

24     A   No.

25     Q   You could not do that. Correct?

15 (Pages 54 to 57)

# SIEMENS *DEMATIC*

## Rapistan Material Handling Automation Division

# SAFETY POLICY
# MANUAL





# Index - Table of Contents

Created By:     Stephfan E Sissell on 01/09/2002 at 12:00 PM
Category: Safety Manual

## *Table of Contents*

| Section | Subject |
|---|---|
| 1 | Statement of Management Support |
| 2 | Health and Safety Program |
| 3 | Responsibility for Safety in the Organization |
| 4 | Employee Conduct & Safety Rules |
| 5 | Drug, Alcohol, and Contraband |
| 6 | New Project Start Up |
| 7 | Safety Requirements for Subcontractors |
| 8 | Installation Safety Training |
| 9 | Safety Meetings |
| 10 | Job Hazard Analysis |
| 11 | Jobsite Inspection |
| 12 | Investigations |
| 13 | First-Aid Procedures |
| 14 | Bloodborne Pathogens Exposure Control Plan (Addendum Section) |
| 15 | Electrical Safety & Assured Grounding |
| 16 | Mobile Equipment |
| 17 | Cranes, Rigging and Tools |
| 18 | Fall Protection |
| 19 | Fire Prevention |
| 20 | Hazard Communication Program |
| 21 | Lock-Out/Tag-Out |
| 22 | Personal Protection Equipment |
| 23 | Stairways and Ladders |
| 24 | Oxy-Fuel, Cutting, Brazing, and Welding |
| 25 | Steel Erection |
| 26 | Forms |

...........................

SIEMENS *DEMATIC*

## *Statement of Management Support*

The basic safety objective of Siemens Dematic Corporation is to ensure that no job is so important that we cannot perform it in a safe manner.  The safety of our employees is the responsibility of Management.  Line Management at all levels at each location has the responsibility for the administration and implementation of a safety program that will achieve successful results.  In order to assist you in the development of a strong safety program, this Safety Manual has been developed.

As stated in the Siemens Dematic Installation Safety Manual, we are convinced that safety ranks equally with production, quality, cost, etc.  It is expected that a high level of safety performance will be maintained at all company and site locations.

Pete J. Metros

Siemens Dematic
507 Plymouth Ave. N.E.
Grand Rapids MI 49505-6098

Installation Safety Manual
Statement of Management Support
Rev. 1-B          01/15/02

Section 1 - 1

# CONTENTS

This shop drawing submittal
submitted by AMEC in accordance with the conditions and condition of the contract documents in any way relieves ____ or its ____ or the terms of the Subcontract. This drawing, data ____ is subject to the Architect's review and approved in accordance with its obligations under the contract documents.

DATE 10/3/02    BY ____

| DSG # | |
| AMEC # | 0150 |
| FILE # | 76 |
| REV. # | 0 |

RECEIVED

OCT 0 % 2002

AMEC CONSTRUCTION
MANAGEMENT, INC.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28
29
30
31

OneStep®

# Index - Table of Contents

Created By:     Stephfan E Sissell on 01/09/2002 at 12:00 PM
Category:  Safety Manual

## *Table of Contents*

| Section | Subject |
|---------|---------|
| 1 | Statement of Management Support |
| 2 | Health and Safety Program |
| 3 | Responsibility for Safety in the Organization |
| 4 | Employee Conduct & Safety Rules |
| 5 | Drug, Alcohol, and Contraband |
| 6 | New Project Start Up |
| 7 | Safety Requirements for Subcontractors |
| 8 | Installation Safety Training |
| 9 | Safety Meetings |
| 10 | Job Hazard Analysis |
| 11 | Jobsite Inspection |
| 12 | Investigations |
| 13 | First-Aid Procedures |
| 14 | Bloodborne Pathogens Exposure Control Plan (Addendum Section) |
| 15 | Electrical Safety & Assured Grounding |
| 16 | Mobile Equipment |
| 17 | Cranes, Rigging and Tools |
| 18 | Fall Protection |
| 19 | Fire Prevention |
| 20 | Hazard Communication Program |
| 21 | Lock-Out/Tag-Out |
| 22 | Personal Protection Equipment |
| 23 | Stairways and Ladders |
| 24 | Oxy-Fuel, Cutting, Brazing, and Welding |
| 25 | Steel Erection |
| 26 | Forms |

..........................

**SIEMENS** *DEMATIC*

# SIEMENS DEMATIC INSTALLATION
# POST-EXPOSURE EVALUATION AND
# FOLLOW-UP CHECKLIST

The following steps must be taken and information transmitted in the case of an employee's exposure to Bloodborne Pathogens:

ACTIVITY

COMPLETION
DATE

- Employee furnished with documentation regarding exposure incident         _____

- Source individual Identified         _____
  (_____)
        Source individual

- Source individual's blood tested and results given to exposed employee         _____
  _____     Consent has not been able to be obtained.

- Exposed employee's blood collected and tested         _____

- Appointment arranged for employee with healthcare professional.         _____
  (_____)
        Professional's Name

- Documentation forwarded to healthcare professional.         _____

  _____     Bloodborne Pathogens Standard

  _____     Description of exposed employee's duties.

  _____     Description of exposure incident including routes of exposure

  _____     Result of source individual's blood testing

  _____     Employee's medical records

Siemens Dematic
507 Plymouth Ave NE
Grand Rapids MI 49505

Installation Safety Manual
Bloodborne Pathogen Exposure Control Plan
Rev. 1-B  01/15/02

Section 14

**SIEMENS** DEMATIC

# Daily Jobsite
# Safety Inspection

This list, while not inclusive, is intended as a guide for detecting job hazards, unsafe conditions, and unsafe practices. The reason for the report is to uncover unsafe acts and/or unsafe conditions so that preventive measures can be initiated and to determine how effectively Rapistan Systems Safety Program has been communicated to employees and how effectively it is being used and managed.

| Date | | Time | | Jobsite | |
|---|---|---|---|---|---|
| Area | | | Project Number | | |
| Supervisor | | | Completed By | | |

| Safety Observation Check List | Yes | No | N/A | Explain Any "NO" Responses |
|---|---|---|---|---|
| **PERSONAL PROTECTION EQUIPMENT (PPE)** | | | | |
| - Minimum Required PPE | | | | |
| - Eye and Face for Work PPE | | | | |
| - Respiratory for Work PPE | | | | |
| - Fall Protection | | | | |
| - Clothing for Work PPE | | | | |
| - Foot and Hand Protection for Work | | | | |
| **HOUSEKEEPING** | | | | |
| - Compound, Lunch Room, and Office Housekeeping | | | | |
| - Work Area Housekeeping | | | | |
| **TOOLS** | | | | |
| - Grinders, and Grinder Sides | | | | |
| - Hand Tools | | | | |
| - Electrical Tools, Cords, and Connections | | | | |
| - Air Tools, Hoses, and Connections | | | | |
| - Cutting Rigs | | | | |
| - Welding Equipment | | | | |
| - Slings, Shackles, and Chokers | | | | |
| - GFCI's | | | | |
| **COMPRESSED GAS CYLINDERS** | | | | |
| - In Work Area Cylinders | | | | |
| - Storage Area Cylinders | | | | |
| **LOCK-OUT/TAG-OUT** | | | | |
| **FIREWATCH** | | | | |
| -Fire Protection and Cylinders | | | | |
| **LADDERS AND STAIRS** | | | | |
| **FLOOR AND WALL OPENINGS** | | | | |
| **AERIAL LIFTS** | | | | |
| - Lift Housekeeping | | | | |
| **MANLIFTS** | | | | |
| **RIGGING** | | | | |
| **SIGNS AND WARNINGS** | | | | |
| **BARRICADES** | | | | |
| **STORAGE** | | | | |
| - Tool Storage | | | | |
| - Supplies Storage | | | | |
| - Flammable and Hazardous Substance Storage | | | | |
| **MATERIAL HANDLING** | | | | |
| - Manual Lifting | | | | |
| - Mechanical Lifting | | | | |
| **FIRST-AID FACILITY** | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

Comments:

_____

_____

_____

_____

Siemens Dematic
507 Plymouth Ave NE
Grand Rapids Mi 49505

Installation Safety Manual
Daily Jobsite Safety Inspection Form
Rev. 1-B  01/15/02

Section 26

# SIEMENS DEMATIC

## *Employee Accident,*
## *Injury or Illness Report*

**Instructions:**  Please print.  Fill in all blanks.  If a blank does not pertain to your accident, injury, or illness, write "N/A" in that blank.  When completed, return this form to your supervisor.

