UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JOHN CARR,                ) | |
|                    ) | |
|      Plaintiff,       ) | |
|                    ) | |
| v.                     ) | Civil Action No. 05-10445-RBC |
|                    ) | |
| SIEMENS DEMATIC CORP., et al.,   ) | |
|                    ) | |
|      Defendants.     ) | |
|                    ) | |

## <u>DEFENDANT SIEMENS DEMATIC CORPORATION'S OPPOSITION TO PLAINTIFF'S MOTION TO COMPEL</u>

Defendant Siemens Dematic Corp. ("Siemens") hereby opposes Plaintiff's Motion to Compel the Further Production of Documents and Further F.R.C.P. 30(b)(6) Testimony.

On December 21, 2006, the parties attended a hearing before the Court concerning the state of fact discovery, which was scheduled to close that day. In an attempt to forestall the scheduled close of discovery, Plaintiff raised concerns to the Court for the first time about Siemens' production of documents and the sufficiency of its F.R.C.P. 30(b)(6) designee. Plaintiff claimed that each was inadequate, and that, therefore, a further extension of the discovery period was necessary.

Plaintiff now moves to compel, arguing that Siemens has failed to produce (1) all responsive documents in its possession relating to contracts for the Terminal E Project; (2) all responsive documents in its possession relating to safety on the Terminal E Project; and (3) a

sufficient 30(b)(6) witness. *See* Plaintiff's Brf. at 1. Plaintiff's claims are without foundation.

Siemens has produced to Plaintiff all responsive documents in its possession and has met its

obligations under F.R.C.P. 30(b)(6). For these reasons, Plaintiff's argument is without merit and

should be denied.

## STATEMENT OF FACTS

The present action stems from an injury to Plaintiff's right hand sustained on or about

February 19, 2003. At the time of the injury, Plaintiff was working as a union Millwright. *See*

Exhibit ("Ex.") A, Complaint at ¶ 6. He and other members of his union had been hired to install

a conveyor belt system at Logan Airport's Terminal E ("Terminal E Project"). *See* Ex. B, Ryan

Dep. at 25. While working at Terminal E, Plaintiff stuck his hand into a conveyor section motor

drive without turning the power to the drive belt off or taking other necessary safety precautions

before doing so. *See* Ryan Dep. at 104-106. As a result, Plaintiff injured his hand when the

drive belt started. *Id.*

Plaintiff has attempted to focus the inquiry in this litigation on the computer logic[1] of the

conveyor belt system at the time of Plaintiff's accident. This case is not, however, about

computer logic or the control room at the Terminal E Project. It is about Plaintiff's failure to

follow both safety protocols and common sense and shut down, lock out, and tag out the drive

belt he was injured on prior to working on it. A lock out/tag out procedure is a very simple set of

steps one takes to ensure that equipment is properly secured and will not start or move while one

is working on it. *See* Ryan Dep. at 267-268. At its most basic, locking out and tagging out a

machine requires that an individual (1) turn off the machine he or she is planning to work on; (2)

place a lock on the power disconnect switch controlling the source of power to the equipment he

---

[1] In his Notice of Taking of 30(b)(6) Deposition of Siemens, Plaintiff defines computer logic as "the computer program and/or code which effects the way in which a luggage conveyor operates and/or interacts with other pieces of equipment." *See* Ex. C.

or she is working on; and (3) place a tag on the lock to let others know who is working on the

equipment. *See* Ryan Dep. at 267. At the time of Plaintiff's accident, all Millwrights working at

the Terminal E Project, including Plaintiff, were aware that the conveyors at Terminal E were

"live," that is, connected to energy sources, and thus capable of running at any time unless turned

off and locked and tagged out. *See* Ryan Dep. at 52-53. At the time, Plaintiff also had been

trained to lock out and tag out live equipment prior to working on it. *See* Ryan Dep at 159,165-

166, and 175. Furthermore, just before Plaintiff began working on the drive belt, Plaintiff's

direct superior, Frank Ryan, a union Millwright foreman on the project, told Plaintiff to lock out

the drive belt. *See* Ryan Dep. at 228, 235. Nonetheless, Plaintiff failed to turn off the power to

the drive belt, or lock out and tag out this disconnect, though the power disconnect switch was

easily accessible to him, mere inches from the drive belt on which he injured himself. *See* Ryan

Dep. at 98-99. Had Plaintiff simply turned off the power to the drive belt and followed basic

lock out tag out steps, there is *no possible way* he could have injured himself as he did. *See* Ryan

Dep. at 62. It was Plaintiff's failure to follow both common safety protocols and common sense

that resulted in his accident, not work being performed on computer logic or in the control room

at the time of the accident.

## ARGUMENT

## I.     SIEMENS HAS PROVIDED PLAINTIFF WITH ALL RESPONSIVE DOCUMENTS IN ITS POSSESSION RELATING TO RELEVANT CONTRACTS

Plaintiff claims that Siemens has failed to comply with its discovery obligations in this

matter by not producing all relevant contracts in its possession. This is untrue. Siemens has

produced to Plaintiff all contracts in its possession that relate to the Terminal E Project,

including, out of an abundance of caution, a contract between AMEC Construction Management,

Inc. ("AMEC") (the construction manager on the Terminal E Project) and Siemens (the

manufacturer of the conveyor belts installed on the Terminal E Project) dated March 19, 2003,

one month after the accident at issue.  Furthermore, as the Court is aware, the full project file for

the Terminal E Project is maintained by the Massachusetts Port Authority ("Massport").  Plaintiff

has had full access to this file and all contract documents found therein.  Siemens has produced

all responsive documents in its possession, and therefore, Plaintiff's Motion to Compel the

production of contract documents should be denied.

## II.     SIEMENS HAS PROVIDED PLAINTIFF WITH ALL RESPONSIVE DOCUMENTS IN ITS POSSESSION RELATING TO SAFETY

In its motion, Plaintiff requests that the Court compel Siemens to produce a full copy of

the Siemens safety manual in effect on February 19, 2003.  Siemens produced a portion of this

safety manual to Plaintiff in October of 2006.  When notified that the manual was incomplete,

Siemens produced the full safety manual to Plaintiff.  Further, Plaintiff has made available all

other documents in its possession that pertain to job safety in the same time frame.  Accordingly,

Plaintiff's request for additional safety documents is moot, and should be denied.

## III.    SIEMENS HAS FULFILLED ITS OBLIGATIONS UNDER F.R.C.P. 30(B)(6)

Plaintiff's claim that Siemens has not produced a sufficient F.R.C.P. 30(b)(6) witness is

without foundation.  In his motion, Plaintiff argues that Siemens has not produced a witness with

sufficient knowledge of work performed on the computer logic of the conveyor belt system being

installed at Terminal E and/or work being performed in the control room at Terminal E at the

time Plaintiff injured himself.  *See* Plaintiff's Brf. at 4-5.

As an initial matter, work on computer logic and/or in the control room is irrelevant to

this litigation and therefore is not a relevant topic for 30(b)(6) deposition testimony.

Nevertheless, Mr. Reinecke, Siemens' 30(b)(6) designee, who was the mechanical superintendent

for Siemens on the Terminal E Project, covered these topics in detail in his deposition.  Thus,

even assuming that these topics were relevant, Siemens has met its obligation under the Federal Rules of Civil Procedure and should not be compelled to submit further 30(b)(6) testimony. Furthermore, Plaintiff's motion is unnecessary as Siemens has agreed to produce Mr. Clinkscales – the very individual Plaintiff seeks to depose through motion practice – in his individual capacity.

A.    Work on Computer Logic and/or in the Control Room at Logan Airport's Terminal E is Not Relevant to the Inquiry in this Litigation

On January 23, 2006, Plaintiff served a broad and sweeping Rule 30(b)(6) Notice of Deposition on Siemens that sought information on an array of topics, many of which have no relevance to the question of how Plaintiff injured himself while working on the Terminal E Project. *See* Ex. C. Upon receipt of this Notice, Siemens objected to those topics that are clearly tangential to this action, and, subject to its objections, agreed to produce a witness to testify. *See* Ex. D. Plaintiff Re-Noticed this deposition for July 28, 2006. *See* Ex. E. On November 7, 2006, Plaintiff deposed Mr. Reinecke on a range of topics, including computer logic. Plaintiff now seeks further testimony on the topic of computer logic. As set forth above in the Statement of Facts, Plaintiff's injury is the direct result of his failure to heed both common sense and the safety procedure he had been trained to follow. Plaintiff was warned that conveyor belts were live, and thus could start at any time, and yet he still failed to shut down, lock out, and tag out the conveyor belt prior to placing his hand in a dangerous position. The computer logic of the conveyor belt system is irrelevant to how Plaintiff injured himself, and thus Siemens should not be forced to supplement Mr. Reinecke's extensive testimony on the subject.[2]

---

[2] In his Motion, Plaintiff also requests that Siemens produce all documents related to electrical and/or computer logic operations in the control room as of the time of the accident. *See* Plaintiff's Brf. at 5. Siemens already has produced to Plaintiff all relevant documents in its possession responsive to this request. In October, Siemens made available to Plaintiff documents relating to the Terminal E Project and produced all documents requested by Plaintiff. Additionally, since that time, Siemens has produced documents specifically relating to computer logic.

B.    Regardless of the Relevancy of Plaintiff's 30(b)(6) Deposition Topics, Siemens Has Met Its 30(B)(6) Obligation Under the Federal Rules of Civil Procedure

Even assuming that computer logic and/or control room work are relevant areas of inquiry, Mr. Reinecke has testified on this subject matter and thus Siemens has met its obligation under F.R.C.P 30(b)(6).

Under F.R.C.P. 30(b)(6), a corporation must designate a person to testify "as to matters known or reasonably available to the organization." F.R.C.P. 30(b)(6). A 30(b)(6) witness is required to respond to inquiries with information reasonably known to the corporation as the result of reasonable inquiries. *See Beloit Liquidating Trust v. Century Idemn., Co.*, No. 02 C 50037, 2003 WL 355743 at *3 (N.D. Ill. Feb. 13, 2003).

In his deposition on November 7, 2006, Mr. Reinecke testified at length about how computer logic affected the conveyors at Terminal E while those conveyors were being tested, which was the case when Plaintiff injured himself. Plaintiff claims that Mr. Reinecke "did not possess any knowledge as to whether the alarms were operational as of February 19, 2003" as evidence that Mr. Reinecke was not sufficient as a 30(b)(6) witness. *See* Plaintiff's Brf. at 5. Plaintiff's dissatisfaction with Mr. Reneicke's answer is not, however, a basis for complaint. *See Berwind Prop. Group, Inc. v. Envtl. Mgmt. Group, Inc.* 233 F.R.D. 62, (D. Mass. 2006 (Gorton, J. (claim of inadequately prepared 30(b)(6) witness: "That Berwind may be unhappy with those answers is not the Court's concern and it will not order EMG to supplement those responses.")). Whether or not Mr. Reienecke recalled the exact day when alarms on the Terminal E Project became fully operational does not render his testimony as a 30(b)(6) deponent insufficient. *See*

---

Further, as noted above in Section I, the project file for the Terminal E Project is maintained by Massport. Plaintiff has had full access to this file.

*U.S. v. Taylor*, 166 F.R.D. 356, 361 (M.D.N.C. 1996) (noting that "just like in the instance of an individual deponent, the corporation may plead lack of memory.").

During his deposition, Mr. Reinecke spoke at length about how the audio and visual alarms were designed to act upon completion of the Terminal E Project (*See, e.g.,* Ex. F, Reinecke Dep. at 217-220), verified that the project was still in the midst of its "testing" phase during February 2003 (*Se, e.g.,* Reinecke Dep. at 148), and indicated that all millwrights, including Plaintiff, were aware that the conveyor belts were live and could start without warning during the testing period. *See, e.g.,* Reinecke Dep. at 132.

Furthermore, contrary to Plaintiff's suggestion in his motion, Mr. Reinecke also testified extensively and in detail during the deposition about how computer logic affected the conveyor belts during both the testing and finished phases of the Terminal E Project. For example, Mr. Reinecke explained how Siemens employees in the control room used computer logic to test the conveyor belt (*see, e.g.* Reinecke Dep. at 184-197) and also described in detail the computer logic of the conveyor in its finished phase (*see, e.g.,* Reinecke Dep. at 148-161). For these reasons, Plaintiff's demand for more F.R.C.P. 30(b)(6) deposition testimony should be denied.