Name: _____

Social Security: _____ Sex: _____ Age: _____

Address: _____ Phone Number: _____

Marital Status:  ☐ Single        ☐ Married        ☐ Separated   ☐ Divorced    ☐ Widowed

Number of Dependents_____

| | |
|---|---|
| Employment start date | Time in present job |
| Job Title | Supervisor's name |
| Department | Date and time of accident |
| Location of accident | Task being performed |
| Body part injured | Name of witness |
| Name of Witness | Name of Witness |

| |
|---|
| Describe how the accident happened |
| What caused the accident |
| What could have prevented this accident |
| Date and time you first sought medical attention |
| Name of hospital or doctor |
| Were you using required safety equipment? |
| Do you have a job at another company? |

The information I have provided either in my own writing or verbally for the purpose of this form is true and correct.  I understand that providing false or misleading information or omission of information on this report or any other form relating to this claim of injury/accident may result in termination of my employment.

Signature of employee: _____Date: _____

Reader or Interpreter: _____Date: _____

Signature of Witness: _____

SIEMENS *DEMA...*

# EMERGENCY PHONE NUMBERS

PHYSICIAN _____ OR _____

HOSPITAL _____ OR _____

AMBULANCE _____

FIRE DEPARTMENT _____

POLICE _____

Or CONTACT _____

Section 26

Siemens Dematic
507 Plymouth Ave NE
Grand Rapids MI 49505

Installation Safety Manual
Emergency Phone Numbers Form
Rev. 1-B  01/15/02

**SIEMENS** ʟ, ʼᴀᴛɪᴄ

## First Aid Log

| From | | Project Number | | | | Project Location | | Month/Year | |
|------|--|----------------|--|--|--|------------------|--|-----------|--|
| To: | | Project Name | | | | | | Legend | |

| Date | Time | Name | Age | Clock # | Supervisor | Injury/Illness | Description of Accident | Treatment/Medication Given by Job Personnel |
|------|------|------|-----|---------|------------|----------------|-------------------------|---------------------------------------------|
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

**Superintendent:** _____

Siemens Dematic
507 Plymouth Ave NE
Grand Rapids MI 49505

Installation Safety Manual
First-Aid Log     01/15/02
Rev. 1-B

Section 26

**SIEMENS** *DEMATIC*

# *First Report of*
# *Injury and Illness*

## *To be completed by job superintendent.*

Siemens Dematic
507 Plymouth Ave NE
Grand Rapids MI 49505-6098
Phone: (616) 451-6200

Name and location/place where accident or exposure occurred _____
Department _____
Date of injury or initial diagnosis of occupational illness _____
Date disability began _____
Was injured paid in full for this day? _____
Date first reported to Company_____    To whom was it reported _____
Name of Superintendent_____    Name of Foremen _____
Name of injured/ill employee _____
Social Security Number_____    Phone Number _____
Address: (No. & St.)_____    City_____    State____    Zip _____
Check (✓) Married_____ Single_____ Widow_____ Divorced_____ Male_____ Female _____
Age_____ Date of Birth _____
Occupation (craft) when injured or exposed _____
Job being performed _____
Department or division regularly assigned _____
Date employed on this job _____    Wages per hour $ _____
Date first employed by Company _____
What was the employee doing when injured? (Be specific – if the employee was using tools or equipment or handling material, name them and tell what the employee was doing with them.) How did the accident occur? (Describe fully the events that resulted in injury or occupational illness.) Tell what happened and how it happened. Name any object or substances involved. Give the full details on all factors that led to the accident. (Use separate sheet for additional space.)

_____
_____
_____
_____
_____
_____

Witness to incident _____
_____
_____

Tool or equipment involved in accident?_____
Day of week _____ Time of day_____ AM/PM    Regular shift _____    Overtime _____
Number of hours worked out of the previous 48 hours _____
Time shift begins _____    Time shift ends _____
Describe the injury or illness in detail and indicate the part of the body affected (i.e., amputation of right index finger at second joint, fracture of ribs, lead poisoning, dermatitis of left hand) _____
Has employee returned to work_____ If so, date and hour_____ At what wage $ _____
At what occupation _____
Name and address of physician _____
Name and address of hospital _____
Records only _____ First Aid _____ Dr.Case _____ Restricted Duty _____ Recordable _____ Lost Time_____
Comments _____
Did employee die? _____    If so, give date of death _____

| Date accident was investigated | Supervisor's signature X |  |
|---|---|---|
| Job Superintendent X | Company |  |
| Date of this report | Signed by X | Time |

Siemens Dematic
507 Plymouth Ave. N.E.
Grand Rapids MI 49505-6098

Installation Safety Manual
First Report of Injury Illness Form
Rev. 1-B          01/15/02

Section 26

**SIEMENS** *DEMATIC*

# *Fork Lift Inspection*

## Internal Combustion
## Lift Truck Operator's Daily Inspection Report

Operator's Name: _____

Unit No:_____ Model:_____ Serial No:_____

Shift:  1_____  2_____  3_____        Date _____

Special Attachments: _____

### IMPORTANT!
THIS CHECK MUST BE MADE BY THE TRUCK OPERATOR DAILY AT THE START OF THE SHIFT

| HOUR METER READING_____ | Needs Attn | OK |
|---|---|---|
| 1. **Engine Oil ---** Check Level (When oil must be added, show number of quarts in "Need Attn" column.) | | |
| 2. **Fuel Systems ---** Check for leaks (Report any leaks immediately.) | | |
| 3. **Radiator ---** Check coolant level (Caution) | | |
| 4. **Tires ---** Check for foreign particles, gouges and cuts; check pneumatic tire pressure. | | |
| 5. **Mast, carriage, fork or attachment ---** Check for loose or missing bolts and damage; check chain, check adjustment and operation. | | |
| 6. **Oil and water ---** Check for leaks. | | |
| 7. **Truck Damage ---** Explain in remarks section. | | |
| 8. **Operator's compartment ---** Inspect for cleanliness. | | |
| 9. **Engine Oil Gauge ---** Check pressure (Report any abnormal pressure readings.) | | |
| 10. **Fuel ---** Check level. | | |
| 11. **Ammeter ---** Check charging rate (Report any unusual readings.) | | |
| 12. **Safety Equipment ---  (Rotating lights, backup alarms, etc.)** Check operation. | | |
| 13. **Steering ---** Check operation. | | |
| 14. **Brakes ---** Check brake pedal travel and parking brake adjustment. | | |
| 15. **Truck Operation ---** Report any unusual operation or noises. | | |
| 16. **Fire Extinguisher ---** Check the pin and check for discharge. | | |

Siemens Dematic
507 Plymouth Ave. N.E.
Grand Rapids MI 49505-6098

Installation Safety Manual
Fork Lift Inspection Form
Rev. 1-B        01/15/02

Section 26

**SIEMENS** *DEMATIC*

# *Near Miss Investigation Report*

To be completed by the supervisor responsible for the job/employee and attached to the First Report of Injury Form. This is to be completed within 24 hours of the reported incident.

This information is being solicited so that all facts can be assessed and analyzed in order to develop procedures that can lead to the prevention of similar incidents in the failure.