C.     Plaintiff Has Agreed to Produce Mr. Clinkscales In His Individual Capacity

Plaintiff's complaint that Siemens has failed to produce a sufficient 30(b)(6) witness is particularly illogical because, as Plaintiff notes in his brief, Siemens has agreed to produce Mr. Clinkscales – the very witness Plaintiff calls for in his motion – for deposition in his individual capacity at Siemens' offices in Texas. Mr. Clinkscales, who was the electrical superintendent on the Terminal E Project, can respond to any further questions Plaintiff has about electrical supply on the project. *See* Plaintiff's Brf. at 5. The parties are currently discussing a mutually acceptable date for this deposition. For this reason, as well as the reasons set forth above in

Sections III(A) and (B), Plaintiff's Motion to Compel further 30(b)(6) deposition testimony should be denied.

CONCLUSION

For the reasons set forth above, Defendants respectfully request that the Court deny Plaintiff's Motion to Compel Further Discovery.


Respectfully Submitted,

Defendant

SIEMENS DEMATIC CORP.

By its attorneys,


/s/  Gabriel D. O'Malley
Matthew M. Burke (BBO # 557281)
Gabriel D. O'Malley (BBO # 651432)
ROPES & GRAY LLP
One International Place
Boston, Massachusetts 02110
(617) 951-7000


Dated: January 23, 2007

**Exhibit A**

# COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, SS                              TRIAL COURT OF MASSACHUSETTS
                                        SUPERIOR COURT DEPARTMENT

JOHN CARR                          )
      Plaintiff,                )
                                   )
                                   )
V.                                 )
                                   )
                                   )
                                   )
SIEMENS DEMATIC CORP.              )
AND AMEC CONSTRUCTION              )
MANAGEMENT, INC.                   )
      Defendants.               )

## COMPLAINT AND JURY DEMAND

1.  The Plaintiff John Carr is an individual residing at 1103 Avalon Drive, Weymouth, Norfolk County, Massachusetts.

2.  The Defendant, Siemens Dematic Corporation is a corporation incorporated under the laws of New York with a principal place of business at 507 Plymouth Avenue, Northeast, Grand Rapids, Michigan.

3.  Jurisdiction over the Defendant, Siemens Dematic Corporation is proper pursuant to the following:

    (a)  The Defendant's transacting business in the Commonwealth of Massachusetts;

    (b)  The Defendant's contracting to supply services or things in the Commonwealth of Massachusetts;

    (c)  The Defendant's causing tortious injury by an act or omission in the Commonwealth of Massachusetts; and/or

    (d)  The Defendant's causing tortious injury inside the Commonwealth of Massachusetts by an act or omission outside this Commonwealth and regularly doing or soliciting business, or engaging in any other persistent course of conduct, or deriving substantial revenue from goods used or consumed, or services rendered, in the Commonwealth of Massachusetts, and set forth in M.G.L., Ch. 223, Subsection A, Section 3.

4.  The Defendant, AMEC Construction Management Incorporated is a corporation incorporated under the laws of Delaware with a principal place of business at 1633 Broadway, New York, NY.

5.  Jurisdiction over the Defendant, AMEC Construction Management, Inc. is proper pursuant to the following:

    (a)  The Defendant's transacting business in the Commonwealth of Massachusetts;

MAR. 4.2005 11:34AM    SIEM 5 DEMATIC LEGAL    FAX NO. 6. 913 5765    NO. 1973    P. 7/11

| (b) | The Defendant's contracting to supply services or things in the Commonwealth of Massachusetts; |
|---|---|

(c)    The Defendant's causing tortious injury by an act or omission in the Commonwealth of Massachusetts; and/or

(d)    The Defendant's causing tortious injury inside the Commonwealth of Massachusetts by an act or omission outside this Commonwealth and regularly doing or soliciting business, or engaging in any other persistent course of conduct, or deriving substantial revenue from goods used or consumed, or services rendered, in the Commonwealth of Massachusetts, and set forth in M.G.L., Ch. 223, Subsection A, Section 3.

6.    At all times material herein, the Plaintiff John Carr was employed by Shaughnessy Millwrights located on D Street, South Boston, Massachusetts, as a millwright and was working on a job site located at Logan International Airport, Terminal E, in Boston, Suffolk County, Massachusetts.

## COUNT I

7.    The Plaintiff repeats the allegations contained in paragraph 1 through 6 as if realleged herein.

8.    On or about February 19, 2003, the Defendant, Siemens Dematic Corporation designed, manufactured, inspected, tested, installed, sold, supplied, maintained, repaired and/or provided start up services on a luggage conveyor machine. Said machine was located at the time of the accident at the Logan Airport Terminal E jobsite located in Boston, Suffolk County, Massachusetts.

9.    As a result of the negligence of the Defendant, Siemens Dematic Corporation in the design, manufacture, inspection, testing installation, sales, supply, maintenance, repair and/or providing start up services of said machine and as a result of the negligence of the Defendant, Siemens Dematic Corporation in failing to give adequate and effective warnings concerning the foreseeable dangers from the foreseeable uses of said machine and as a result of the negligence of the Defendant in failing to give adequate and proper instruction for the foreseeable uses of said machine and as a result of the negligence of the defendant Siemens Dematic Corporation in failing to properly guard said machine, the Plaintiff John Carr was caused to be seriously and permanently injured.

10.    As a direct and proximate result of said injuries the Plaintiff has incurred and continues to incur medical expenses, has lost and continues to lose time and wages from his employment and has suffered and continues to suffer an impairment to his ability to enjoy life and attend to his usual activities.

11.    At all times material herein, the Plaintiff was in the exercise of due care and free from all comparative negligence.

12.    The Plaintiff has satisfied all conditions precedent to the bringing of this cause of action.

WHEREFORE, the Plaintiff John Carr demands judgment against the Defendant, Siemens Dematic Corporation in the amount of his damages together with costs, interests and reasonable attorney's fees.

THE PLAINTIFF JOHN CARR CLAIMS AND DEMANDS A TRIAL BY JURY ON HIS CAUSE OF ACTION.

-2-

MAR. 4. 2005 11:35AM    SIEMENS DEMATIC LEGAL    FAX NO. 6. 913 5785    NO. 1973  P. 8/11    P. 8

## COUNT II

13.    The Plaintiff, John Carr repeats the allegations contained in paragraphs 1 through 12 in this Complaint as if realleged herein.

14.    The Defendant, Siemens Dematic Corporation expressly and impliedly warranted that the conveyer machine was safe, merchantable and fit for use for which it was intended.

15.    The Defendant, Siemens Dematic Corporation in permitting, allowing and/or suffering the aforesaid defective, dangerous, and hazardous conveyer machine to be sold breached its express and implied warranties related to merchantability, marketability and fitness for a particular intended use and purpose.

16.    The Plaintiff relied on the warranties made by the Defendant, Siemens Dematic Corporation and suffered personal injuries as a result of the breaches of said warranties by the Defendant.

17.    As a direct and proximate result of said injuries the Plaintiff has incurred and continues to incur medical expenses, has lost and continues to lose time and wages from his employment and has suffered and continues to suffer an impairment to his ability to enjoy life and attend to his usual activities.

18.    At all times material herein the Plaintiff was in the exercise of due care and free from all comparative negligence.

19.    The Plaintiff has satisfied all conditions precedent to the bringing of this cause of action.

WHEREFORE, the Plaintiff John Carr demands judgment against the Defendant, Siemens Dematic Corporation in the amount of his damages together with costs, interests and reasonable attorney's fees.

THE PLAINTIFF JOHN CARR CLAIMS AND DEMANDS A TRIAL BY JURY ON HIS CAUSE OF ACTION.

## COUNT III

20.    The Plaintiff repeats and the allegations contained in paragraphs 1 through19 of this Complaint as if realleged herein.

21.    At all times material herein the Defendant, Siemens Dematic Corporation was the manufacturer and seller of the conveyer machine in question.  At all times material herein, the Defendant Siemens Dematic Corporation through its employees and/or agents supervised the installation of said conveyer machine on the premises of the Logan Airport Terminal E jobsite, located in Boston, Suffolk County, Massachusetts.

22.    The Defendant, Siemens Dematic Corporation had a duty to supervise said installation of said machine in a safe and proper manner.

23.    On or about February 19, 2003, the Defendant, Siemens Dematic Corporation breached said duty by negligently supervising the installation of the said conveyer machine thereby causing the Plaintiff to have his hand caught in the conveyer machine.

24.    On or about February 19, 2003, as a direct and proximate result of the Defendant, Siemens Dematic Corporation's negligence, the Plaintiff was caused to sustain serious

personal injury.

25. As a direct and proximate result of said injuries the Plaintiff has incurred and continues to incur medical expenses, has lost and continues to lose time and wages from his employment and has suffered and continues to suffer an impairment to his ability to enjoy life and attend to his usual activities.

26. The Plaintiff was in the exercise of due care and free of any comparative negligence at all times material herein.

27. The Plaintiff has fulfilled all conditions precedent to the bringing of this cause of action.

WHEREFORE, the Plaintiff John Carr demands judgment against the Defendant, Siemens Dematic Corporation in the amount of his damages together with costs, interests and reasonable attorney's fees.

THE PLAINTIFF JOHN CARR CLAIMS AND DEMANDS A TRIAL BY JURY ON HIS CAUSE OF ACTION.

## COUNT IV

28. The Plaintiff repeats the allegations contained in paragraphs 1 through 27 as if realleged more fully herein.

29. At all times material herein the Defendant, AMEC Construction Management, Inc. was the construction manager at the Logan Airport Terminal E jobsite located in Boston, Suffolk County, Massachusetts.

30. At all times material the Defendant, AMEC Construction Management, Inc. had a duty to keep the jobsite reasonably safe and free from all foreseeable hazards.

31. On or about February 19, 2003, the Defendant, AMEC Construction Management, Inc., negligently breached said duty by failing to maintain said jobsite reasonably safe and free from all foreseeable hazards and by failing to enforce safety procedures on said jobsite.

32. On or about February 19, 2003, as a direct and proximate result of said negligence of the Defendant, AMEC Construction Management, Inc. the Plaintiff was caused to sustain serious personal injuries when his hand was caught in the conveyer machine.

33. As a result of said injuries, the Plaintiff was caused to incur and continues to incur medical expenses, has lost and continues to lose time and wages from his employment and has suffered and continues to suffer an impairment to his ability to enjoy life and attend to his usual activities.

34. The Plaintiff was in the exercise of due care and free of any comparative negligence at all times material herein.

35. The Plaintiff has fulfilled all conditions precedent to the bringing of this cause of action.

WHEREFORE, the Plaintiff John Carr demands judgment against the Defendant, AMEC Construction Management, Inc. in the amount of his damages together with costs, interests and reasonable attorney's fees.

- 4 -

MAR. 4. 2005 11:35AM     SI..NS DEMATIC LEGAL          NO. 1973   P. 10/11
MAR 5 05 THU 5:55 PM                         FAX NO.  010 913 5765        P. 10

THE PLAINTIFF JOHN CARR CLAIMS AND DEMANDS A TRIAL BY JURY ON HIS CAUSE OF ACTION.