Job Number _____    Location _____
Date of incident _____    Time_____ am/pm
Date of this report _____    Time_____ am/pm
Exact location at the jobsite of the incident _____
_____
If injured, name of the employee _____
Employees craft _____
How many hours has the employee worked during the last 48 hours? _____
Shift start time_____ am/pm

I.    Supervisor responsible for the work/employee _____
      Foreman of the crew _____
      Name of all employees working in the crew at the time of the incident _____
      _____
      Were any employees from other companies involved, directly or indirectly _____
      _____
      If yes, name employees, company, and explain relationship _____
      _____
      _____
      _____

II.   Brief description of the job assignment _____
      _____
      Describe requirements for any equipment and/or personal protective equipment required for this job
      _____

III.  Describe conditions and events leading up to the incident in detail _____
      _____
      _____
      _____
      Describe the incident in detail _____
      _____
      _____
      Describe the injury and/or damage to equipment and/or property in detail_____
      _____
      _____

IV.   If any equipment as involved, describe the equipment (brand, model number, year, company number, serial number, etc.)_____
      _____
      How long has the equipment been on the job? _____
      Who was operating the equipment _____
      Date of last inspection_____ Were all guards in place _____
      If no, explain _____
      Were any modifications made or safe guards bypassed on this equipment? _____
      If yes, explain _____
      Who authorized these modifications and why? _____
      Describe any defects or malfunctions found in the equipment _____
      _____
      Describe any misuse of this equipment _____
      _____

**SIEMENS** *DEMATIC*

V.    In your opinion, why did this incident occur? _____
_____
_____
_____

Were there any unsafe actions and/or unsafe conditions and why did they exist? _____
_____
_____
_____

Detail any other information that you are aware of that may relate to this incident _____
_____
_____
_____

VI.   Describe steps initiated to avoid similar occurrences in the future _____
_____
_____
_____
_____


_____          _____
Foreman's Signature                       Job Superintendent's Signature


_____          _____
Date                                      Date

# SIEMENS *DEMATIC*

## Job Hazard Analysis (JHA) Worksheet

Contractor: _____    Lower-Tier Subcontractor: _____

Construction/Installation Activity: _____

Job Site Location: _____    Date of Analysis: _____

| Work Activity Steps | Equipment/Tools To Be Used | Potential Hazards/Exposures | Loss Prevention Measures/Controls |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

Project Superintendant: _____    Date: _____

Safety Coordinator: _____    Date: _____

Siemens Dematic
507 Plymouth Ave. N.E.
Grand Rapids MI 49505-6098

Installation Safety Manual
Job Hazard Analysis Form
Rev. 1-B        01/15/02

Section 26

# JOB SITE SAFETY MEETING REPORT
## Department/Tool Box Talk Activity

*Conducted weekly or as needed:  Before new process/equipment startup, safety awareness, lesson to be learned, share-the-knowledge, etc.*

Project Number: _____          Location: _____

Project Manager: _____

Date: _____          Time: _____
                                             Start                          End

Trades Present: _____
                          (carpenters, masons, iron workers,operating engineers, laborers, electricians, etc.)

Total Present: _____

Instructor/Leader _____

       a) Leader has completed OSHA 10 hr. certified training course.    _____
                                                                                                          (yes / no)

       b) Leader job title or function: _____
                                                       (project manager, project engineer, project superintendent, foreman, etc.)

Topics discussed:

_____
_____
_____
_____

Safety and health suggestions and comments offered by attendees:

_____
_____
_____
_____

I hereby certify that a job safety meeting was conducted as described above:

       _____          _____
                   Signature                                      Signature

       _____          _____
                   Print Name                                    Print Name

       _____          _____
                 Title or Function                              Title or Function

Attendees:     _____          _____
                    _____          _____
                    _____          _____
                    _____          _____
                    _____          _____
                    _____          _____
                    _____          _____
                    _____          _____

Additional remarks:

_____
_____
_____

Note:  OSHA Safety and Health regulations for Construction, paragraph 1926.20 and 1926.21 require, in part, that employers establish accident prevention programs as well as, instruct employees in the recognition and avoidance of unsafe conditons.

This report documents and records your employee training efforts and provides evidence for OSHA compliance officers of these efforts.

INS601.FRM (Rev C.) 12-01

SIEMENS*DEMATIC*

# SIEMENS DEMATIC CORP.

# SUBCONTRACTOR ACKNOWLEDGMENT

SUBCONTRACTOR NAME: _____,
hereinafter referred to as "Subcontractor".

Subcontractor hereby acknowledges that it has received a copy of the Siemens Dematic Corp. INSTALLATION SAFETY MANUAL - Revision 1-B, " which includes Subject Sections 1 through 26", ("Installation Safety Manual").

Subcontractor further acknowledges that Subcontractor has read, understands, agrees with and will abide by all of the terms and provisions contained in the Safety Manual and further understands that the violation of any of the terms and provisions contained in the Safety Manual will be considered a breach of any agreement that Subcontractor may have with Siemens Dematic Corp. In addition to all other remedies Siemens Dematic Corp. may have under any agreement with Subcontractor, at law or in equity, Siemens Dematic Corp. has the right to immediately remove any of the individuals working for Subcontractor at the installation site for violation(s) of any of the terms and provisions contained in the Safety Manual and Subcontractor shall not allow any such individuals back on site without the prior written consent of Siemens Dematic Corp.

Subcontractor agrees to provide a copy of the Safety Manual to any of its employees or its subcontractors who will be working at the installation site; require such employees or subcontractors to read, understand, agree to and abide by all of the terms and provisions stated in the Safety Manual; require the employee or subcontractor to acknowledge such in writing; maintain a copy of the Safety Manual at the installation site; and produce a copy of the Safety Manual at the site for inspection when requested by Siemens Dematic Corp.

Acknowledged and agreed to by:

Subcontractor

By: _____

Its: _____

Date: _____

NOTE: The Safety Manual may not be sent to you with future subcontract agreements or bid requests. You will receive updates, additions and/or corrections as necessary.

# Section 26 - Forms

**Created By:**    Stephfan E Sissell on 01/09/2002 at 01:07 PM
**Category:** Safety Manual

Accident Investigation


Accident.doc

Aerial Lift Inspection


Aerial lift1.doc

Aerial Lift Inspection (Spanish)


SPAerial.doc

Assured Equipment & Grounding


AssuredG.doc

Bloodborne Pathogen Addendum Section


Bloodbo1.doc

Crane Lift Plan Part #1


CraneLif.doc

Crane Lift Plan Part #2


CraneLi1.doc

Daily Crane Pre-Operation Checklist


DailyCra.doc

Daily Jobsite Safety Inspection


DailyJob.doc

Employee Accident, Injury or Illness Report


Employe1.doc

Emergency Phone Numbers


Emergenc.doc

First Aid Log

FirstAid.doc

First Report of Injury or Illness

FirstRep.doc

ForkLift Inspection

ForkLif1.doc

Fork Lift Inspection (Spanish)

ForkLift.doc

Near Miss Investigation Report

NearMiss.doc

Job Hazard Analysis (JHA) Worksheet

Job Hazard Analysis.doc

Job Site Safety Meeting Report - Department/Tool Box Talk Activity

INS601.xls

Subcontractor Acknowledgement Form

Subcontractor Acknowledgment2.doc

.............................

Page 222

1    Q  You do understand why they would turn on
2  TC3 line to see how it would interface with TC2
3  line?
4    A  Certain components of it, yes; the
5  merge.
6    Q  That would not include TC3-13?
7    A  No, not on its own.  Not on an
8  individual basis.
9    Q  Not with only that one segment being on?
10    A  No.
11    Q  TC3-13?
12    A  I don't see why they would.  I can only
13  guess.  I don't know why you would do it.
14    Q  What would your guess be, sir?
15      MR. O'MALLEY:  Objection.
16      THE WITNESS:  Why would they turn --
17      you asked me --
18  BY MR. DEVER:
19    Q  I am asking you.
20    A  I don't think -- why would they turn
21  TC3-13 on?  It makes no sense, logically, to me.
22    Q  Okay.  What would your guess be?  You
23  said, "I can only guess."
24    A  I can't guess why they would turn it on.
25  I have no idea.  You misinterpreted what I meant.