Respectfully Submitted,
The Plaintiff,
By his attorney,

Brian C. Dever
BBO # 544203
KECHES & MALLEN, P.C.
122 Dean Street
Taunton, MA 02780
(508)822-2000

Date: ___2/14___, 2005

- 5 -

**Exhibit B**

```
 1    A.    Yes.

 2    Q.    When did the project finish?

 3    A.    2003 sometime.

 4    Q.    Would it have been the summer of 2003?

 5    A.    Yes, I believe it was.

 6    Q.    Do you know if it was the early summer

 7 or late summer?

 8    A.    I believe it was sometime in June.

 9    Q.    When you started the project before

10 September 11th, what was your understanding -- give

11 me the general understanding of what the project

12 was.  What were you doing there?

13    A.    A baggage conveyer system was being

14 installed.

15    Q.    And what was Shaughnessy's role in this

16 project?

17    A.    They were doing the installation

18 equipment.

19    Q.    And what other companies were involved

20 in the project?

21    A.    In the very beginning?

22    Q.    Yes.

23    A.    There was a company out of Texas that we

24 were working for.  The name's escaped me right now,
```

Page 104

```
 1      A.      About a foot.

 2      Q.      The next line indicates, Because line

 3   was stopped, put hand on pulley to check rattle.

 4   Is that portion of the statement an accurate

 5   description of what Mr. Carr did?

 6                   MR. DEVER:  Objection.

 7      A.      I believe so.

 8      Q.      And what's the basis of your belief?

 9      A.      Why else would he have his hands in

10   there?

11      Q.      Did he indicate this to you directly?

12      A.      No.

13      Q.      The next line reads, Line started

14   without warning.  Is that portion of the statement

15   an accurate description of what happened?

16      A.      Yes.

17      Q.      And what's your -- why do you believe

18   that to be the case?

19      A.      Cause it started very quickly.

20      Q.      And to your knowledge, were there any

21   warnings of any sort prior to the line starting?

22      A.      No.

23      Q.      If you turn to the next page at the top,

24   there's a -- there's a line that reads, Describe
```

1  unsafe acts.  Do you see that?

2     A.     Yes.

3     Q.     And under that, it says, Pulled off V

4  belt cover to inspect noise coming from belt.  Is

5  that an accurate reflection of what happened?

6                    MR. DEVER:  Objection.

7     A.     Yes.

8     Q.     Let's go back to Exhibit 8 for a moment,

9  Mr. Ryan.  Do you have Exhibit 8 in front of you?

10  If not, you can take a look at that.

11              Can you describe what pulling off the V

12  belt cover means by looking at Exhibit 8?

13     A.     Yes.

14     Q.     Where would the V belt cover be on this

15  picture?

16     A.     Right there.

17     Q.     Let the record reflect the witness is

18  pointing to the center of the top picture to the

19  yellow metal piece.

20              Would there normally be -- if you look

21  to the right of Exhibit 8, you'll see half of a

22  yellow piece that's cut off.

23     A.     Yes.

24     Q.     And that half seems to have a cover on

1    it.  Is that what you -- that's what you're

2    referring to when you mentioned --

3         MR. DEVER:  Objection.

4    Q.     -- V belt cover?

5    A.     Yes.

6    Q.     Okay.  And how would one take a V belt

7    cover off?

8    A.     There's two.  They're rubber actually,

9    and they kind of just go over and clip in.

10   Q.     So what would you do then to just

11   unclip?

12   A.     I would just lift the clip up, and it

13   would pop right off.

14        MR. DEVER:  Off the record.

15        (Discussion off the record.)

16   Q.     If you look back to Exhibit 9, under

17   paragraph B, it says, Describe unsafe conditions.

18   Next to that it says, No LOTO used, and then

19   there's an arrow to the word LOTO indicating lock

20   out/tag out.  Is this portion of the statement

21   correct?

22        MR. DEVER:  Objection.

23   A.     Yes.

24   Q.     Do you believe that failing to use lock

1    equipment.

2        Q.      Okay.  Let's just back up.  There have

3    been some questions about the change in lock

4    out/tag out procedure after Mr. Carr's accident.

5        A.      Yes.

6        Q.      In comparing the two procedures, did

7    both procedures require that an individual turn off

8    the power switch prior to working on a piece of

9    machinery?

10                 MR. DEVER:  Objection.

11       A.      In order to install a lock, you have to

12   turn off the power switch.

13       Q.      So both -- so after -- in both

14   procedures, after you turn off the power switch,

15   there was a step that required you to put a lock on

16   that power switch to make sure that it couldn't be

17   turned back on, right?

18       A.      Yes.

19       Q.      And this was part of the written

20   procedure that you saw prior to Mr. Carr's

21   accident, right?

22                 MR. DEVER:  Objection.

23       A.      Yes.

24       Q.      And both procedures also had a

1    requirement that you put a tag on the lock to

2    indicate that it was locked?

3        A.    Yes.

4        Q.    Okay.  And if Mr. Carr had turned off

5    the switch, the drive belt that he was working on

6    wouldn't have turned on, would it?

7        A.    No.

8        Q.    And if he locked it out in addition to

9    turning off the switch, there's no way that the

10   drive belt would have turned on, would it?

11       A.    No.

12       Q.    And if he had pressed the "E" stop,

13   there's no way that it would have turned on,

14   correct?

15              MR. DEVER:  Objection.

16       A.    By itself or with -- with the on/off

17   switch being off, too?

18       Q.    Let's say the on switch -- let's say the

19   switch is on and he pulled out the "E" stop.

20       A.    You actually push in the "E" stop to

21   stop the conveyer.  I believe the "E" stop can be

22   overridden by the computer.

23       Q.    Okay.  All right.  I think that's it.

24   RECROSS-EXAMINATION BY MR. DEVER:

1    Q.    But in terms of the specific testing

2    that was happening each day, would there be a

3    discussion amongst the Shaughnessy employees we're

4    testing this line?

5    A.    Not really, because the techs would be

6    testing different equipment all the time, and it

7    wasn't one specific piece of equipment that they'd

8    be testing, but you could tell everybody that they

9    were going to go and test one piece of machinery

10   that day, and that would be it.  The testing was

11   going on throughout the whole building.

12   Q.    And did all the Shaughnessy employees

13   know that there was testing going on throughout the

14   whole building?

15             MR. DEVER:  Objection.

16   A.    Pretty much everybody was aware that

17   there was testing going on.

18   Q.    How would they have been aware?

19   A.    It had been going on, and they were

20   aware that everything was live and anything could

21   turn on at any time.  That was discussed with all

22   employees.

23   Q.    When was that discussed?

24   A.    That was pretty much discussed every

1  day.

2      Q.     Would it be discussed at this morning

3  meeting?

4      A.     I can't say for sure.

5      Q.     But when you say "every day," would

6  there be other discussions that may not have

7  happened in the morning meeting in which this would

8  have been discussed?

9      A.     Most of the time I try to make sure that

10  everybody knew what equipment was being turned on

11  and off.

12      Q.     But apart from the specifics of which

13  equipment on a particular day, were there general

14  discussions about lines being live, as you say?

15      A.     All the lines had power to them and all

16  the lines could turn on at any time.

17      Q.     And it was your understanding that the

18  Shaughnessy employees knew this?

19      A.     Yes.

20              MR. DEVER:  Take a two-minute break

21  to use the men's room.

22              MR. O'MALLEY:  Sure.

23              (Recess taken.)

24              MR. O'MALLEY:  Could you read back

1      Q.      Do you recall ever seeing someone not

2  use the procedure in your presence?

3                MR. DEVER:  Objection.

4      A.      In my presence?  No.

5      Q.      To your knowledge, has Mr. Carr ever

6  used the lock out/tag out procedure before?

7      A.      I believe so.

8      Q.      What are you basing that belief on?

9      A.      I believe he locked out other machinery

10  during that project.

11      Q.      Do you recall seeing him lock out other

12  machinery?

13      A.      I believe so.

14      Q.      Do you remember any specific instance of

15  that happening?

16      A.      No.

17      Q.      What conversations, if any, did you have

18  with Mr. Carr about him locking out machinery on

19  occasions other than that of his accident?

20      A.      He was -- he was present for some of the

21  meetings that we discussed lock out/tag out.

22      Q.      Do you know if Mr. Carr ever checked --

23  ever used a lock out/tag out procedure when

24  checking a drive belt as he did in the case of the

1    Shaughnessy training on the Terminal "E" project?

2              MR. DEVER:  Objection.

3       A.     If training's a safety meeting, yes.

4       Q.     In the safety meeting, were there

5    times -- I believe you've testified there were

6    times during the safety meetings there were

7    discussions of lock out/tag out procedure?

8              MR. DEVER:  Objection.

9       A.     Yes, there was.

10      Q.     And from the time you started, your

11   first week during the installation process through

12   the time you left, which is just prior to the

13   completion of the conveyer belt, how many safety

14   meetings do you think you went to, weekly safety

15   meetings?

16      A.     Probably maybe a hundred.

17      Q.     And in those safety meetings, when, if

18   at all, was lock out/tag out procedures discussed?

19      A.     I'd say not till equipment was powered

20   up did we start talking about lock out/tag out.

21      Q.     So --

22      A.     So it was after September when the

23   equipment started running before we started to talk

24   about it.

1    Q.      Okay,

2              MR. DEVER:   '02?

3              THE WITNESS:   Yes.

4    Q.      How many different sessions were there

5  where it was discussed?

6    A.      In detail, not that many.

7    Q.      More or less than five?

8    A.      I would say probably -- probably five.

9    Q.      How about -- you said in detail.  How

10 about generally?

11   A.      Generally, it was talked about.

12   Q.      In these safety meetings or outside of

13 them?

14   A.      Outside of them.  A lot of the tag out

15 part of it might not have been discussed as much as

16 the lock out part of it.

17   Q.      Do you remember before you became a

18 foreman, when you were a millwright, do you

19 remember your foreman or the supervisor discussing

20 lock out/tag out procedures with you outside of the

21 weekly safety meeting?

22   A.      No.

23   Q.      How about after you became foreman and

24 then supervisor, do you remember speaking with

1    here that Mr. Carr was present.  Do you have any

2    recollection of him being at the meeting?

3        A.       No.  I think the accident already

4    happened before these meetings.

5        Q.       The accident happened the 19th, I

6    believe.

7        A.       Of February?

8        Q.       Yeah.

9        A.       Of '03?  I don't see his name here.

10       Q.       Do you have any recollection of him, of

11   where he was during this meeting?

12       A.       He was probably absent.

13       Q.       If a millwright wasn't present for one

14   of these weekly safety meetings, what happened?

15   Were there make-up sessions?

16       A.       No.  There wouldn't have been.

17       Q.       Okay.  Do you remember Mr. Carr being at

18   any weekly safety meeting where lock out/tag out

19   procedures were discussed?

20       A.       Yes.

21       Q.       Can you tell me specifically which

22   meetings?

23       A.       I can't tell you specifically.  I'd say

24   as soon as that equipment got powered up, I want to

1  by?

2      A.      Yes.

3      Q.      Okay.  And what you told him

4  specifically was, can you check out that rattling

5  guard?

6      A.      Yes.

7      Q.      All right.  Do you recall anything else

8  that you told him in that conversation

9  specifically?

10      A.      I told him to make sure he locked and

11  tagged it out before he worked on it.

12      Q.      Are you sure of that?

13      A.      Yes.

14      Q.      And that was when the machine -- the

15  equipment was running?

16      A.      Yes.

17      Q.      Okay.  And you didn't have any

18  conversations with him about pushing in the "E"

19  stop?

20      A.      No.

21      Q.      When you had this conversation with

22  Mr. Carr, was there anyone else in the area?

23      A.      No.

24      Q.      All right.  Was Mr. Garrity or

Page 235

```
 1       Q.      Okay.  And did you have an understanding

 2   that you were going to issue him a lock to do that

 3   work?

 4       A.      I -- I think I told him to go get his

 5   own lock and put it on, to go get a lock and put it

 6   on.

 7       Q.      You think, or you did?

 8       A.      I did.

 9       Q.      Okay.  Is that different from what you

10   told us a little while ago?  You told us a little

11   while ago that you had a conversation with him

12   about making sure he had put a lock on it.

13       A.      Yes.

14               MR. O'MALLEY:  Objection.

15       Q.      Are you now saying that in addition to

16   telling him to put a lock on it, you told him to go

17   get a lock?

18       A.      Yeah.  I told him to lock it out.  Those

19   are my words.  My words were, Lock it out.

20       Q.      Okay.  So I can ask you 40 million more

21   questions about this, but what you're sticking to

22   is you told John Carr, in the time frame you told

23   him to work on this rattling cover, to lock it out?

24       A.      To lock it out before he worked on it.
```

1      Q.      Do you -- just for the record, Mr. Ryan

2   made two X's on Exhibit 7, and the X's are just

3   above the D2 and D3, and they are representative of

4   Mr. Cameron and Mr. Garrity, correct?

5      A.      Hmmmm hmmm.

6              MR. DEVER:  Yes.

7      A.      Yes.

8      Q.      Was it your understanding that the belt

9   was turned on by Mr. Garrity and Mr. Cameron?