Page 223

1  I don't know why they would turn it on.
2    Q  Does the term "rate testing mode" mean
3  anything to you?
4    A  Sure.
5    Q  Okay.  What does that mean?
6    A  Rate testing is just the rate that the
7  belt is transporting the piece of luggage.
8    Q  Do they time that luggage?
9    A  Do they time it?
10    Q  Yes.  Is there a setting that you turn
11  to rate testing mode?
12    A  There is not a setting that you go to
13  rate testing, no.  There's a tool that is used on
14  top of the belt that a millwright uses to track
15  the speed of the belt.
16    Q  Okay.  Do you know who John Daily is,
17  D-a-i-l-y, identified in answers to
18  interrogatories as Siemen's contractor
19  administrator?
20    A  John Daily?  Doesn't jump up right now.
21  I don't know.
22    Q  The answer to interrogatories also
23  identified Jeff McLaughlin, M-c-l-a-u-g-h-l-i-n,
24  as project manager?
25    A  Yes.

Page 224

1    Q  Would he have been the project manager
2  at the time of Mr. Carr's accident for Siemen's?
3    A  I believe so.
4    Q  You were listed as the site
5  superintendent in these answers.
6    A  Yes.
7    Q  Would you agree you were the site
8  superintendent at the time of the accident?
9    A  Yes.
10    Q  You also indicated that for the
11  electrical portion of this, that would be Gary
12  Clinkscales?
13    A  Yes.  Yes.
14    Q  Still work for Siemen's?
15    A  Yes.
16    Q  In terms of when these flashing, warning
17  lights and audio alarms became active on TC2 and
18  TC3 line, Mr. Clinkscales would have been the
19  person who would be more knowledgeable about that
20  than you, because it's an electrical issue?
21    A  It's an electrical issue.
22    Q  Is that correct?
23    A  Yes.
24    Q  All right.  I am going to show you --
25      MR. DEVER:  Why don't we mark this

Page 225

1  as the next exhibit, and I will show it
2  to the witness.
3
4      (Reinecke Exhibit 14:
5      Marked for identification.)
6
7  BY MR. DEVER:
8    Q  Sir, I am going to show you a document
9  that I am -- that I have marked as Exhibit Number
10  14, and I want to tell you something about it
11  before I show it to you.
12      The face sheet indicates Siemen's
13  Dematic Rapistan Materials Handling Automation
14  Division Safety Policy and Manual.  That is the
15  face sheet.
16    A  Uh-huh.
17    Q  Before I ask you any questions about
18  that, the content of Exhibit Number 14, sir, have
19  you ever seen a document identifying itself as
20  what this face sheet identifies itself?
21    A  I have seen that, yes.
22    Q  Okay.  Do you remember seeing it and
23  having it available to you on the Terminal E
24  project when you worked for Siemen's before
25  Mr. Carr's accident?

57  (Pages 222 to 225)

Richard Reinecke

### Page 226

1    A  I think I did, but I can't tell where it
2  is.  I have seen it -- if I saw it, it was in my
3  trailer then.
4    Q  Okay.  Is it -- you continued for some
5  time to work for Siemen's.  Do you have an --
6  after this accident.  Do you have a memory that
7  if there was a safety policy manual for this
8  project that it was sort of a standard Siemen's
9  safety policy?
10    A  I assume it would be, yes, throughout
11  the company.
12    Q  The reason I bring that up, sir -- in
13  fairness to you, I want to show this to you and
14  point out a couple things in it.
15       The second page of the document has a
16  Table of Contents; do you see that?
17    A  Yes.
18    Q  And it talks about the health and safety
19  programs; see that?
20    A  Yes.
21    Q  And statement of management's support;
22  do you see that?
23    A  Yes.
24    Q  Responsibility for safety and
25  organization?

### Page 227

1    A  Yes.
2    Q  All right.  All those things?
3    A  Correct.
4    Q  And it has a section on job hazard
5  analysis; do you see that?
6    A  Yes.
7    Q  All right.  And then the third page of
8  the document, sir, says, "Statement of
9  Management's Support."  Do you see that?
10    A  Yes.
11    Q  It says, amongst other things, the
12  second paragraph -- or the first paragraph, "The
13  Basic Safety Objective of the Siemen's Dematic
14  Corporation is to ensure that no job is so
15  important we cannot perform it in a safe manner."
16  Do you agree with that?
17    A  Yes.
18    Q  That was true on the E Terminal project
19  at the time of Mr. Carr's accident?
20    A  Yes.
21    Q  Okay.  The second paragraph says, "As
22  stated in Seimen's Dematic Installation Safety
23  Manual, we are convinced that safety ranks
24  equally with production, quality, costs,
25  et cetera.

### Page 228

1       "It's expected that a high level of
2  safety performance will be maintained at all
3  company and site locations."  Did I read that
4  correctly?
5    A  Yes.
6    Q  Do you know who Pete Metros (phonetic)
7  is?
8    A  No.
9    Q  Sounds like he knows what he is talking
10  about?
11    A  I imagine.
12       MR. O'MALLEY:  Objection
13  BY MR. DEVER:
14    Q  Do you know what the Siemen's Dematic
15  Installation Safety Manual is?
16    A  Do I know what it is?
17    Q  Yes.
18    A  No.
19    Q  Have you ever seen it?
20    A  I have seen this.  Is this the manual?
21    Q  I don't know, sir.  That is kind of what
22  I was asking.  This document, Exhibit 14 --
23    A  Yes.
24    Q  -- says it's the safety policy manual.
25  Okay.  Agreed?

### Page 229

1    A  I saw something similar.  I can't
2  pinpoint exactly three years ago which one,
3  whether it said "manual" or "policy."
4    Q  Mr. Reinecke, if I had it I would show
5  it to you.  Okay?
6       This document, Exhibit 14, says it's the
7  safety policy manual.  Correct?
8    A  Correct.
9    Q  And then on Table of Contents, number
10  one, it refers us to the Statement of Management
11  Support?
12    A  Correct.
13    Q  And then we turn to the next page, and
14  we actually see the Statement of Management
15  Support?
16    A  Correct.
17    Q  That references in the second paragraph
18  the Seimen's Dematic Installation Safety Manual.
19  Correct?
20    A  Yes.
21    Q  And you can't tell us what that document
22  is.  Correct?
23    A  I don't really remember.
24    Q  Okay.  And you can't tell us what it
25  says in terms of Siemen's Dematic installation

58 (Pages 226 to 229)

Page 230

1  safety procedures?
2      A  I can assume what I probably read in it.
3  but I can't remember the specifics.
4      Q  Okay.  You don't even know if you ever
5  saw the Siemen's Dematic Installation Safety
6  Manual?
7          MR. O'MALLEY:  Objection
8          THE WITNESS:  No, I don't
9  BY MR. DEVER:
10      Q  Now I am going to get a little tricky
11  here.  Okay?  Stay with me.
12      A  I guess.
13      Q  We are into the safety policy manual,
14  Exhibit 14, cover sheet, Table of Contents.
15      A  Yes.
16      Q  And Statement of Management Support is
17  the third page; fourth sheet is the contents
18  sheet that says one through 31, but doesn't have
19  any information on it.  Right?
20      A  Uh-huh.
21      Q  All right.  And there is a stamp on this
22  particular sheet that indicates it was received
23  October 2, '02, AMEC Construction Management,
24  Inc.; do you see that?
25      A  Yes.

Page 231

1      Q  When I turn over to the fifth page, sir,
2  again we have the Table of Contents.  Correct?
3      A  Yes.
4      Q  And up at the top there is an index that
5  says, "Created by Stephfan E. Sissell on 1/9/02
6  at 12:50 p.m.  Category, Safety Manual."  Do you
7  see that?
8      A  Yes.
9      Q  Is that a Siemen's emblem?
10      A  That up there (indicating)?
11      Q  Yes.
12      A  I have no idea.
13      Q  Me neither.  Okay.  Then the next page,
14  sir, is a Siemen's Dematic Installation Post
15  Exposure Evaluation Followup Checklist."  Do you
16  see that?
17      A  Yep.
18      Q  Down at the bottom it says, "Blood borne
19  pathogen exposure control plan."  Do you see that
20  down here (indicating)?
21      A  Yes.
22      Q  Okay.  And what I want to do is take you
23  back here to the Table of Contents.
24      A  Uh-huh.
25      Q  Blood borne pathogen section is number

Page 232

1  14?
2      A  Okay.
3      Q  All right.  Then the next section refers
4  to -- Section 26, Installation Safety Manual, and
5  it's a form.  Correct?
6      A  Correct.
7      Q  And on the Table of Contents it says
8  Section 26 is forms?
9      A  Correct.
10      Q  The rest of the document is all the
11  forms.  Correct?
12      A  Okay.  Yes.
13      Q  Okay.
14      A  Yes.
15      Q  So --
16          MR. O'MALLEY:  Can you ask the
17      questions from across the table?
18          MR. DEVER:  Yes.  I needed to show
19      him the document.  That is all
20  BY MR. DEVER:
21      Q  You would agree with me, sir, that
22  whatever the Siemen's Dematic Safety Policy
23  Manual was at the time of this accident, it would
24  be more than what we have in Exhibit 14?
25      A  Rephrase that again.