10     A.      Yes.

11     Q.      And that the belt was not turned on by

12   the Siemens people?

13     A.      That was my understanding.

14     Q.      What was your understanding of why they

15   were turning the belt on, if you have one?

16             MR. DEVER:  Objection.

17     A.      I believe they were continuing their

18   testing.

19     Q.      Okay.  How far away is the guard belt

20   that you asked Mr. Carr to check from the on/off

21   switch, roughly?

22             MR. O'MALLEY:  Let's actually put

23   another exhibit in.  This is number 8, I believe.

24             (Exhibit 8 marked for

1           identification.)

2      A.      I'd say within a foot.

3      Q.      This picture, is this generally

4  representative of where the guard belts were placed

5  in relation to the on/off switches at the Terminal

6  "E" project at Logan?

7      A.      The on/off switches were by all the

8  motors, yes.

9      Q.      So how far away?

10     A.      I'd say roughly within a foot.

11     Q.      How far away was the "E" stop button

12 from the guard belt?

13               MR. DEVER:  Objection.

14     A.      Depends on which part of the guard belt.

15 If it's the top part where the drive is, it's

16 within a foot.

17     Q.      To your mind, is the "E" stop visible if

18 one is standing in front of the guard belt?

19     A.      Yes.

20     Q.      And are the on/off switches in Exhibit 8

21 visible if one is standing in front of the guard

22 belt?

23     A.      Yes.

24     Q.      Is this generally the case with on/off

1  can either be shut off by an "E" stop, this is to a

2  particular segment --

3       A.     Yes.

4       Q.     -- or by the control room?

5       A.     Or by the control room or with the

6  on/off switch.

7       Q.     Or with the on/off switch?

8       A.     (Witness nods.)

9       Q.     Just to back up, if somebody presses the

10  "E" stop on a segment, can that line turn on if the

11  control room wants it to turn on?

12       A.     I don't believe so.

13       Q.     If somebody turns the line off, turns

14  the on/off switch off, can that line turn on?

15       A.     No.

16       Q.     And what's your -- why do you believe

17  this?

18       A.     Cause I believe it shuts the power off.

19       Q.     Is that something that the millwrights

20  were aware of?

21       A.     Yes.

22       Q.     And how were they aware of that?

23       A.     They were aware of what turns machines

24  off and on.

**Exhibit C**

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| JOHN CARR | ) | CIVIL ACTION NO: 05-10445-MLW |
|     Plaintiff | ) | |
| v. | ) | |
| | ) | |
| SIEMENS DEMATIC CORP. | ) | |
| AND AMEC CONSTRUCTION | ) | |
| MANAGEMENT, INC. | ) | |
|     Defendants | ) | |

**PLAINTIFFS' NOTICE OF TAKING 30(b)(6) DEPOSITION
OF DEFENDANT, SIEMENS DEMATIC CORP.**

Notice is hereby given that on **Friday, February 24, 2006 at 10:00 a.m.** at the office of

Keches & Mallen, P.C., 122 Dean Street, Taunton, Massachusetts, the plaintiff will take the

deposition upon oral examination of **Siemens Dematic Corp.,** by the person/persons most

knowledgeable of the following matters pursuant to Fed. R. Civ. P. 30(b)(6):

DEFINITION:

"Computer Logic" - The computer program and/or code which effects the way in which a

luggage conveyor operates and/or interacts with other pieces of equipment.

1.    The facts and circumstances surrounding the Plaintiff's accident of February 19, 2003

2.    The policies and procedures employed by the defendant with respect to posting warning
        signs regarding hazardous conditions or the jobsite.

3.    The policies and procedures employed by the defendant with respect to the supervision of
        the installation of the conveyer machine on the jobsite located in Logan Airport, Boston,
        Massachusetts.

4.    The contract between the defendant and any other entity relative to the Logan Airport
        Terminal E project.

5.    The identity of employees/agents of the defendant with supervisory responsibilities for
        the installation of the conveyer machines on the Logan Airport Terminal E project
        including work done on the computer logic of said machine.

6.    The identity of employees/agents of the defendant with supervisory responsibilities for
        the installation of the conveyer machines on the Logan Airport Terminal E project
        including the implementation of lock out/tag out procedures on the conveyor machines on
        the Logan Airport Terminal E project.

7.    The preparation of any reports of injury filed by or on behalf of Siemens Dematic Corp.

and the information contained therein, which have John Carr's accident of February 19, 2003 as their subject matter.

8. The preparation and/or generation of any and all investigative reports by any person or entity which has John Carr's accident as the subject matter.

9. The taking of any statement, written or oral, from any witnesses to John Carr's accident.

10. The schedule of work performed by on the project including but not limited to daily progress of the work.

11. The names of any employees of Siemens Dematic Corp. including, but not limited to, the name of the employees with responsibilities for supervising any work being done on the subject conveyer belt or computer logic program on the date of the Plaintiff's accident.

12. Any and all guidelines, instructions, warnings, or policies issued to the defendant relative to job safety on the on the Logan Airport Terminal E project.

13. Any and all incidents involving the subject conveyer machine at the Logan Airport Terminal E project.

14. The identities of any and all entities and/or persons for the defendant with responsibilities for inspecting the job site for safety concerns.

15. The identities of any and all independent contractors responsible for supervising the installation of the conveyer machines on the Logan Airport Terminal E project.

16. The identity of any and all persons who were servants, agents, or employees of the defendant who conversed with the Plaintiff on the subject job site from February 1, 2003 to February 19, 2003.

17. The issuance of any citations, warnings, or instructions to the defendant or any subcontractor relative to the supervision of the installation of the conveyer machine on the Logan Airport Terminal E project.

18. Any and all complaints of injury made to the defendant involving lock out/tag out procedures and/or implementation and/or requests for locks on the Logan Airport Terminal E project.

19. The scheduling of the work at Logan Airport Terminal E project.

20. The substance of all discussions held regarding the supervision of the installation of the conveyer machines during safety meetings, including any discussions regarding the lock out/tag out procedures, locks and/or the effect of working being conducted on the computer logic of the luggage conveyors.

21. The way in which the computer logic controls, relates to, effects or otherwise communicates with the luggage conveyors on Terminal E of Logan Airport.

22. The scope of any work being performed on the computer logic in the five days prior to the Plaintiff's accident.

- 2 -

23.   How any work on the computer logic prior to the Plaintiff's accident could affect the function of the TC-3 line, the TC-2line and any related safety features.

24.   Any communication of safety concerns regarding any work which was being done on computer logic in the five days prior to the Plaintiff's accident. DeTerra Court Reporting, a Notary Public for the Commonwealth of Massachusetts, or before some other officer authorized by law to administer oaths.  The oral examination will continue from day to day until completed.

The attention of Siemens Dematic Corp., is directed to Massachusetts Rules of Civil Procedure 30(b)(6) requiring a corporation to designate one or more officers, directors, managing agents, or other persons to testify on its behalf on the above-specified matters Massachusetts Water Resource Authority, through its designated persons, pursuant to Mass. R. Civ. P. 30(b)(6) is requested to bring to the deposition all documents listed on the attached Schedule "A."

You are invited to attend and cross-examine.

Respectfully Submitted,
By His Attorney,
KECHES & MALLEN, P.C.

Daniel M. Surprenant, Esq.
BBO#634616
122 Dean Street
Taunton, MA  02780
(508) 822-2000

**Exhibit D**



ROPES & GRAY LLP

ONE INTERNATIONAL PLACE     BOSTON, MA 02110-2624     617-951-7000     F 617-951-7050

BOSTON     NEW YORK     PALO ALTO     SAN FRANCISCO     WASHINGTON, DC     www.ropesgray.com

April 24, 2006

Gabriel D. O'Malley
(617) 951-7656
gabriel.o'malley@ropesgray.com

## BY MAIL AND FACSIMILE

Daniel M. Surprenant, Esq.
Keches & Mallen, P.C.
122 Dean Street
Taunton, MA  02780

Re:     Carr v. Siemens Dematic Corp., et al
        USDC C.A. No. 05-10445MLW
        Our File No.:  00965.00220

Dear Dan:

I write with respect to Plaintiff, John Carr's, Fed. R. Civ. P. 30(b)(6) Deposition Notice for a corporate representative for Siemans Dematic Corp ("Siemans").  As you know, we represent Siemans in the above-captioned matter.

Certain of the topics on which testimony is sought are objectionable.  I will address our specific objections to each topic in the Notice in the order in which they appear.  Siemans reserves the right to assert further objections at the time of, or prior to, the deposition.

**Topic 2:**

Siemans objects to this topic on the grounds that it is vague, ambiguous, and overbroad. Siemans objects to the term "jobsite" as vague and ambiguous, and interprets it to encompass that area of Logan Airport Terminal E where Plaintiff's accident occurred.  Siemans further objects to this topic to the extent that it calls for information that does not specifically relate to the conveyors at Logan Airport Terminal E on the grounds that such information is irrelevant and/or immaterial and not reasonably calculated to lead to the discovery of admissible evidence.

**Topic 3:**

Siemans objects to this topic on the grounds that it is overly broad and burdensome.  Siemans objects to this topic on the grounds that any inquiries that are not limited in time to the date of Plaintiff's accident and a reasonable time period preceding Plaintiff's accident are irrelevant and/or immaterial and not reasonably calculated to lead to the discovery of admissible evidence.

Daniel M. Suprenant, Esq.                    - 2 -                    April 24, 2006

**Topic 4:**

Siemans objects to this topic on the grounds that it is overly broad and burdensome. Siemans objects to this topic to the extent that it calls for information that does not specifically relate to the conveyors at Logan Airport Terminal E on the grounds that such information is irrelevant and/or immaterial and not reasonably calculated to lead to the discovery of admissible evidence.

**Topic 5:**

Siemans objects to this topic on the grounds that it is vague, overly broad, and burdensome. Siemans objects to this topic on the grounds that the term "supervisory responsibilities" is vague and on the grounds that the topic calls for a legal conclusion. Siemans further objects to this topic on the grounds that any inquiries that are not limited in time to the date of Plaintiff's accident and a reasonable time period preceding Plaintiff's accident are irrelevant and/or immaterial and not reasonably calculated to lead to the discovery of admissible evidence.

**Topic 6:**

Siemans objects to this topic on the grounds that it is vague, overly broad, and burdensome. Siemans objects to this topic on the grounds that the term "supervisory responsibilities" is vague and on the grounds that the topic calls for a legal conclusion. Siemans further objects to this topic on the grounds that any inquiries that are not limited in time to the date of Plaintiff's accident and a reasonable time period preceding Plaintiff's accident are irrelevant and/or immaterial and not reasonably calculated to lead to the discovery of admissible evidence.

**Topic 10:**

Siemans objects to this topic on the grounds that it is overly broad and burdensome. Siemans objects to this topic on the grounds that any inquiries that are not limited in time to the date of Plaintiff's accident and a reasonable time period preceding Plaintiff's accident are irrelevant and/or immaterial and not reasonably calculated to lead to the discovery of admissible evidence. Siemans further objects to this topic to the extent that it calls for information that does not relate specifically to the conveyors at Logan Airport Terminal E on the grounds that such information is irrelevant and/or immaterial and not reasonably calculated to lead to the discovery of admissible evidence.

**Topic 11:**

Siemans objects to the term "subject conveyor belt" as vague and ambiguous.

9878308_11.DOC

Daniel M. Suprenant, Esq.                    - 3 -                    April 24, 2006

**Topic 12:**

Siemans objects to this topic on the grounds that it is overly broad and burdensome.  Siemans objects to this topic on the grounds that any inquiries that are not limited in time to the date of Plaintiff's accident and a reasonable time period preceding Plaintiff's accident are irrelevant and/or immaterial and not reasonably calculated to lead to the discovery of admissible evidence.  Siemans further objects to this topic to the extent that it calls for information that does not specifically relate to the conveyors at Logan Airport Terminal E on the grounds that such information is irrelevant and/or immaterial and not reasonably calculated to lead to the discovery of admissible evidence.