Page 233

1      Q  In layman's terms, sir, what I showed
2  you in Exhibit 14 appears to be missing vast
3  sections of Siemen's Dematic Safety Policy.
4      A  Doesn't seem like the one I saw.
5      Q  Okay.
6      A  But it could have been the Rapistan one
7  also.  I don't know.  I can't remember which one
8  it was.
9          MR. DEVER:  This is the next
10      exhibit.
11
12          (Reinecke Exhibit 15:
13      Marked for identification.)
14
15          (Whereupon, a recess was taken from
16  3:42 o'clock p.m. until 3:50 o'clock
17  p.m.)
18
19          THE WITNESS:  I just want to clarify
20      one thing, because we get into what I
21      received and what I read, and this and
22      that, which would be over the years
23      and -- but there was Siemen's -- see,
24      you keep directing things to Siemen's,
25      when I did have that period when it was

Page 234

```
 1    Rapistan.
 2         Yes. I did receive stuff from
 3    Rapistan about lockout/tagout.
 4    Siemen's, I don't know if it was
 5    Siemen's.
 6         What I am saying is, I know I got it
 7    from Rapistan. Then when Siemen's
 8    bought it or whatever they did, I don't
 9    believe I got the Siemen's one, but I
10    had it from Rapistan.
11         So we rolled into the same contract.
12    You know, I just wanted to clarify that.
13    It's hard to explain.
14         There is two different companies
15    involved when the safety -- I was issued
16    stuff from Rapistan for safety
17    procedures in the beginning, which I
18    probably read and have no idea where
19    they are
20    BY MR. DEVER:
21    Q   Okay. Are you all done?
22    A   Yes. I wanted to clarify that.
23    Q   Let's see if we can put that into a more
24    concise form, sir.
25    A   I get confused with Siemen's and Dematic
```

Page 235

```
 1    and Siemen's Rapistan. It gets real confusing
 2    about what I received from either one of them,
 3    because it was a mess when it was --
 4         I believe it's Rapistan. I want to put
 5    it on that, because I imagine when I first was
 6    there in 2000 I received a whole package from
 7    Rapistan.
 8    Q   Here is the deal, sir --
 9    A   Yes.
10    Q   -- I can't ask you another question
11    until you stop talking. I am not trying to be
12    rude.
13    A   I am not either. I am making my point.
14    Q   I will let you keep talking until you
15    are done. When you are done, you let me know and
16    I will ask the next question.
17    A   I am done.
18    Q   I think this is what you are telling me,
19    but correct me if I am wrong: What you're
20    telling us is that when you worked for Lonestar,
21    you understood the concept of lockout/tagout?
22    A   Yes. I'd received literature from
23    Rapistan.
24    Q   When you worked for Lonestar?
25    A   Right.
```

Page 236

```
 1    Q   All right. So, the company that
 2    eventually got bought out by Siemen's is what you
 3    are referring to as Rapistan?
 4    A   Yes.
 5    Q   When you started on this project at
 6    Terminal E, they sent you a bunch of information?
 7    A   Yes.
 8    Q   Their manuals, safety manuals that dealt
 9    with lockout/tagout?
10    A   Right. Dealt with safety procedures.
11    Q   Okay. Which included lockout/tagout?
12    A   Yes.
13    Q   Which would have included job hazard
14    analysis?
15    A   I have no idea if that was in there. I
16    can't remember what all the subcategories were.
17    Q   Okay. Did you read it?
18    A   Of course I read it.
19    Q   Okay. Did you try to comply with it?
20    A   I complied -- that message to my
21    millwrights, that I have to comply with stuff I
22    got from then Rapistan.
23    Q   Did you then turn it over to the
24    millwrights, what you got from Rapistan?
25    A   I didn't turn over a copy, no.
```

Page 237

```
 1    Q   Did you walk them through it?
 2    A   Page by page?
 3    Q   Yes.
 4    A   No. Verbally tell them what Rapistan's
 5    requirements were, that you had to use
 6    lockout/tagout procedures.
 7         MR. O'MALLEY: Are we talking about
 8    the timing -- his verbal -- this verbal
 9    discussion occurred through the period
10    of time of your time or only during the
11    period until --
12         THE WITNESS: No. The
13    lockout/tagout discussion went on
14    through the whole course of the project,
15    but I received the material from
16    Rapistan
17    BY MR. DEVER:
18    Q   What you are saying is after June of
19    2001 --
20    A   Yep.
21    Q   Strike that.
22         Before July of 2001, when you worked for
23    Lonestar --
24    A   Right.
25    Q   -- Rapistan -- you were a -- Lonestar
```

60 (Pages 234 to 237)

## Page 218

1  A  They are startup warning lights.  When
2  you pushed them, the conveyor system is starting
3  up.  There is a pause.  That light comes on; the
4  MCP alarm is going on on the ground floor,
5  warning there's going to be a startup in about
6  six seconds, probably.
7  Q  Between seven and eight seconds sound
8  about right?
9  A  Right.  You will hear, hear the
10  conveyors going bang, bang, bang, bang, bang,
11  bang.  They all just don't go click.  You hear
12  them cascading on.
13  Q  In its finished system?
14  A  Certified.
15  Q  Certified.  The warning lights come on
16  at the same time an audio alarm goes on, a horn?
17  A  Yes.
18  Q  Both are flashing or making noise for
19  somewhere between six to eight seconds before any
20  conveyors turn on?
21  A  Yes.
22  Q  All right.  Which means -- I am not
23  trying to be fresh here -- there is a
24  six-to-eight-second delay between the time that
25  someone signals the MCP panel and the belt

## Page 219

1  drivers that we see uncovered in TC3-13 would
2  turn on?
3  A  Not necessarily.
4  Q  Okay.  Tell me what was wrong.
5  A  In the completed mode, where it's been,
6  say, commissioned, inspected and tested, yes,
7  when you hit the start button, you have a
8  six-second delay or whatever it is, if you are in
9  the test mode.  They can still force it on
10  without the alarms going on.
11  Q  Who is "they"?
12  A  Control room.  They still have it on
13  their screens.
14  Q  The Siemen's people in the control room
15  can force on the conveyor system without the
16  alarms signaling an advance warning?
17  A  I am sure it's in the programming, yes.
18  Q  At the time of this accident, were the
19  visual yellow-orange lights in the audio alarm
20  operational?
21  A  I have no idea.  I don't know.
22  Q  What would you need to know that?
23  A  What would I need?  I would have to see
24  it myself, when it started up.
25  Q  When do you think the yellow lights in

## Page 220

1  the audio alarm became operational?
2  A  In February, I really -- I really --
3  it's toward the tail end of testing, so an
4  inspection.  I don't know.
5  Q  So you would expect that the yellow
6  lights and the audio alarm would be operational
7  but overridden in the time frame of the accident?
8  A  No.
9  Q  What are you telling me?
10  A  I really truly don't think they were
11  operational at the time we were testing.  They
12  might have been put up the day before.  I don't
13  know.
14  That is an electrical schedule.  I don't
15  know whether electrical installed their yellow
16  lights or not.  I don't know.  Just because I see
17  them, I don't have a visual recollection if they
18  were working or not.
19  Q  Okay.  We are going to take a break in
20  one second.
21  So we are clear on the record, these
22  photographs were taken long after the system
23  became operational?
24  A  Yes.
25  Q  I don't want to mislead you on that.