**Topic 13:**

Siemans objects to the terms "incidents" and "subject conveyor machine" as vague and ambiguous.  Siemans objects to this topic on the grounds that any inquiries that are not limited in time to the date of Plaintiff's accident and a reasonable time period preceding Plaintiff's accident are irrelevant and/or immaterial and not reasonably calculated to lead to the discovery of admissible evidence.

**Topic 14:**

Siemans objects to this topic on the grounds that it is overly broad and burdensome.  Siemans further objects to this topic to the extent that it calls for information that does not relate to the conveyors at Logan Airport Terminal E on the grounds that such information is irrelevant and/or immaterial and not reasonably calculated to lead to the discovery of admissible evidence.

**Topic 15:**

Siemans objects to this topic on the grounds that any inquiries that are not limited in time to the date of Plaintiff's accident and a reasonable time period preceding Plaintiff's accident are irrelevant and/or immaterial and not reasonably calculated to lead to the discovery of admissible evidence.

**Topic 17:**

Siemans objects to this topic on the grounds that any inquiries that are not limited in time to the date of Plaintiff's accident and a reasonable time period preceding Plaintiff's accident are irrelevant and/or immaterial and not reasonably calculated to lead to the discovery of admissible evidence.

**Topic 18:**

Daniel M. Suprenant, Esq.                    - 4 -                    April 24, 2006

Siemans objects to this topic on the grounds that any inquiries that are not limited in time to the date of Plaintiff's accident and a reasonable time period preceding Plaintiff's accident are irrelevant and/or immaterial and not reasonably calculated to lead to the discovery of admissible evidence.

**Topic 19:**

Siemans objects to this topic on the grounds that any inquiries that are not limited in time to the date of Plaintiff's accident and a reasonable time period preceding Plaintiff's accident are irrelevant and/or immaterial and not reasonably calculated to lead to the discovery of admissible evidence. Siemans further objects to this topic to the extent that it calls for information that does not specifically relate to the conveyors at Logan Airport Terminal E on the grounds that such information is irrelevant and/or immaterial and not reasonably calculated to lead to the discovery of admissible evidence.

**Topic 20:**

Siemans objects to this topic on the grounds that any inquiries that are not limited in time to the date of Plaintiff's accident and a reasonable time period preceding Plaintiff's accident are irrelevant and/or immaterial and not reasonably calculated to lead to the discovery of admissible evidence.

**Topic 21:**

Siemans objects to this topic on the grounds that any inquiries that are not limited in time to the date of Plaintiff's accident and a reasonable time period preceding Plaintiff's accident are irrelevant and/or immaterial and not reasonably calculated to lead to the discovery of admissible evidence.

**Topic 23:**

Siemans objects to this topic on the grounds that any inquiries that are not limited in time to the date of Plaintiff's accident and a reasonable time period preceding Plaintiff's accident are irrelevant and/or immaterial and not reasonably calculated to lead to the discovery of admissible evidence.

*********************************

With respect to Schedule A, attached to the Notice, certain of the requests for documents are objectionable. I will address our specific objections to each request in the Notice in the order in which they appear. Siemans reserves the right to assert further objections at the time of, or prior to, the deposition.

9878308_11.DOC

Daniel M. Suprenant, Esq.                    - 5 -                    April 24, 2006

**Request 1:**

Siemans objects to this request to the extent that it calls for information that does not specifically relate to Plaintiff's accident on the grounds that such information is irrelevant and/or immaterial and not reasonably calculated to lead to the discovery of admissible evidence.

**Request 3:**

Siemans objects to this request to the extent that it calls for information that does not specifically relate to Plaintiff's accident on the grounds that such information is irrelevant and/or immaterial and not reasonably calculated to lead to the discovery of admissible evidence.

**Request 4:**

Siemans objects to this request on the grounds that any inquiries that are not limited in time to the date of Plaintiff's accident and a reasonable time period preceding Plaintiff's accident are irrelevant and/or immaterial and not reasonably calculated to lead to the discovery of admissible evidence.

**Request 5:**

Siemans objects to this request on the grounds that any inquiries that are not limited in time to the date of Plaintiff's accident and a reasonable time period preceding Plaintiff's accident are irrelevant and/or immaterial and not reasonably calculated to lead to the discovery of admissible evidence.

**Request 8:**

Siemans objects to this request on the grounds that any inquiries that are not limited in time to the date of Plaintiff's accident and a reasonable time period preceding Plaintiff's accident are irrelevant and/or immaterial and not reasonably calculated to lead to the discovery of admissible evidence.

**Request 10:**

Siemans objects to this request on the grounds that any inquiries that are not limited in time to the date of Plaintiff's accident and a reasonable time period preceding Plaintiff's accident are irrelevant and/or immaterial and not reasonably calculated to lead to the discovery of admissible evidence. Siemans further objects to this request to the extent that it calls for information that does not specifically relate to the conveyors at Logan Airport Terminal E on the grounds that

Daniel M. Suprenant, Esq.                    - 6 -                    April 24, 2006

such information is irrelevant and/or immaterial and not reasonably calculated to lead to the discovery of admissible evidence.

**Request 15:**

Siemans objects to this request on the grounds that any inquiries that are not limited in time to the date of Plaintiff's accident and a reasonable time period preceding Plaintiff's accident are irrelevant and/or immaterial and not reasonably calculated to lead to the discovery of admissible evidence.

**Request 16:**

Siemans objects to this request on the grounds that any inquiries that are not limited in time to the date of Plaintiff's accident and a reasonable time period preceding Plaintiff's accident are irrelevant and/or immaterial and not reasonably calculated to lead to the discovery of admissible evidence. Siemans further objects to this request to the extent that it calls for information that does not specifically relate to the conveyors at Logan Airport Terminal E on the grounds that such information is irrelevant and/or immaterial and not reasonably calculated to lead to the discovery of admissible evidence.

**Request 17:**

Siemans objects to this request on the grounds that any inquiries that are not limited in time to the date of Plaintiff's accident and a reasonable time period preceding Plaintiff's accident are irrelevant and/or immaterial and not reasonably calculated to lead to the discovery of admissible evidence. Siemans further objects to this request to the extent that it calls for information that does not specifically relate to the conveyors at Logan Airport Terminal E on the grounds that such information is irrelevant and/or immaterial and not reasonably calculated to lead to the discovery of admissible evidence.

**Request 19:**

Siemans objects to this request on the grounds that it is premature.

**Request 20:**

Siemans objects to each subpart of the request on the grounds that any inquiries that are not limited in time to the date of Plaintiff's accident and a reasonable time period preceding Plaintiff's accident are irrelevant and/or immaterial and not reasonably calculated to lead to the discovery of admissible evidence. Siemans further objects to the request to the extent that it calls for information that does not specifically relate to the conveyors at Logan Airport Terminal E on the grounds that such information is irrelevant and/or immaterial and not reasonably calculated to lead to the discovery of admissible evidence.

9878308_11.DOC

Daniel M. Suprenant, Esq.                    - 7 -                    April 24, 2006

**Request 23:**

Siemans objects to this request on the grounds that any inquiries that are not limited in time to the date of Plaintiff's accident and a reasonable time period preceding Plaintiff's accident are irrelevant and/or immaterial and not reasonably calculated to lead to the discovery of admissible evidence. Siemans further objects to this request to the extent that it calls for information that does not specifically relate to the conveyors at Logan Airport Terminal E on the grounds that such information is irrelevant and/or immaterial and not reasonably calculated to lead to the discovery of admissible evidence.

**Request 24:**

Siemans objects to this request on the grounds that any inquiries that are not limited in time to the date of Plaintiff's accident and a reasonable time period preceding Plaintiff's accident are irrelevant and/or immaterial and not reasonably calculated to lead to the discovery of admissible evidence. Siemans further objects to this request to the extent that it calls for information that does not specifically relate to the conveyors at Logan Airport Terminal E on the grounds that such information is irrelevant and/or immaterial and not reasonably calculated to lead to the discovery of admissible evidence.

Subject to, and without waiving, the objections set forth above, Richard Reinecke will be the Siemans designee for the topics set forth in the Notice. I am available to discuss the objections set forth above at your convenience.

Sincerely,

Gabriel O'Malley

9878308_11.DOC

**Exhibit E**

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

JOHN CARR                          )          CIVIL ACTION NO: 05-10445-MLW
     Plaintiff                 )
v.                                 )
                                   )
SIEMENS DEMATIC CORP.              )
AND AMEC CONSTRUCTION              )
MANAGEMENT, INC.                   )
     Defendants               )

## PLAINTIFFS' RE-NOTICE OF TAKING 30(b)(6) DEPOSITION OF DEFENDANT, SIEMENS DEMATIC CORP.

Notice is hereby given that on **Friday, July 28, 2006 at 10:00 a.m.** at the office of Keches & Mallen, P.C., 122 Dean Street, Taunton, Massachusetts, the plaintiff will take the deposition upon oral examination of **Rick Reineke, designee for Siemens Dematic Corp.,** of the following matters pursuant to Fed. R. Civ. P. 30(b)(6):

DEFINITION:

    "Computer Logic" - The computer program and/or code which effects the way in which a luggage conveyor operates and/or interacts with other pieces of equipment.

1.    The facts and circumstances surrounding the Plaintiff's accident of February 19, 2003

2.    The policies and procedures employed by the defendant with respect to posting warning signs regarding hazardous conditions or the jobsite.

3.    The policies and procedures employed by the defendant with respect to the supervision of the installation of the conveyer machine on the jobsite located in Logan Airport, Boston, Massachusetts.

4.    The contract between the defendant and any other entity relative to the Logan Airport Terminal E project.

5.    The identity of employees/agents of the defendant with supervisory responsibilities for the installation of the conveyer machines on the Logan Airport Terminal E project including work done on the computer logic of said machine.

6.    The identity of employees/agents of the defendant with supervisory responsibilities for the installation of the conveyer machines on the Logan Airport Terminal E project including the implementation of lock out/tag out procedures on the conveyor machines on the Logan Airport Terminal E project.

7.  The preparation of any reports of injury filed by or on behalf of Siemens Dematic Corp. and the information contained therein, which have John Carr's accident of February 19, 2003 as their subject matter.

8.  The preparation and/or generation of any and all investigative reports by any person or entity which has John Carr's accident as the subject matter.

9.  The taking of any statement, written or oral, from any witnesses to John Carr's accident.

10. The schedule of work performed by on the project including but not limited to daily progress of the work.

11. The names of any employees of Siemens Dematic Corp. including, but not limited to, the name of the employees with responsibilities for supervising any work being done on the subject conveyer belt or computer logic program on the date of the Plaintiff's accident.

12. Any and all guidelines, instructions, warnings, or policies issued to the defendant relative to job safety on the on the Logan Airport Terminal E project.

13. Any and all incidents involving the subject conveyer machine at the Logan Airport Terminal E project.

14. The identities of any and all entities and/or persons for the defendant with responsibilities for inspecting the job site for safety concerns.

15. The identities of any and all independent contractors responsible for supervising the installation of the conveyer machines on the Logan Airport Terminal E project.

16. The identity of any and all persons who were servants, agents, or employees of the defendant who conversed with the Plaintiff on the subject job site from February 1, 2003 to February 19, 2003.

17. The issuance of any citations, warnings, or instructions to the defendant or any subcontractor relative to the supervision of the installation of the conveyer machine on the Logan Airport Terminal E project.

18. Any and all complaints of injury made to the defendant involving lock out/tag out procedures and/or implementation and/or requests for locks on the Logan Airport Terminal E project.

19. The scheduling of the work at Logan Airport Terminal E project.

20. The substance of all discussions held regarding the supervision of the installation of the conveyer machines during safety meetings, including any discussions regarding the lock out/tag out procedures, locks and/or the effect of working being conducted on the computer logic of the luggage conveyors.

21. The way in which the computer logic controls, relates to, effects or otherwise communicates with the luggage conveyors on Terminal E of Logan Airport.

22. The scope of any work being performed on the computer logic in the five days prior to the

- 2 -

Plaintiff's accident.