## Page 221

1  A  Okay.  I was going to ask that next.
2  MR. DEVER:  Okay.  With that we will
3  take a break.
4
5  (Whereupon, a recess was taken from
6  3:22 o'clock p.m. until 3:27 o'clock
7  p.m.)
8
9  BY MR. DEVER:
10  Q  If TC2 line was in a function testing
11  mode, under what scenarios do you see only TC3-13
12  coming on?
13  A  I see no scenario that TC3-13 would be
14  on --
15  Q  Even --
16  A  -- unless somebody requested it to be
17  turned on, which would be a millwright, if he was
18  testing it.
19  Q  If they -- if they, the Siemen's control
20  room personnel, wanted to see how TC3 line
21  interfaced with a running TC2 line, under what
22  scenarios do you see only TC3-13 coming on?
23  A  I don't see any relationship between
24  TC3-13 and TC2, period, while they were turning
25  that on.

56 (Pages 218 to 221)

Page 222

1      Q  You do understand why they would turn on
2    TC3 line to see how it would interface with TC2
3    line?
4      A  Certain components of it, yes; the
5    merge.
6      Q  That would not include TC3-13?
7      A  No, not on its own.  Not on an
8    individual basis.
9      Q  Not with only that one segment being on?
10     A  No.
11     Q  TC3-13?
12     A  I don't see why they would.  I can only
13    guess.  I don't know why you would do it.
14     Q  What would your guess be, sir?
15          MR. O'MALLEY:  Objection.
16          THE WITNESS:  Why would they turn --
17     you asked me --
18    BY MR. DEVER:
19     Q  I am asking you.
20     A  I don't think -- why would they turn
21    TC3-13 on?  It makes no sense, logically, to me.
22     Q  Okay.  What would your guess be?  You
23    said, "I can only guess."
24     A  I can't guess why they would turn it on.
25    I have no idea.  You misinterpreted what I meant.

Page 223

1    I don't know why they would turn it on.
2      Q  Does the term "rate testing mode" mean
3    anything to you?
4      A  Sure.
5      Q  Okay.  What does that mean?
6      A  Rate testing is just the rate that the
7    belt is transporting the piece of luggage.
8      Q  Do they time that luggage?
9      A  Do they time it?
10     Q  Yes.  Is there a setting that you turn
11    to rate testing mode?
12     A  There is not a setting that you go to
13    rate testing, no.  There's a tool that is used on
14    top of the belt that a millwright uses to track
15    the speed of the belt.
16     Q  Okay.  Do you know who John Daily is,
17    D-a-i-l-y, identified in answers to
18    interrogatories as Siemen's contractor
19    administrator?
20     A  John Daily?  Doesn't jump up right now.
21    I don't know.
22     Q  The answer to interrogatories also
23    identified Jeff McLaughlin, M-c-l-a-u-g-h-l-i-n,
24    as project manager?
25     A  Yes.

Page 224

1      Q  Would he have been the project manager
2    at the time of Mr. Carr's accident for Siemen's?
3      A  I believe so.
4      Q  You were listed as the site
5    superintendent in these answers.
6      A  Yes.
7      Q  Would you agree you were the site
8    superintendent at the time of the accident?
9      A  Yes.
10     Q  You also indicated that for the
11    electrical portion of this, that would be Gary
12    Clinkscales?
13     A  Yes.  Yes.
14     Q  Still work for Siemen's?
15     A  Yes.
16     Q  In terms of when these flashing, warning
17    lights and audio alarms became active on TC2 and
18    TC3 line, Mr. Clinkscales would have been the
19    person who would be more knowledgeable about that
20    than you, because it's an electrical issue?
21     A  It's an electrical issue.
22     Q  Is that correct?
23     A  Yes.
24     Q  All right.  I am going to show you --
25          MR. DEVER:  Why don't we mark this

Page 225

1    as the next exhibit, and I will show it
2    to the witness.
3
4        (Reinecke Exhibit 14:
5        Marked for identification.)
6
7    BY MR. DEVER:
8      Q  Sir, I am going to show you a document
9    that I am -- that I have marked as Exhibit Number
10    14, and I want to tell you something about it
11    before I show it to you.
12          The face sheet indicates Siemen's
13    Dematic Rapistan Materials Handling Automation
14    Division Safety Policy and Manual.  That is the
15    face sheet.
16     A  Uh-huh.
17     Q  Before I ask you any questions about
18    that, the content of Exhibit Number 14, sir, have
19    you ever seen a document identifying itself as
20    what this face sheet identifies itself?
21     A  I have seen that, yes.
22     Q  Okay.  Do you remember seeing it and
23    having it available to you on the Terminal E
24    project when you worked for Siemen's before
25    Mr. Carr's accident?

57 (Pages 222 to 225)

Richard Reinecke

11/07/2006

Page 306

```
1      Q  They said -- if the Siemen's guys said,
2   on the walkie-talkie, "Turn on TC3-13," they
3   turned on TC3-13?
4      A  I don't know if that would happen.
5      Q  According to your testimony, in this
6   testing phase of February 2003 there would be no
7   need at that time to have any other signage on
8   any of the lines indicating that the line could
9   turn on at any moment because everyone already
10  knew that?
11     A  I assume that the lights weren't
12  working, so, yes -- you know, I wasn't there to
13  see the line start up.  So I really can't answer
14  what was working and what wasn't working.
15     Q  I was asking you about signs.
16     A  Signs?  What kind of signs?
17     Q  You know --
18     A  My little eleven and a half -- my eight
19  and a half by eleven?
20     Q  Yes.
21     A  I am sure they were ripped off and
22  thrown in the garbage by then.  Not by us, but,
23  you know, everybody was warned.
24        That was pre -- whenever the juice was
25  taken to the conveyors, that is when those little
```

Page 307

```
1   signs come up.
2        At this stage testing had been going on
3   for months.
4      Q  And these signs are long gone?
5      A  They are long gone.
6      Q  Okay.
7      A  It's obvious everything is live, because
8   we have been doing it for months.
9      Q  The final thing I just want to cover
10  with you, sir, is something you just said.  You
11  assumed that at the time of Mr. Carr's accident
12  that the warning light and the audio alarm in the
13  delayed system, both of those were not working at
14  the time of Mr. Carr's accident.  Correct?
15     A  I don't know.
16     Q  All right.  That is what you just told
17  me, you assumed that?
18     A  I wasn't there.
19     Q  And post-accident, after Mr. Carr's
20  accident, as part of your investigation did you
21  make any determination to figure out if that was
22  in place?
23     A  No.
24     Q  With regard to your comment that you
25  assumed it was not working, i.e., the audio delay
```

Page 308

```
1   alarm and the visual light delayed alarm, that
2   assumption is based upon the common sense concept
3   in your mind that had the light gone on, and the
4   alarm gone on, that if Mr. Carr was simply
5   touching the belt, he would have known enough to
6   pull back from the belt, wait eight seconds, six
7   to eight seconds and the whole thing would turn
8   on.  Right?
9      A  I don't know if it was working.  How can
10  I answer that?
11     Q  Your assumption is that it wasn't?
12     A  I don't want to assume.  Why should I
13  assume something?
14     Q  I don't know why you want to assume
15  something, but you did in one of your earlier
16  responses.
17     A  I made a comment that I don't know if it
18  was or was not working.  My recollection, it was
19  working, but I can't -- I think -- I don't know.
20     Q  Now, your recollection is that at the
21  time of Mr. Carr's accident the audio alarm and
22  visual light alarm was working?
23     A  No.
24     Q  Correct?
25     A  No.  No.  Don't misinterpret it.  I am
```