23.    How any work on the computer logic prior to the Plaintiff's accident could affect the function of the TC-3 line, the TC-2 line and any related safety features.

24.    Any communication of safety concerns regarding any work which was being done on computer logic in the five days prior to the Plaintiff's accident. DeTerra Court Reporting, a Notary Public for the Commonwealth of Massachusetts, or before some other officer authorized by law to administer oaths. The oral examination will continue from day to day until completed.

The attention of Siemens Dematic Corp., is directed to Massachusetts Rules of Civil Procedure 30(b)(6) requiring a corporation to designate one or more officers, directors, managing agents, or other persons to testify on its behalf on the above-specified matters Siemens Dematic Corporation, through its designated persons, pursuant to Mass. R. Civ. P. 30(b)(6) is requested to bring to the deposition all documents listed on the attached Schedule "A."

You are invited to attend and cross-examine.

Respectfully Submitted,
By His Attorney,
KECHES & MALLEN, P.C.

Daniel M. Surprenant, Esq.
BBO#634616
122 Dean Street
Taunton, MA  02780
(508) 822-2000

## SCHEDULE A

1.    Copies of any and all written statements, signed or unsigned, and/or copies of any and all verbatim written transcriptions of any and all statements of the Defendant taken on a recording device, which are in the possession, custody or control of the Defendant or the Defendant's attorney(s).

2.    Copies of any and all written statements, signed or unsigned, and/or copies of any and all verbatim written transcriptions of any and all statements of any and all witnesses to the accident taken on a recording device, which are in the possession, custody or control of the Defendant or the Defendant's attorney(s).

3.    Copies of any and all written statements, signed or unsigned, and/or copies of any and all verbatim written transcriptions of any and all statements of the Plaintiff taken on a recording device, which are in the possession, custody or control of the Defendant or the Defendant's attorney(s).

4.    Any and all photographs which depict the location of the accident which forms the basis of this action and any and all photographs of the water accumulation on the floor from the beginning of the project to the present.

5.    Copies of any and all charts, maps, diagrams, blueprints, or drawings which depict the area where the Plaintiff alleges he was injured.

6.    All letters and statements of any kind whatsoever in the possession, custody or control of the Defendant, its agents, servants and/or employees which notified said Defendant of the accident alleged in the Plaintiff's Complaint.

7.    All reports of injury filed with or by the Defendant which have John Carr's industrial accident of February 19, 2003 as their subject matter.

8.    The minutes of all safety meetings conducted at the job site for one year before the Plaintiff's accident to the present.

9.    Any and all correspondence between the Defendant and O.S.H.A. which has John Carr's industrial accident as its subject matter.

10.   All correspondence between the Defendant and O.S.H.A. which has job safety as its subject matter.

11.   All correspondence between the Defendant and any person or entity which has John Carr's industrial accident as its subject matter.

12.   All accident reports generated by any person or entity which have John Carr's industrial accident as their subject matter.

13.   All investigative reports generated by any person or entity which have John Carr's industrial accident as their subject matter.

14.   All correspondence between the Defendant and any federal, state, municipal, or administrative agency which has John Carr's industrial accident as its subject matter.

15.   All directives, memoranda, postings, and other documents which have the supervision of

- 4 -

installation of conveyer machines on the Logan Airport Terminal E project as their subject matter.

16.  All directives, memoranda, postings, and other documents which have the supervision of work on the Logan Airport Terminal E project as their subject matter.

17.  Any work schedules, directives, memoranda, postings or employee lists which indicate the name of the employee(s), agent(s) or servant(s) of the Defendant responsible for safety at the job site.

18.  Any and all surveillance and/or investigative videotapes and/or photographs depicting the Plaintiff.

19.  Any and all documents which the Defendant intends to introduce as evidence in a trial of this action.

20.  Any and all contracts, other documents, or memoranda relative to any work performed at the Logan Airport Terminal E job site, including by not limited to:

a)  The contract between the Defendant and the Plaintiff's employer, if any;
b)  The contracts between the Defendant and any and all sub contractors performing installation of machines on the project;
c)  The contract between the Defendant and the owner;
d)  Any other contracts to which the Defendant was a party.

21.  Any and all policies of insurance, including but not limited to coverage selection pages or declaration sheets, or any other agreements under which the Defendant or any other entity may be liable to satisfy, in whole or in part, any judgment which may be entered in the instant litigation or to indemnity any other party as a result of the act alleged in the Plaintiff's Complaint.

22.  All documents reflecting any work being performed in the area where the Plaintiff alleges his accident occurred from 2 months prior to his alleged accident date of February 19, 2003 through the present.

23.  All documents reflecting the scheduling of any work relative to contracts at Logan Airport Terminal E project.

24.  Copies of any and all charts, maps, schematics, diagrams, blueprints, and/or drawings of any kind which depict, refer to and/or in any manner relate to the premises upon which the Plaintiff claims to have been injured.

You are invited to attend and cross-examine.

Respectfully Submitted,
The Plaintiff,
By His Attorney,

Daniel M. Surprenant
BBO# 634616
KECHES & MALLEN, P.C.
122 Dean Street
Taunton, MA  02780
(508) 822-2000

- 5 -

**Exhibit F**

Richard Reinecke

11/07/2006

Page 217

1              MR. O'MALLEY:   Objection

2    BY MR. DEVER:

3        Q    -- turn that on and then do 14, 15, 16?

4              MR. O'MALLEY:   Objection.

5              THE WITNESS:   All I am saying is it

6         is integral to TC3 and TC2.

7              Safety precautions -- safety

8         precautions, once again, were our

9         meetings; they were seasoned millwrights

10        and had worked on these jobs eight to

11        nine months.   They know the testing

12        procedures.

13             There is a light there, because --

14        just because there are lights there

15        don't mean they work.   They were in

16        testing and commissioning modes.

17             I don't know what else to tell you.

18   BY MR. DEVER:

19       Q    Let me take you there for a moment.

20   Earlier today we talked about the lights on the

21   poles that we see in Exhibit, photograph number

22   9?

23       A    Correct.

24       Q    In finished mode, how did that light

25   work?

Richard Reinecke

11/07/2006

Page 218

1      A    They are startup warning lights.  When

2    you pushed them, the conveyor system is starting

3    up.  There is a pause.  That light comes on; the

4    MCP alarm is going on on the ground floor,

5    warning there's going to be a startup in about

6    six seconds, probably.

7      Q    Between seven and eight seconds sound

8    about right?

9      A    Right.  You will hear, hear the

10   conveyors going bang, bang, bang, bang, bang,

11   bang.  They all just don't go click.  You hear

12   them cascading on.

13     Q    In its finished system?

14     A    Certified.

15     Q    Certified.  The warning lights come on

16   at the same time an audio alarm goes on, a horn?

17     A    Yes.

18     Q    Both are flashing or making noise for

19   somewhere between six to eight seconds before any

20   conveyors turn on?

21     A    Yes.

22     Q    All right.  Which means -- I am not

23   trying to be fresh here -- there is a

24   six-to-eight-second delay between the time that

25   someone signals the MCP panel and the belt

Richard Reinecke                                    11/07/2006

Page 219

1    drivers that we see uncovered in TC3-13 would

2    turn on?

3         A    Not necessarily.

4         Q    Okay.  Tell me what was wrong.

5         A    In the completed mode, where it's been,

6    say, commissioned, inspected and tested, yes,

7    when you hit the start button, you have a

8    six-second delay or whatever it is, if you are in

9    the test mode.  They can still force it on

10   without the alarms going on.

11        Q    Who is "they"?

12        A    Control room.  They still have it on

13   their screens.

14        Q    The Siemen's people in the control room

15   can force on the conveyor system without the

16   alarms signaling an advance warning?

17        A    I am sure it's in the programming, yes.

18        Q    At the time of this accident, were the

19   visual yellow-orange lights in the audio alarm

20   operational?

21        A    I have no idea.  I don't know.

22        Q    What would you need to know that?

23        A    What would I need?  I would have to see

24   it myself, when it started up.

25        Q    When do you think the yellow lights in

Richard Reinecke

Page 220

1    the audio alarm became operational?

2        A    In February, I really -- I really --

3    it's toward the tail end of testing, so an

4    inspection, I don't know.

5        Q    So you would expect that the yellow

6    lights and the audio alarm would be operational

7    but overridden in the time frame of the accident?

8        A    No.

9        Q    What are you telling me?

10        A    I really truly don't think they were

11    operational at the time we were testing.  They

12    might have been put up the day before.  I don't

13    know.

14            That is an electrical schedule.  I don't

15    know whether electrical installed their yellow

16    lights or not.  I don't know.  Just because I see

17    them, I don't have a visual recollection if they

18    were working or not.

19        Q    Okay.  We are going to take a break in

20    one second.

21            So we are clear on the record, these

22    photographs were taken long after the system

23    became operational?

24        A    Yes.

25        Q    I don't want to mislead you on that.

Richard Reinecke                                    11/07/2006

Page 148

1    the merge and cascade back, shutting down the

2    entire line?

3        A    Yes.

4        Q    Now, let me start off with a basic.  Do

5    you know what was going on at the time of John

6    Carr's accident?

7                 MR. O'MALLEY:  Objection.

8                 THE WITNESS:  I believe they were

9                 probably -- if it's February 2003, which

10                I would imagine they were testing it,

11                running them, and testing them.

12                Especially considering you know the

13                modifications that are being done by the

14                second contract, 20 feet away.

15                    Obviously, they have chopped into

16                their system, reconfigure or whatever.

17                Not this area, but I am not sure where

18                the incline went in or whatever.  I

19                imagine they were still testing.

20                    By that time we were testing,

21                verifying.  It could have been anywhere

22                from charting belts; they could have

23                been doing a final inspection.  I never

24                talked to Fran Ryan specifically what

25                task Carr was doing.

Richard Reinecke                                        11/07/2006

Page 132

1      Q    -- that Mr. Carr had been asked by his

2  boss, Mr. Reinecke, to remove one of the yellow

3  covers and to check the belt, and all he was

4  going to do was touch the belt to check its

5  tension, would that be a situation where you

6  would have thought that lockout/tagout was

7  necessary?

8              MR. O'MALLEY:  Objection.

9              THE WITNESS:  He is putting his hand

10             physically, with the cover off, on

11             the belt?

12  BY MR. DEVER:

13     Q    Touching it with his finger and touching

14  on the belt for tension?

15     A    Do I think in my opinion it should have

16  been a lockout?

17     Q    Yes.

18     A    Yes.

19     Q    Why is that?

20     A    Because the nature of the systems at

21  that point is they knew all these systems are

22  live.  Obviously, they have been working with it

23  for a long time.  They know everything is hot,

24  and to stick your hand in a moving -- something

25  that can move at any time, it's -- you put a lock

Legalink Boston, Merrill Legal Solutions
(617) 542-0039

Richard Reinecke                                    11/07/2006

Page 184

1   room and say it's all clear?

2               MR. O'MALLEY:   Objection

3

4   BY MR. DEVER:

5        Q    Correct?

6        A    They would radio control to say they had

7   walked the line.

8        Q    All right.  Then, presumably, at that

9   point in time the control room has the line in a

10  forced on position, so when the last E stop gets

11  pulled, and the last motor disconnect is in the

12  on position, then the line will activate?

13       A    No.

14       Q    What is wrong?

15       A    There's a pause.  It doesn't -- unless

16  this guy has a video camera on him, pulling that

17  E stop out and knowing he hit the computer, which

18  doesn't happen, and starting it simultaneously, I

19  find that hard to believe.

20       Q    I am not suggesting that at all.  You

21  tell me how it works.  When the Shaughnessy guy

22  would pull out the last E stop --

23       A    Yep.

24       Q    -- everything else is pulled out, and

25  all the motors are in the on position?

Richard Reinecke                                  11/07/2006

Page 185

1    A    Right.

2    Q    Something has to happen before that line

3    turns on.

4    A    Yes.

5    Q    What has to happen?

6    A    MCP panel motor starters have to get a

7    signal to turn on.  They don't turn on at once.

8    They go bing, bing, bing, bing.  You hear them

9    clicking in the motor control panel.