Page 309

```
1   sorry if I said it wrong.  I don't know.  I can't
2   remember if it was or it wasn't.  I don't know.
3   I don't remember.
4        After that, of course it worked, but
5   that's only the one on the commissioned line I
6   know it worked.  Prior to that, I don't know.
7      Q  I think your earlier testimony is that
8   the audio alarm and light alarm system may have
9   been functioning on the day of Mr. Carr's
10  accident --
11     A  No.  I don't know.
12     Q  Hold on.  Let me finish the question.
13  -- but that if it were functioning, the control
14  room had a manual override that they could
15  override both the visual alarm and the audio
16  alarm.  Correct?
17     A  If it was working.  You are asking me to
18  assume again.
19     Q  Yes, sir.
20     A  You are asking me to assume what the
21  control room was going to do or what they can do.
22     Q  Let me do this for you:  On the day of
23  Mr. Carr's accident, if the audio alarm and the
24  visual alarm were working and were not being
25  overridden, then when TC3-13 was electronically
```

78  (Pages 306 to 309)

Richard Neinecke

11/07/2006

Page 310

```
1    turned on there would be an eight-second delay
2    during -- or six-to-eight seconds during which
3    the alarm would be going off, and the flashing
4    light would be going off before the belt started
5    to turn. Correct?
6        A  If you started the full system. I still
7    don't get what you are driving at. You are still
8    wanting me to assume a situation. I don't -- you
9    got me lost.
10       Q  Okay. Nice and slow. Okay? I just
11   want to finish up with you on this, and we can
12   all go home.
13          If, electrically, the wiring and all of
14   the work had been done so that the alarm system,
15   the -- back up a half second.
16          You understood that this system, under
17   the terms and specifications of the contract had
18   an alarm system where there would be a flashing
19   light and audio alarm that would sound for about
20   six seconds, up to eight seconds, before the
21   motor turned on, started turning the belts, which
22   in turn would turn on and turn the conveyors.
23   Correct?
24       A  That is what it is designed to do, yes.
25       Q  The purpose of those visual and audio
```

Page 311

```
1    alarms was to warn people who were around the
2    conveyors that that conveyor line was about to
3    turn on. Correct?
4        A  In what phase of installation?
5        Q  Well, at any phase.
6        A  No, not any phase.
7        Q  Okay. In its finished phase?
8        A  Yes, in the finished phase, yes, in the
9    commissioning phase.
10       Q  In its commissioning phase, yes?
11       A  Yes.
12       Q  Now, in its testing phase, at some point
13   in time you want to test the audio and visual
14   alarm to make sure it functions properly.
15   Correct?
16       A  Yes.
17       Q  Okay. So, during a portion of the
18   testing phase you want to make sure that the
19   visual and audio alarm is functioning properly?
20       A  Yes.
21       Q  Okay. And what you are also telling us
22   is that the control room and Siemen's people in
23   the control room, during a portion of the testing
24   phase, can override the operational audio and
25   visual alarm system. Correct?
```

Page 312

```
1        A  I have to think it through, how it
2    works, the circuitry. They cannot override --
3    when it's -- this is hard to explain.
4           When it started from scratch, and the
5    alarms go on, they can't override that alarm. It
6    goes for six seconds, and all the alarms go off.
7    They can't forcibly, at that time, turn anything
8    off.
9           I think what -- if they force the lines
10   on, the alarm does not go off.
11       Q  Why is that?
12       A  That is all in the PLC program. It's
13   not hooked into a start switch, is all I know.
14       Q  PLC program is Siemen's program?
15       A  Yes, it is.
16       Q  So if the Siemen's control room people
17   force on a line or a segment of a line, the alarm
18   switch for that line or that segment of the line
19   will not sound, even if the alarm and visual
20   signal is electrically operational?
21       A  I am not positively sure about this. I
22   am not going to stick my neck out.
23       Q  The guy we really need to ask about that
24   would be either Mr. Bissot, Oscar Bissot or
25   Mr. Clinkscales?
```

Page 313

```
1        A  Correct.
2           MR. DEVER: Thank you, sir. That is
3    all the questions I have. Your lawyer
4    may have several questions of you
5           MR. O'MALLEY: No. Just take one
6    last break, and we will be back in two
7    minutes.
8
9           (Whereupon, a recess was taken from
10   5:27 o'clock p.m. until 5:30 o'clock
11   p.m.)
12
13          MR. O'MALLEY: I think we are done.
14          MR. DEVER: Thank you. Thank you,
15   sir. You are a very nice man
16          THE WITNESS: No problem.
17
18   (Whereupon, the deposition was
19   concluded at 5:30 o'clock p.m.)
20
21
22
23
24
25
```

79 (Pages 310 to 313)

Page 102

1      A  Yes.
2      Q  Okay.  Is that the ramp that would then
3   convey the baggage into the baggage screening
4   room.
5      A  I believe so.
6      Q  That ramp that we see in the picture,
7   that is not part of the original base contract,
8   but that's the add-on contract?
9      A  Yes.
10     Q  In Reinecke Exhibit Number 9, sir, there
11  is a pole with a yellow-orangish light on it.  Do
12  you see that?
13     A  Yes.
14     Q  Do you know what that is?
15     A  Yes.
16     Q  Tell us what that is.
17     A  Start-up light alarm.
18     Q  Was that -- at that location was that
19  start-up light alarm part of the original
20  contract?
21     A  Yes.
22     Q  I am showing you, sir, TC -- excuse
23  me -- I am showing you Reinecke Exhibit Number 7,
24  sir.
25     A  Yes.

Page 103

1      Q  To the left of TC3-16 there appears to
2   be another pole with a light on it.
3      A  Yes.
4      Q  Do you recognize that?
5      A  Yes.
6      Q  Tell us what that is.
7      A  That's a warning light, start-up light.
8      Q  Is that part of the original base
9   contract?
10     A  I believe it was, yes.
11     Q  Okay.  If you look in the background of
12  the picture you see a gathering of people?
13     A  Yes.
14     Q  Chubby guy with the white shirt, looks
15  remarkably similar to me; do you see him?
16     A  Yes.
17     Q  Right dead center of my body is the same
18  start-up light pole that we see in TC9.  Correct?
19     A  Correct.
20     Q  Okay.  And so you would agree that what
21  we see in Exhibit Number 7 was part of the
22  original base contract between Modern and
23  Siemen's?
24     A  I believe so, yes.
25     Q  Thank you, sir.  Looking at Exhibit

Page 104

1   Number 11, was -- with regard to the merge, was
2   everything north of the merge on TC3 line part of
3   the original base contract?
4      A  Yes.
5      Q  And was everything north of the merge
6   part of the original -- original base contract on
7   TC2 line, as well?
8      A  Yes.
9      Q  Was there anything about the schematic
10  drawing, Exhibit Number 11, that involved the
11  second contract?
12     A  Not that I see, no.
13     Q  All right.  What you are telling us is
14  somewhere around 20 or 30 feet or so south of the
15  merger point the conveyor belt changed and
16  started to ramp, to climb an elevation so that
17  the conveyor line could switch over into another
18  building to be screened?
19     A  Yes.
20     Q  Where it started to ramp up in elevation
21  is essentially where the new modification
22  contract came in?
23     A  Yes.
24     Q  Very good.  So, in terms of the original
25  base contract, it was you and Gary Clinkscales

Page 105

1   that were directly involved with Siemen's?
2      A  Yes.
3      Q  And then what was Mr. Clinkscales' role?
4      A  Electrical superintendent.
5      Q  Where is he these days?
6      A  Siemen's Texas.
7      Q  Who was whose boss?
8      A  Neither.  Neither.  We were independent
9   of each other.  He was in charge of electrical,
10  and I was in charge of mechanical.
11     Q  Okay.  Who would he interface with?
12  Would he deal with Shaughnessy?
13     A  No.
14     Q  What subcontractor did the electrical?
15     A  EG Sawyer.  They are out of Boston, I
16  believe.  I couldn't tell you who the owner is.
17  Pretty big out there.
18     Q  Okay.  Would you interface with them at
19  all?
20     A  EG Sawyer?
21     Q  Yes.
22     A  I might.  Just rarely.  I wouldn't
23  really interface with them.  I would have no
24  reason.  Maybe the only reason I would interface
25  with them, they might want to know where I was

27 (Pages 102 to 105)