10   Q    Down in the first floor bag room?

11   A    Right.  Guys in the computer room, yes,

12   they could -- but they have to pick -- there is

13   not -- I don't know now to put it in terminology

14   of computer.  It's not a select all and say go.

15        They pick these components individually,

16   and say -- they send a signal to the motor

17   starter to activate that segment.

18   Q    Okay.  In this case, when you use the

19   term "to activate that segment," say, for

20   instance, that there are 60 segments of conveyor

21   line between the ticket counter and the merge?

22   A    Yep.

23   Q    Do they have to select 60?

24   A    Yes.  If there are 60 motors, they have

25   to select 60 pieces of equipment to send a signal

Richard Reinecke                                      11/07/2006

Page 186

1   to the motor switch down in the MCP panel to

2   start.

3        Q    Okay.  Now, the testimony we have so

4   far, sir, is that Shaughnessy guys, when they

5   pulled out the last E stop --

6        A    E stop, right.

7        Q    -- the TC2 line, the entire line in the

8   area that we showed you in the photographs --

9        A    Uh-huh.

10       Q    -- TC2 line came on?

11            MR. O'MALLEY:   Objection.

12  BY MR. DEVER:

13       Q    If I understand your answer, earlier

14  answer, that would mean that from the time,

15  assuming that all the E stops are pulled and all

16  motor disconnects are in the on position, when

17  the Shaughnessy fellow pulled out the last E

18  stop, there would have to be a pause for the

19  control room people to then select all the line

20  segments from the ticket counter down to the area

21  where the Shaughnessy guys were and activate the

22  line.  Right?

23       A    Yes.  But there is a sequence the way

24  they could have done that.  They can't start it

25  when the E stop is activated.

Richard Reinecke                                11/07/2006

Page 187

1          If there is 60 components, and they are

2     walking the line and going of 50, 58, to 76, the

3     control box guys are probably turning on

4     conveyors following them.  I don't know how

5     they -- he can't push an E stop in.

6          What I am saying is, E stop does not

7     control the on/off of that section of the

8     conveyor.

9          Q   I got you on that, I think.  Let me make

10    sure I get it right.  Say segment one is up by

11    the ticket counter, closest to the tickets?

12         A   Yes.

13         Q   Segment 60 is just beyond the merge we

14    are talking about?

15         A   Yep.

16         Q   Okay.  What you are saying is, if the

17    guys are walking the line from one up to 60,

18    as they -- as they -- if the motor disconnect is

19    in the on position, as they pop the E stop out to

20    disengage the E stop --

21         A   Right.

22         Q   -- would they, in this testing

23    procedure, say, "Okay.  Segment one is clear"?

24         A   They would tell them -- yes, they know

25    where they are.  Number one computer room knows

Richard Reinecke                                    11/07/2006

Page 188

1    where they are.

2         Q    By pulling the E stop?

3         A    They see it on the screen and know

4    exactly where they are.

5         Q    The control room might then turn on

6    segment one?

7         A    Their option; they could do it.

8         Q    Okay.  Or the Shaughnessy guys might

9    say, "Okay.  Turn on segment one"?

10        A    Yes, they could.

11        Q    Then what happens is that the control

12   room sends a signal to the MCP panel,

13   mechanically, and that --

14        A    Electronic.

15        Q    -- electronically turns on segment one?

16        A    Turns on the motor starter.

17        Q    That turn on the conveyor?

18        A    Turns on that section of the conveyor.

19        Q    As they work from one to, say 30, they

20   are pulling the E stops, and if the people in the

21   control room want to turn on those individual

22   segments, they are selecting each motor --

23        A    Yes.

24        Q    -- for each segment of conveyor belt to

25   turn on the motor, which in turn will turn on the

Richard Reinecke                                    11/07/2006

Page 189

1    conveyor belt?

2        A    Yes.

3        Q    Okay.  All right.  And so, in terms of

4    the Shaughnessy personnel and what they testified

5    to so far in this case, sir, is that the last

6    fellow from Shaughnessy testified that he pulled

7    out the last E stop in this room --

8        A    Okay.

9        Q    -- where this accident occurred on the

10   TC2 line?

11       A    Okay.

12           MR. O'MALLEY:   Objection.

13   BY MR. DEVER:

14       Q    And that TC2 line turned on.  Okay?

15       A    Uh-huh.

16       Q    That is yes?

17       A    Yes.

18       Q    Okay.  Now, if I understand your

19   testimony, for that to occur in the area where

20   this accident happened, it would mean that every

21   segment in that -- of TC2 line in that area had

22   to -- the motor disconnect had to be in the on

23   position, and all the E stops had to be pulled

24   out, as a base position.  Correct?  And then

25   another thing had to happen?

Richard Reinecke

11/07/2006

Page 190

1      A    No.   If the conveyor -- the conveyor is

2    not running at all, and all the motor disconnects

3    are on, and the E stops are pulled, nothing is

4    happening.   They could force on any piece they

5    want.   All this --

6      Q    Who is "they"?

7      A    The control room can force on any piece

8    of the conveyor.   He could have pulled the last

9    one, and they could force that on.   None of these

10   would be running.   It's up to them.

11     Q    None of the -- he could -- if he pulled

12   the last E stop on a segment south of the merge,

13   then the control room could say, "All right.   We

14   will turn that segment on, but nothing north of

15   that segment"?

16     A    Yes.   If they wanted to, they have that

17   option.

18     Q    All right.   If they wanted to, at that

19   point, turn the whole TC2 line on, once that last

20   E stop was pulled, so that all E stops and all

21   motor disconnects were in the on position, the

22   control room could turn the whole line on?

23     A    Yes.

24     Q    Okay.   Now, in order for that to occur,

25   in the control room what is actually happening

Richard Reinecke

11/07/2006

Page 191

1   is, when you pull the last E stop, a signal will

2   occur in the motor control room saying that E

3   stop has been pulled?

4        A    In the computer room, on their digital

5   screen it will show that that E stop is now

6   pulled out.

7        Q    Okay.  And therefore, they, the control

8   room, can then determine what they want to do in

9   terms --

10       A    Yes.

11       Q    -- of turning the line on?

12       A    They see on the screen that everything

13  is fine.

14       Q    They can turn whatever segment along

15  that line on as they choose?

16       A    Yes.

17       Q    Was it their practice, the control

18  room's practice, to then tell the Shaughnessy

19  guys what they were going to turn on?

20       A    That is -- I don't know.  I don't know

21  what their communication was.  That was -- that

22  was the communication between the control room

23  and the millwrights that were testing the line.

24  They have their own -- I don't know what the

25  procedure is.  They had their own thing going

Richard Reinecke                                    11/07/2006

Page 192

1    about how they wanted to do it.

2        Q   Who was in the control room?

3        A   There is --

4        Q   Siemen's guys?

5        A   There was Siemen's guys in there, yes.

6        Q   Who were they?

7        A   Multitude.  I couldn't tell you which

8    ones were there on a day.  When you are in a

9    testing procedure, there is different specialists

10   come in, programmers.

11           You know, like you are talking about

12   rate people that understand the rate and the flow

13   and whatnot.  So -- it's a lot of people in and

14   out of there.

15       Q   Are they all Siemen's people?

16       A   More or less, yes.  I could try to think

17   of some of the names.  Maybe Glenn Talent,

18   T-a-l-e-n-t.  That's the only one.  I just

19   remember the first name.  Glenn was there a lot.

20       Q   But in terms of, if anyone else was in

21   the control room, it was sort of coincidental the

22   fellows that would be looking at the panel and

23   deciding which segment of the line to turn on,

24   that would be Siemen's people?

25       A   Siemen's, yes.  They had their own

Richard Reinecke

11/07/2006

Page 193

1   protocol --

2       Q   Okay.

3       A   -- how to do it.

4       Q   Did you get involved in that at all?

5       A   No.

6       Q   All right.  You let the Siemen's

7   protocol people on the testing set up their own

8   protocol with the Shaughnessy people?

9       A   They had their criteria for testing the

10  systems, Siemen's criteria.  They all packaged.

11          And of course, the same thing, the

12  Siemen's people they went through the -- either

13  they went through me; they would ask me did I

14  need -- I am going to test this line; I need a

15  crew.

16          I'd go to the foremen or the general

17  foreman and say, "We need a crew tomorrow to test

18  this line."

19      Q   To work with the Siemen's people in the

20  control room?

21      A   In the control room.

22      Q   Each side would kind of hook up with a

23  walkie --

24      A   Walkie-talkies.

25      Q   And they could communicate?

Richard Reinecke

11/07/2006

Page 194

1      A    Yes.

2      Q    Here is the part of the equation that we

3 have gotten some testimony on, and I want you to

4 answer some questions on.

5           I am told that there were two -- there

6 was two guys from Shaughnessy that were walking

7 the TC2 line.

8      A    Okay.

9      Q    And their testimony is that they get in

10 the area where this accident occurs, and they

11 pull -- all the disconnects are in the on

12 position, and they pull out the last E stop, and

13 then --

14     A    On the TC2 line?

15     Q    On the TC2 line.

16           MR. O'MALLEY:    Objection

17 BY MR. DEVER:

18     Q    And the TC2 turns on.    Okay?

19     A    Uh-huh.

20     Q    That logically makes sense to you.

21 Correct?

22     A    They pulled the last E stop on the TC2,

23 and it turned on?

24     Q    Yes.

25     A    No.    It doesn't make sense to me.

Richard Reinecke

11/07/2006

Page 195

1    Q    Well, the illogical part is that

2    simultaneous with pulling out the last E stop the

3    line would not turn on.  Correct?

4    A    Correct.

5    Q    There would have to be a pause for

6    someone in the control room to register that the

7    light has reflected that the last E stop has been

8    pulled to then send a signal to the motor control

9    panel on the first floor baggage room to then

10   turn on --

11   A    Right.

12   Q    -- the individual segments?

13   A    Yes.

14   Q    Okay.  So that pause is what, five

15   seconds or ten seconds?

16   A    Could be anything.  Depends how fast he

17   is with his computer.

18   Q    Fair enough.  Now, here is the part that

19   I don't quite understand from some of the earlier

20   testimony:  The fellow for Shaughnessy indicates

21   that with regard to this conveyor system, he is

22   to the east side of the TC2 line --

23   A    Okay.

24   Q    -- so they indicated -- you see in one

25   of these pictures there is a -- see if I can find

Richard Reinecke                                    11/07/2006

Page 196

1    it -- there is a wall with a star on it.

2            See that?

3        A   Yes.  Right here (indicating) over here.

4        Q   What number is that?

5        A   Number 3.

6        Q   Okay.  And he indicates -- if we look at

7    the diagram, we will call that the east side of

8    the TC2 line.

9            He indicates that the two -- there were

10   two Shaughnessy guys over in there (indicating)

11   somewhere.  Okay?

12       A   Uh-huh.

13       Q   That it was their intent in working with

14   the Siemen's people in the control room to turn

15   on the TC2 line?

16           MR. O'MALLEY:  Objection

17   BY MR. DEVER:

18       Q   Okay.  Follow me?

19       A   I follow you.

20       Q   All right.  And that what you have told

21   us is that when the Shaughnessy guys pull out the

22   last E stop, that the control room would get the

23   signal, and then the control room, once they

24   realize the last E stop has been turned on,

25   control can turn on any segment along TC2,

Richard Reinecke                                                11/07/2006

Page 197

1    provided that the disconnects are on and the E

2    stops are all pulled?

3        A    Yes.  They have the option of turning

4    them on.

5        Q    I got that.  His testimony, the witness'

6    testimony, is at that moment in time, TC3 line is

7    off; it's not running.  All right?

8        A    Uh-huh.

9        Q    Instead of saying "off," I am going to

10   say it's not running.  Mr. Carr is checking a

11   belt, and didn't know it at that time, but Carr,

12   the witness -- but Carr is on his knees checking

13   the belt at about TC3-13.

14              MR. O'MALLEY:  Objection

15   BY MR. DEVER:

16       Q    You see that in the diagram?

17       A    Yes.

18       Q    That would be north of the merge on the

19   TC3 line?

20       A    Yes.

21       Q    And his testimony, the witness'

22   testimony is that only the segment that Mr. Carr

23   was working on, only that belt for that motor

24   that controlled that segment turned on?