Richard Reinecke

11/07/2006

Page 294

1    Q -- Oscar. I've got to give you Oscar --
2    A  Glenn Talent.
3    Q  All right. But in terms of the computer
4    logic, computer-related issues, the control room
5    people on the date of Mr. Carr's accident, you
6    are unaware of who they were?
7    A  I am unaware of who was in the control
8    room.
9    Q  You are unaware of what role they played
10   in the accident?
11   A  I am unaware of what their role was.
12   Q  When you investigated the accident
13   post-accident, did you try to make any
14   determination of that, how --
15   A  I tried to make sense of it.
16   Q  -- how this one segment turned on?
17   A  I wasn't aware at the time that was what
18   happened, so --
19   Q  Okay.
20   A  I wasn't aware that one segment turned
21   on.
22   Q  Did you have any understanding before
23   now or today as to how the accident happened?
24   A  I really do not have that much knowledge
25   of it. I knew where it happened. I know his

Page 295

1    finger was in it. I knew the conveyor started.
2    I didn't know how many segments started, one,
3    three, ten or 20. I have no idea. I wasn't
4    there to see.
5        I don't know what the testing scope was
6    at the time.
7    Q  Did you change any policies with regard
8    to communication between the control room people
9    and Shaughnessy millwrights testing the line
10   after Mr. Carr's accident?
11   A  Not that I recall, no.
12   Q  One of the categories here, number 7, is
13   any reports filed by Siemen's. You indicated
14   that you filed one but have not seen it?
15   A  I haven't seen it.
16   Q  In preparation for your deposition here
17   today, did you review any documents?
18   A  (Shaking head.)
19   Q  What you see -- you are shaking your
20   head no?
21   A  No. I am sorry.
22   Q  What you see is what you get with you?
23   A  You showed me more than I have seen.
24   Q  Okay. Number 12, sir, you were asked --
25   we were asking you with regard to guidelines and

Page 296

1    instructions and warnings of policies issued by
2    the defendant, Siemen's, relative to the job
3    safety of the Logan Airport Terminal E project,
4    and you are not aware of anything that was
5    specifically issued by Siemens. Correct?
6    A  Correct.
7    Q  Number 13 is looking for any and all
8    incidents involving the subject conveyor machine
9    at Logan Terminal E project. You indicated
10   Mr. Carr's accident, and then you indicated that
11   a few days later that there were four Shaughnessy
12   people laid off because they weren't following
13   lockout/tagout?
14   A  Yes.
15   Q  You are unfamiliar with any other
16   accidents?
17   A  In my terminal, no, I don't recall any.
18   Q  Number 14 asks to identify any and all
19   entities of persons for the defendant, Siemen's,
20   with responsibility for inspecting the job site
21   for safety concerns. That would be you.
22   Correct?
23   A  Well, if I see it. We are back to that
24   again. If I saw it, yes.
25   Q  You understood your job was to walk

Page 297

1    through the project and check on the work?
2    A  Check the work and check if installation
3    is done properly, per specifications.
4    Q  You are, at the same time, checking on
5    it --
6    A  If I notice something noticeable, yes.
7    Q  -- with regard to safety?
8    A  Yes.
9        MR. O'MALLEY: I want to note we
10       objected to the breadth and scope of
11       that in a letter dated April 24, of this
12       year, 2006. Those objections still
13       stand.
14   BY MR. DEVER:
15   Q  Would you also agree that
16   Mr. Clinkscales, with regard to the electrical
17   work, would have a responsibility for making sure
18   that work was done in a safe fashion?
19   A  I am sure if he observed something that
20   was unsafe, he would bring it to somebody's
21   attention and correct it on spot also.
22       I can't speak to him, but I assume he
23   would.
24   Q  And with regard to the Siemen's fellows
25   that were working in the control room, in terms

75 (Pages 294 to 297)

Page 310

1　turned on there would be an eight-second delay
2　during -- or six-to-eight seconds during which
3　the alarm would be going off, and the flashing
4　light would be going off before the belt started
5　to turn. Correct?
6　　A　If you started the full system. I still
7　don't get what you are driving at. You are still
8　wanting me to assume a situation. I don't -- you
9　got me lost.
10　　Q　Okay. Nice and slow. Okay? I just
11　want to finish up with you on this, and we can
12　all go home.
13　　If, electrically, the wiring and all of
14　the work had been done so that the alarm system,
15　the -- back up a half second.
16　　You understood that this system, under
17　the terms and specifications of the contract had
18　an alarm system where there would be a flashing
19　light and audio alarm that would sound for about
20　six seconds, up to eight seconds, before the
21　motor turned on, started turning the belts, which
22　in turn would turn on and turn the conveyors.
23　Correct?
24　　A　That is what it is designed to do, yes.
25　　Q　The purpose of those visual and audio

Page 311

1　alarms was to warn people who were around the
2　conveyors that conveyor line was about to
3　turn on. Correct?
4　　A　In what phase of installation?
5　　Q　Well, at any phase.
6　　A　No, not any phase.
7　　Q　Okay. In its finished phase?
8　　A　Yes, in the finished phase, yes, in the
9　commissioning phase.
10　　Q　In its commissioning phase, yes?
11　　A　Yes.
12　　Q　Now, in its testing phase, at some point
13　in time you want to test the audio and visual
14　alarm to make sure it functions properly.
15　Correct?
16　　A　Yes.
17　　Q　Okay. So, during a portion of the
18　testing phase you want to make sure that the
19　visual and audio alarm is functioning properly?
20　　A　Yes.
21　　Q　Okay. And what you are also telling us
22　is that the control room and Siemen's people in
23　the control room, during a portion of the testing
24　phase, can override the operational audio and
25　visual alarm system. Correct?

Page 312

1　　A　I have to think it through, how it
2　works, the circuitry. They cannot override --
3　when it's -- this is hard to explain.
4　　When it started from scratch, and the
5　alarms go on, they can't override that alarm. It
6　goes for six seconds, and all the alarms go off.
7　They can't forcibly, at that time, turn anything
8　off.
9　　I think what -- if they force the lines
10　on, the alarm does not go off.
11　　Q　Why is that?
12　　A　That is all in the PLC program. It's
13　not hooked into a start switch, is all I know.
14　　Q　PLC program is Siemen's program?
15　　A　Yes, it is.
16　　Q　So if the Siemen's control room people
17　force on a line or a segment of a line, the alarm
18　switch for that line or that segment of the line
19　will not sound, even if the alarm and visual
20　signal is electrically operational?
21　　A　I am not positively sure about this. I
22　am not going to stick my neck out.
23　　Q　The guy we really need to ask about that
24　would be either Mr. Bissot, Oscar Bissot or
25　Mr. Clinkscales?

Page 313

1　　A　Correct.
2　　MR. DEVER: Thank you, sir. That is
3　all the questions I have. Your lawyer
4　may have several questions of you
5　　MR. O'MALLEY: No. Just take one
6　last break, and we will be back in two
7　minutes.
8
9　　(Whereupon, a recess was taken from
10　5:27 o'clock p.m. until 5:30 o'clock
11　p.m.)
12
13　　MR. O'MALLEY: I think we are done.
14　　MR. DEVER: Thank you. Thank you,
15　sir. You are a very nice man
16　　THE WITNESS: No problem.
17
18　　(Whereupon, the deposition was
19　concluded at 5:30 o'clock p.m.)
20
21
22
23
24
25

79　(Pages 310 to 313)

UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MASSACHUSETTS

JOHN CARR                      )
     Plaintiff              )
                          )
v.                             )                CIVIL ACTION NO: 05-10445MLW
                          )
SIEMENS DEMATIC CORP.          )
AND AMEC CONSTRUCTION          )
MANAGEMENT, INC.               )
     Defendants              )

## CERTIFICATION OF COUNSEL

_____Pursuant to Local Rules 37.1 and 7.1(A)(2) of the United States District Court for the

District of Massachusetts and Rule 37 of the Federal Rules of Civil Procedure, I, Brian C. Dever,

attorney for the Plaintiff, John Carr, hereby certify that I have conferred in good faith with

counsel for the Defendants on a number of occasions in an effort to obtain the production of

documents that are at issue in the instant Motion.

                                 /s/ Brian C. Dever_____
                                 Brian C. Dever (BBO # 544203)