25              MR. O'MALLEY:   Objection

Richard Reinecke

11/07/2006

Page 148

1    the merge and cascade back, shutting down the

2    entire line?

3        A    Yes.

4        Q    Now, let me start off with a basic.  Do

5    you know what was going on at the time of John

6    Carr's accident?

7            MR. O'MALLEY:   Objection.

8            THE WITNESS:  I believe they were

9            probably -- if it's February 2003, which

10           I would imagine they were testing it,

11           running them, and testing them.

12           Especially considering you know the

13           modifications that are being done by the

14           second contract, 20 feet away.

15           Obviously, they have chopped into

16           their system, reconfigure or whatever.

17           Not this area, but I am not sure where

18           the incline went in or whatever.  I

19           imagine they were still testing.

20           By that time we were testing,

21           verifying.  It could have been anywhere

22           from charting belts; they could have

23           been doing a final inspection.  I never

24           talked to Fran Ryan specifically what

25           task Carr was doing.

Richard Reinecke                                        11/07/2006

Page 149

1    BY MR. DEVER:

2        Q    Do you know what rate testing mode is?

3        A    Rate testing?

4        Q    Yes.

5        A    How many bags per minute and speed of

6    the belts.

7        Q    If I just wanted to run one segment on a

8    conveyor belt --

9        A    Uh-huh.

10       Q    -- is there a manual override to run

11   that one segment?

12       A    Manual override to run the one section?

13   They can -- the computer room can force on a

14   conveyor, only if the motor disconnection and E

15   stops are not engaged.

16            If either one is engaged, they have no

17   control whatsoever.  They can't force it on, but

18   they can force it on, yes.

19       Q    Give that to me again.  The computer

20   room can force on a conveyor only if --

21       A    -- E stop is not active, and motor

22   disconnect is in the off position.

23            If E stop is pulled, it's totally

24   independent.  They can't do a thing.  That is how

25   they do force it.

Richard Reinecke

11/07/2006

Page 150

1    Q    You have got to give it to me slowly.

2    A    Okay.

3    Q    The computer room can force on a

4  conveyor only if the E stop is engaged?

5    A    No.   Disengaged.

6        MR. O'MALLEY:   Put it in positive.

7        THE WITNESS:   I don't know how you

8        want me to term it.

9  BY MR. DEVER:

10    Q    When you say the term "Terminal E stop

11  disengaged" --

12    A    Not in the on position.   It's pulled

13  out.

14    Q    Okay.   When?

15    A    Push it in, its engaged; pull it out,

16  it's disengaged.

17    Q    If the conveyor is running, and I

18  want -- I have an emergency --

19    A    Yes.

20    Q    I want to stop the conveyor from

21  running, I am going to press in the E stop.

22  Correct?

23    A    Yes.

24    Q    Okay.   That will stop the conveyor?

25    A    Yes.

Richard Reinecke                                          11/07/2006

Page 151

1       Q    Okay.  And when I press in the E stop,

2  it's engaged?

3       A    Yes.

4       Q    And what it's engaged in is the stopped

5  position?

6       A    Yes.

7       Q    When the E stop is in the disengaged

8  position, it's been pulled out, and the conveyor

9  could run?

10       A    No.

11       Q    Correct me.

12       A    If you pull it out, the conveyor cannot

13  run yet.  Are you saying you pull it out and it

14  runs?

15       Q    Yes.

16       A    No.

17       Q    Tell me what is wrong.

18       A    You push the E stop in, like I said, and

19  it turns the conveyor off.  You pull the E stop

20  out and it disengages.  The conveyor cannot start

21  until you hit a start button.

22       Q    Where is the start button?

23       A    I will show you in one of the pictures.

24       Q    Go ahead, sir.  Basically it's right --

25  any picture I have you can mark on it.  If I have

Richard Reinecke                                    11/07/2006

Page 152

1    a better picture let me know.

2         A    I think it's this (indicating) one.

3    It's a yellow box.

4         Q    Hold on a second.  I had more pictures,

5    and maybe -- that we weren't using.  Like, for

6    instance, that one (indicating), does that help?

7         A    That's it right there.

8                   MR. DEVER:  Why don't we mark that.

9

10                  (Reinecke Exhibit 12:

11                   Marked for identification.)

12

13   BY MR. DEVER:

14        Q    Sir, I am going to show you what has

15   been marked as Reinecke Exhibit Number 12, and

16   you were talking about an E stop.  Do you see an

17   E stop in the picture?

18        A    That figures, no.

19        Q    You are also talking about a start

20   button?

21        A    Yes.

22        Q    Do you see a start?

23        A    As a matter of fact, it is here.  This

24   (indicating) is all one unit.

25        Q    Just circle that whole unit --

Richard Reinecke                                    11/07/2006

Page 153

1      A    Okay.

2      Q    -- nice and dark so we can see it.

3    There it looks like there are four buttons?

4      A    Yes.

5      Q    All right.  The bottom one appears to be

6    red?

7      A    That's an orange button.

8      Q    What is that (indicating)?

9      A    That's a jammed signal or if something

10   jams, this light will come on.

11     Q    What color is above that, looks like

12   black?

13     A    This is the -- I don't know -- I

14   can't --

15     Q    All right.  Color above that?

16     A    That's a green -- that's a green start

17   button.

18     Q    Okay.

19     A    And above that is the E stop.

20     Q    The E stop again gets pulled out?

21     A    Gets pulled out and is disengaged.

22     Q    Show me the E stop.

23     A    Right here (indicating).  When it's

24   disengaged it's not lit.  When it's engaged, and

25   pushed it lights, a bright red right.

Richard Reinecke

11/07/2006

Page 154

1    Q    Okay.  I've got to get the terminology

2  right before we break here.  If the E stop is

3  engaged, it's engaged in the stopped position, at

4  which time it's pushed in.  Correct?

5    A    Yes.

6    Q    Is it lit up at that time?

7    A    When it's pushed in, yes.

8    Q    Okay.  When it's disengaged you pull it

9  out, and the light shuts off?

10   A    Correct.

11   Q    All right.  But you said that if someone

12 has hit the E stop and stopped the line --

13   A    Yes.

14   Q    -- then wants to turn the line back on,

15 they pull out the E stop?

16   A    Yes.

17   Q    That will not, in and of itself, engage

18 the line?

19   A    No, it won't.

20   Q    You need to take an additional step,

21 which is to press the start button?

22   A    The green start button in this exhibit.

23   Q    Will that start the entire line?

24   A    E stop will -- yes.  You are into the --

25 Yes.  You go -- it goes into the cascade mode

Richard Reinecke                                    11/07/2006

Page 155

1    again, because now it's got -- it's stopped, and

2    the bags are going to hit in front of the --

3    whatever -- north, again blocking the photo eye,

4    which is going to cascade it back again.

5         Q    Covering this little area we are talking

6    about, the computer room can force on a conveyor

7    only if the E stop has been pulled out and in a

8    disengaged position.  Correct?

9         A    Yes.

10        Q    And then you said something about the

11   motor disconnect.

12        A    Has to be on.

13        Q    Is that pushing the green button on?

14        A    No.  The motor disconnect in this

15   exhibit is this yellow-gray box with a red

16   switch.

17        Q    Okay.  Put a square around --

18        A    That's a motor disconnect switch.

19   That's got an on/off position with a hole for a

20   lock.

21        Q    Okay.  The on/off switch, is the on/off

22   switch for a specific segment of a conveyor?

23        A    It's for that segment's motor.

24        Q    Okay.  If that segment is disconnected,

25   then even if the computer room is saying it's to

Richard Reinecke

11/07/2006

Page 156

1    be in the forced on position, it will not turn on

2    that segment, because the motor disconnect is in

3    the off position?

4        A    Correct.  It cannot force it.

5        Q    Okay.  So if that segment, if the motor

6    is on, and the E stop is pulled, and the computer

7    room has the conveyors in a forced on position,

8    that segment will turn on?

9        A    No.  That segment -- that segment, even

10   if they are in the forced on position, he pushes,

11   engages the E stop --

12       Q    No.  No.  No.  Go ahead.

13       A    Well, if he engages it and pulls it out,

14   it will not start, no matter if it's in the

15   forced position.

16       Q    Let me see if I get the scenarios right.

17       A    Sure.

18       Q    If the conveyor belt is in the forced on

19   position, and they are running the conveyor belt,

20   and in order for those conveyor belts to run,

21   each segment motor connection has to be in the on

22   position.  Correct?

23       A    Yes.

24       Q    Okay.  And then someone hits an E stop,

25   and engages the E stop, and the line will shut

Richard Reinecke                                11/07/2006

Page 157

1   down.  Correct?

2       A    That segment will shut down.

3       Q    That segment where the E stop is

4   controlled?

5       A    Yes.

6       Q    Okay.  Now, when you then pull the E

7   stop out --

8       A    Yes.

9       Q    -- to disengage it --

10      A    Yes.

11      Q    -- and the motor disconnect has remained

12  in the on position --

13      A    Yes.

14      Q    -- then that segment will start to move

15  again, as long as the computer room has the

16  conveyor in the forced on position?

17      A    No.

18      Q    What is wrong?

19      A    You can't -- how do I word this?  I am

20  trying to figure it out here.

21          When E stop is engaged and disengaged,

22  basic terminology, it shuts down the motor

23  starter in the -- in the motor control panel.

24      Q    Goes to the off position?

25      A    When it's engaged and disengaged, that's

Richard Reinecke                                    11/07/2006

Page 158

1    how it stops it.  It stops the starter in the

2    motor control panel.

3        Q    Right.

4        A    That's what that does.  For the motor

5    starter to work again, the only way it can be

6    triggered is by the green start button or the

7    control room.  Has nothing to go with -- the E

8    stop has nothing to do with restarting the system

9    segment.

10            It shuts it down, and it keeps it down

11   and until you start it from the control room or

12   MCP panel or that.

13       Q    So, for instance, if at the time of

14   Mr. Carr's accident --

15       A    Uh-huh.

16       Q    -- the TC2 and TC3 lines were in a

17   forced on --

18       A    Uh-huh.

19       Q    -- format --

20       A    Yes.

21       Q    -- and the Shaughnessy millwrights had

22   pulled the E stops --

23       A    Got it.

24       Q    -- as they were going down the line, and

25   as they were making sure that the line was clear,

Richard Reinecke                                    11/07/2006

Page 159

1   they were pulling out the E stops?

2       A   Right.

3       Q   Disengaging them?

4       A   Right.

5       Q   What you are telling me is the conveyor

6   segments would not turn on until they also

7   pressed the green start button for each segment?

8       A   Right.

9       Q   Or the control room was forcing on that

10  conveyor?

11      A   Yes.

12      Q   Okay.

13          MR. O'MALLEY:   I'd just like to

14      clarify his previous testimony.   You

15      indicated that the motor disconnect also

16      relates to this, and that has to be in

17      the on position?

18          THE WITNESS:   Yes.   It has to be in

19      the on position.

20

21  BY MR. DEVER:

22      Q   But what you are telling us, and correct

23  me, because you are the expert in this, if the

24  motor, the knob itself --

25      A   This knob --

Page 160

1    Q    Yes.

2    A    -- that we drew the square around?

3    Q    Yes.  If that is in the on position,

4    and --

5    A    Uh-huh.

6    Q    -- and then someone hits the E stop --

7    A    Uh-huh.

8    Q    -- the knob doesn't change positions?

9    A    No.

10    Q    It's still in the on position?

11    A    Yes.

12    Q    Then when you pull the E stop out --

13    A    Right.

14    Q    -- that conveyor segment is not going to

15    turn on unless you do one of two things.  Either

16    hit the green start button or the computer room

17    is forcing that segment on?

18    A    Yes.

19    Q    And logically, if no one hit the green

20    start button to turn on a particular segment, and

21    someone disengaged the E stop, that would tell

22    you that the control room forced on that segment?

23              MR. O'MALLEY:  Objection.

24    BY MR. DEVER:

25    Q    You can answer.

**Richard Reinecke**

Page 161

1      A    I would assume, yes, because that's the

2   only two ways you can really start it.

3            MR. DEVER:  Thank you, sir.  Let's

4        take a break.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25